**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARIANO TORRES and LESTER WILSON;

          *Plaintiffs,*

    v.

JAMES CARLSON, AIDAN PARISI, GRANT
MINER, CATHERINE )CURRAN-GROOME,
PEOPLE'S FORUM, INC., LISA FITHIAN,
GABRIEL YANCY, ETHAN CHOI, and JOHN
DOES 1–40,

          *Defendants.*

**Case No. 25-cv-3474 (CM)**

**Oral Argument Requested**

---

**DEFENDANTS CARLSON, PARISI, FITHIAN, AND CHOI'S**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

---

**COHEN&GREEN P.L.L.C.**
J. Remy Green
1639 Centre St., Suite 216
Ridgewood, New York 11385
t: (929) 888-9480

October 20, 2025

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................................ii

TABLE OF AUTHORITIES .........................................................**Error! Bookmark not defined.**

PRELIMINARY STATEMENT .............................................................................................1

INCORPORATION BY REFERENCE...................................................................................1

FACTUAL SUPPLEMNT..........................................................................................................2

      A.     Protests at Hamilton Hall.................................................................................2

      B.     Plaintiffs make no allegations at all about Fithian. .......................................4

      C.     Plaintiffs' allegations about Carlson and Choi do not include any act joining in any conspiracy to engage in violence. ........................................................5

      D.     Plaintiffs' allegations about Parisi do not involve any conduct targeted at Plaintiffs, or entry into any conspiracy..............................................................6

      E.     For the Individual Defendants, Plaintiffs specifically plead there was no conspiracy to bar travel. .......................................................................................7

ARGUMENT ..........................................................................................................................7

      I.     Plaintiffs' State Law Claims Require the Court to Accept the Vague, Undefined Conspiracy Plaintiffs Allege.................................................................................................8

      II.     Plaintiffs' § 1985 Conspiracy Claim is Frivolous. ................................................8

      A.     Plaintiffs affirmatively allege there was no violation of the right to travel. ..............9

      B.     Plaintiffs fail to allege any facts supporting a meeting of the minds. ........................9

C.      Plaintiffs affirmatively allege that any supposed conspiracy had a different objective than violating rights........................................................................................10

D.      Plaintiffs do not plausibly allege any racial motivation or agreement to racially motivated conduct by Individual Defendants...........................................................12

III.    Plaintiffs Do Not Plausibly Allege Intentional Infliction of Emotional Distress. ..........13

IV.    Plaintiffs Do Not Plausibly Allege the People who Assaulted Them are Defendants Carlson and Choi.......................................................................................................................15

V.    The Court Should Award Mandatory Anti-SLAPP Fees.....................................................16

A.      Brief background on the anti-SLAPP law...............................................................16

B.      The Court should grant mandatory fees here. ........................................................17

CONCLUSION.............................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
421 U.S. 240 (1975)..................................................................................................................18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................4, 9

*Bell v Hood*,
327 US 678 (1946)....................................................................................................................8

*Bernardi v NY State Dept. of Corr. & Community Supervision*,
2021 US Dist LEXIS 95225 ....................................................................................................14

*Bobulinski v Tarlov*,
758 F Supp 3d 166 (SDNY 2024) (Oetken, J.) ...........................................................17, 18, 19

*Bray v Alexandria Women's Health Clinic*,
506 US 263 (1993)......................................................................................................10, 11, 12

*Button v NY Times Co.*,
2025 US Dist LEXIS 180601 (SDNY Sep. 15, 2025)...............................................................19

*Canel v. Art Inst. of Chicago*,
No. 23 CV 17064, 2025 WL 564504 (N.D. Ill. Feb. 20, 2025) ...............................................12

*Collier v Ram Partners, Inc.*,
159 F Supp 2d 889 (D Md 2001) .....................................................................................14, 15

*Collins v Giving Back Fund*,
2019 US Dist LEXIS 132088 (SDNY Aug. 6, 2019)...............................................................13

*Colon v Wal-Mart Stores*,
182 Misc 2d 921 (Sup Ct, Montgomery County 1999).............................................................15

*Comyack v Giannella*,
2020 N.J. Super. LEXIS 49 (Super Ct Apr. 21, 2020) ...........................................................16

*Cook v Emblem Health Servs. Co., LLC*,
59 Misc 3d 1209[A] (Sup Ct, NY County 2018).....................................................................14

*Dolan v. Connolly*,
794 F.3d 290 (2d Cir. 2015) .....................................................................................................9

*Farbstein v Hicksville Pub. Lib.,*
  323 F Supp 2d 414 (EDNY 2004)................................................................8, 9

*Goldstein v Held,*
  93 AD3d 689 (2d Dept 2012) ...........................................................................17

*Graham by Graham v Guilderland Cent. Sch. Dist.,*
  256 AD2d 863 (3d Dept 1998) .........................................................................14

*Heilbut v Cassava Scies., Inc.,*
  778 F Supp 3d 551 (SDNY 2025) ...............................................................18, 19

*Howell v NY Post Co.,*
  81 NY2d 115 (1993) ..........................................................................................13

*Isaly v Garde,*
  83 Misc 3d 379 (Sup Ct, NY County 2024) ...................................................17

*James v Artuz,*
  1998 US Dist LEXIS 1277 (SDNY Feb. 6, 1998)..............................................9

*Landau v. Corp. of Haverford Coll.,*
  780 F. Supp. 3d 548 (E.D. Pa. 2025).................................................................6

*Mercado v PRRC, Inc.,*
  2015 US Dist LEXIS 152511 (D Conn Nov. 10, 2015)....................................15

*Mizrahi v Leon Baer Borstein, Gorstein & Sheinbaum,*
  2014 NY Slip Op 31485[U] (Sup Ct, NY County 2014)..................................14

*Murchinson Ltd. v Nano Dimension Ltd.,*
  2025 US Dist LEXIS 92192 ...............................................................................17

*Rivera v Baccarat, Inc.,*
  1996 US Dist LEXIS 6355 (SDNY May 10, 1996)............................................15

*Rothman v City of NY,*
  2020 US Dist LEXIS 223270 (SDNY Nov. 30, 2020) ........................................1

*Sanders v Grenadier Realty, Inc.,*
  367 F App'x 173 (2d Cir 2010)..........................................................................12

*Shukla v. Deloitte Consulting LLP,*
  2020 US Dist. LEXIS 104555, 2020 WL 3181785 (SDNY June 15, 2020)......14

*Snyder v. Phelps,*
  562 US 443 (2011)...........................................................................8, 13, 14, 15

*Southampton Day Camp Realty, LLC v Gormon,*
   118 AD3d 976 (2d Dept 2014) .................................................................................. 16, 18

*Webb v Goord,*
   340 F3d 105 (2d Cir 2003) ...................................................................................... 10

*Williams v City of Mount Vernon,*
   428 F Supp 2d 146 (SDNY 2006) ............................................................................ 13

*Williams v Port Auth.,*
   880 F Supp 980 (EDNY 1995) ................................................................................ 15

**Statutes**

42 U.S.C. § 1985 .................................................................................................. 8, 10, 11

42 U.S.C. § 1985(3) ................................................................................................. 8, 10

42 U.S.C. § 1985's .................................................................................................... 8

42 U.S.C. § 1986 ...................................................................................................... 8

N.Y. Civ. R. L. § 70-a ............................................................................................ 16, 17

N.Y. Civ. R. L. § 70-a(1)(a) .................................................................................... 17

N.Y. Civ. R. L. § 76-a(1)(a)(1)-(2) .......................................................................... 17

N.Y. Civ. R. L. § 76-a(1)(b) .................................................................................... 17

**Other Authorities**

*The Cox Commission Report: Crisis at Columbia. Report of the Fact-Finding Commission Appointed to Investigate*
   *the Disturbances at Columbia in April and May 1968,* COLUMBIA UNIVERSITY (1968) ........................... 2

CPLR 3211(g) ....................................................................................................... 16, 17, 18

CPLR 3212(h) ........................................................................................................ 17

Elizabeth M. Jaffe, *Sticks and Stones May Break My Bones but Extreme and Outrageous Conduct Will Never*
   *Hurt Me: The Demise of Intentional Infliction of Emotional Distress Claims in the Aftermath of* Snyder v.
   Phelps, 57 Wayne L. Rev. 473, 475 (2011 ......................................................................... 13

Fed. R. Civ. P. 11 ................................................................................................... 8

Fed. R. Civ. P. 12 ................................................................................................... 18

Johanna Lee, *Mandela Hall: A History of the 1985 Divest Protests,* COLUMBIA SPECTATOR (Apr. 13,
   2016) ............................................................................................................... 3

John Kifner "Columbia's Radicals of 1968 Hold a Bittersweet Reunion," NEW YORK TIMES (April 28, 2008) ..................................................................................................................................2

Paul Starr, *How the '68 Uprising Looks Today*, COLUMBIA COLLEGE TODAY (2018) .................................3

## PRELIMINARY STATEMENT

As set out in Defendant The People's Forum's ("TPF") motion to dismiss (ECF No. 36-1, "TFP MTD"), this suit is a naked assault on the right to free speech. More, it is — as this Court has described similar suits in the past — a "violation of th[e] principle" represented by the admonition, "Don't make a federal case out of that." *Rothman v City of NY*, 2020 US Dist LEXIS 223270, at *1 (SDNY Nov. 30, 2020).

At best — even largely taking the allegations at face value — Plaintiffs allege a broader political movement, and a side personal conflict during a political action. But they then declare, without any factual or legal support, that having engaged in *any* political advocacy around Palestine and Israel (at least, if the person falls on a particular side of that cultural conflict), that person has entered into a conspiracy to enact racial violence against not just Jews, but anyone with a vague, perceived affiliation with Jews.[1]

Nothing in the First Amended Complaint (ECF No. 27; "FAC") provides any basis for federal jurisdiction. There is nothing here to make a federal case out of, and Plaintiffs do not succeed in doing so. Plaintiffs' simple assault claims against *some* Defendants can and should proceed in state court, if that is the path Plaintiffs chose. But there is no basis for claims to proceed here. The Court should grant the motions to dismiss.

## INCORPORATION BY REFERENCE

In the interest of preserving space and time, Defendants Carlson, Parisi, Fithian, and Choi (together, "Individual Defendants") incorporate by reference TPF's motion by reference here, and

---

[1] As discussed below, Jewishness and support for the State of Israel are largely and uncritically conflated throughout Plaintiffs' complaint.

only repeat as necessary for context,[2] and elaborate as necessary.  Accordingly, the factual portion below begins where the TPF MTD leaves off, as do the legal arguments.  And similarly, that means that the Court should likely begin reading with TPF's papers before reading Individual Defendants'.

## FACTUAL SUPPLEMNT

As set out in the TPF MTD, Plaintiffs allege a conspiracy by Columbia students to engage in political advocacy at Columbia, and engage in direct action "'to seize and hold Hamilton Hall until such time as Columbia acquiesced to' certain policy demands."  TPF MTD at 3-4, *citing, e.g.,* FAC ¶¶ 154 and 135.

### A.  Protests at Hamilton Hall.[3]

Protests that involve seizing Hamilton Hall have a relevant history.  It is a history that reflects an acceptance (at least for a time) by Columbia that students might take some direct action like the occupation alleged here.

In 1968, Columbia Students occupied the building in protest of the university's ties to military research, the broader Vietnam War, and related issues, with protests beginning within three weeks of Dr. King's assassination.  *See generally, e.g.,* John Kifner "Columbia's Radicals of 1968 Hold a Bittersweet Reunion," NEW YORK TIMES (April 28, 2008).  That stand off — and the violent repression it engendered — led to the formation of the current, representative University Senate.  *See generally, e.g., The Cox Commission Report: Crisis at Columbia. Report of the Fact-Finding Commission Appointed to Investigate the Disturbances at Columbia in April and May 1968,* COLUMBIA UNIVERSITY (1968).

The hall was again at the center of a student protest/occupation in 1985, when the Hall was dubbed "Mandela Hall" and students demanded the University divest from investments supporting

---

[2] *Accord* Individual Rules of the Hon. Colleen McMahon § V(D) ("You can also save pages by not telling the Court the obvious – there is no need to recite the standards for granting, e.g., a motion to dismiss, a motion for summary judgment, a motion for reconsideration…").

[3] Individual Defendants adopt the way Plaintiffs refer to the building, for clarity.

the Apartheid government then in power in South Africa.  *See generally, e.g.,* Johanna Lee, *Mandela Hall: A History of the 1985 Divest Protests*, COLUMBIA SPECTATOR (Apr. 13, 2016).  That occupation lasted 21 days — and in fact, led to Columbia becoming the first major American university to divest from South Africa (a result that, with the benefit of hindsight, is a significant honor).  *Id.*  And, here, the decision to rename the Hall "Hind's Hall" cannot be read as anything other than an explicit echo of the 1985 occupation.  FAC ¶ 135.

As noted above, that history reflects — or at least, reflected until now — a fundamental understanding in the Columbia community of the role of occupation as direct action.  The 1968 occupation led directly to Columbia "adopt[ing] changes in governance — such as the creation of the University Senate — that demonstrated receptivity to greater participation" by students demanding political action.  Paul Starr, *How the '68 Uprising Looks Today*, COLUMBIA COLLEGE TODAY (2018) (noting "If you know about it only vaguely or picture it in a gentle light, the student revolt at Columbia in April 1968 might seem like a romantic episode in that era's youthful rebellion. But it was a deadly serious confrontation — electrifying to people who supported the revolt; horrifying to others who saw it as evidence of a widening gyre of instability and violence in America.").[4]

In short, occupation of Hamilton Hall is a well-trod tradition, particularly around University investments that support (to the minds of the protesters) unjustified military action abroad.  And the resolution of the 1968 occupation reflected an acceptance of a kind of American Revolution in miniature — to abuse an analogy and paraphrase, when in the course of student events, it becomes necessary for a student body to demand change from the university, a decent respect to the opinions of mankind requires that they should occupy Hamilton Hall.

---

[4] *Available at* https://www.college.columbia.edu/cct/issue/spring18/article/how-68-uprising-looks-today.

Some of the Individual Defendants — accepting the complaint's allegations as true — participated in a plan to occupy Hamilton Hall to demand divestment from Israel's government; much as students did in 1968 with Vietnam and the United States military, or in 1985 with Apartheid South Africa. Indeed, the FAC itself incorporates this idea when describing Defendants' goals: The actions were intended as a "continuation of the Vietnam antiwar movement and the movement to divest from apartheid South Africa," and the communication saying so "typified a strategy … to mimic the rhetoric of political protest movements (particularly the protest movements against the Vietnam War and South African apartheid)." FAC ¶ 51.[5]

### B. Plaintiffs make no allegations at all about Fithian.

Defendants solely allege "though Fithian stayed outside of Hamilton Hall during the siege, she had a material role in coaching, training, and directing the Occupiers on how to storm and seize Hamilton Hall and how to bar the doors so that no one could enter or leave, based on her years of experience agitating and protesting." FAC ¶ 128. That is, they specifically allege that she did not have anything to do with the relevant confrontation — and that her participation only had to do with "block[ing]" the doors to the building by furniture and vending machines from inside the building. FAC ¶¶ 127-128; 171.

Defendants do not allege any entry into **any** conspiracy by Fithian, let alone a conspiracy to engage in racial violence. Across the 19 times her name is mentioned in the complaint, most are the stuff of conspiracy theories — in ways that echo, ironically enough, a long history of antisemitic tropes — alleging a secret "network of organizations, groups, and cells that are connected through a largely untraceable underground communications system." FAC ¶ 147.[6]

---

[5] With that said, it appears Plaintiffs miss the significance of those specific echoes.

[6] As further discussed below, this (call it) "secret cabal" approach to pleading is explicitly rejected in *Twombly* itself. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 586 (2007) (Stevens, J., dissenting) (noting the majority rejects pleading where "the

### C. Plaintiffs' allegations about Carlson and Choi do not include any act joining in any conspiracy to engage in violence.

While Plaintiffs *do* allege specific conduct by Carlson and Choi that targeted Plaintiffs, they do not plausibly allege any conspiracy. Plaintiffs allege an assault by *someone*. But that person is certainly not Carlson — and given the Carlson allegations, there is no basis in the FAC to conclude Plaintiffs plausibly identified Choi as engaged in any relevant conduct. *See* Carlson Decl. ¶¶ 1-6. That is, the person in the photographs has stomach tattoos; Carlson does not. *Id.*; FAC ¶ 123 (showing someone with stomach tattoos that Plaintiffs say is Carlson).[7]

As with Fithian, Plaintiffs allege Carlson and Choi joined a plan to occupy Hamilton Hall, to protest Columbia's investment in Israel. *E.g.,* FAC ¶ 101.

For Carlson, when — as Plaintiffs themselves allege — Plaintiff Torres "managed to remove Carlson's mask along with the hooded sweatshirt," and *Plaintiffs' own images* show Torres holding Carlson against a wall, Carlson merely asks others to help. FAC ¶ 123. *Accord also, e.g.,* FAC ¶ 191 ("Mr. Torres fought off Carlson"). Plaintiffs then allege that Carlson and Torres traded threats, with Mr. Torres arming himself with a fire extinguisher. They also allege — with pictures now conspicuously absent — "Carlson … and Choi continued to punch Mr. Torres and push him against the wall." FAC ¶ 124.

As far as the shadowy conspiracy, that really and truly appears to be it. Plaintiffs allege *other* people called Plaintiffs "Jew-lovers," but not any Defendant here. Nor do they allege any communication or meeting of the mind between those strangers to the suit and any Defendant here.

---

claimed conspiracy is 'conceivable' but not 'plausible,'" even with a long history of the same parties conspiring to do the same thing alleged).

[7] Given the… strangeness of this allegation, Defendants are open to, say, having Carlson appear for a brief deposition or something similar, purely for the purpose of confirming he has no stomach tattoos — and therefore cannot be the person Plaintiffs say assaulted Torres.

The same is true for Choi.  Plaintiffs allege that Choi "followed" Mr. Torres at some point.  FAC ¶ 120.  Then, as part of the same vague group pleading for Carlson, Defendants allege Choi participated in a series of "punch[es]" and "push[es]."  FAC ¶ 124.

Again, as far as the supposed "untraceable underground communications system," Plaintiffs allege no communications sent by or to Choi.  FAC ¶ 147.  Nor do they allege any basis to think Choi reached any meeting of the minds with anyone with the specific intent to engage in racial violence.

### D. Plaintiffs' allegations about Parisi do not involve any conduct targeted at Plaintiffs, or entry into any conspiracy.

For Parisi, Plaintiffs allege no direct conduct.  Rather, they allege pure political speech advocating for "a free Palestine within our lifetimes."  FAC ¶ 66.  They also allege that Parisi participated in a training about "the myriad of forms of resistance that Palestinians have adopted historically," and while Plaintiffs *characterize* some of the training as involving, "calls for violence against Jews and the destruction of Israel, as well as praise for Hamas and other jihadist terrorist organizations that call for the murder of Jew," those conclusions are essentially the only parts of the relevant section outside quotation marks.  FAC ¶¶ 54-66.  And courts have consistently cautioned against adopting such an "embedded proposition that any anti-Israel speech is intrinsically antisemitic," and reminded similar plaintiffs "reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views."  *Landau v. Corp. of Haverford Coll.*, 780 F. Supp. 3d 548, 555 (E.D. Pa. 2025).  *See also,* TPF MTD at 11-13 (addressing this issue in detail).  Plaintiffs also allege that Parisi made some colorful social media posts in reaction to attacks by the Columbia administration.  FAC ¶¶ 91.

That is where the allegations about Parisi end.  Parisi too is lumped into the shadowy cabal Plaintiffs allege, but again without any allegation of specific participation or meeting of minds to engage in anything other than time-tested protest of a kind Columbia had supposedly shifted to welcome in the wake of 1968 — and that largely worked in 1985.

### E. For the Individual Defendants, Plaintiffs specifically plead there was no conspiracy to bar travel.

Last, as far as facts are concerned, Plaintiffs specifically plead that they were ***not*** barred from travel.  In fact, Plaintiffs repeatedly plead that the people they dub "Occupiers" repeatedly tried to ***facilitate*** Plaintiffs' travel from the inside to the outside of Hamilton Hall — and even offered to pay them to engage in such travel.  FAC ¶¶ 112 ("Two masked John Does demanded that Mr. Torres leave … They pressed a roll of cash into his hand and said, 'This is bigger than you' and 'You don't make enough money for this.'"); 115 ("An unmasked John Doe wearing a Columbia University shirt approached [Mr. Wilson] and said, 'You need to leave.'"); 220 ("For example, they brought with them substantial amounts of U.S. currency to offer to Plaintiffs and/or other Columbia employees as a bribe to leave the building"); 221 ("Upon encountering Plaintiffs inside Hamilton Hall, certain of the Occupiers, including Carlson, Yancy, Choi, and other masked John Does, demanded that Plaintiffs leave the building"[8]).  And though Plaintiffs suggest that some unknown people may not have ***immediately*** allowed Plaintiffs to leave the building (FAC ¶¶ 129-134), they do not allege any participation by any Defendant in that, and in fact, allege that "[e]ventually, an Occupier opened a door" and let Plaintiffs leave.  FAC ¶ 134.  A timeframe for these events is not offered.

## ARGUMENT

As explained below, Plaintiffs utterly fail to state a claim.  Dressing up a simple assault claim as a vast, shadowy conspiracy does not open the door to federal courts.  For its sheer length, actual conduct by any Defendant forms little of Plaintiffs complaint.  And the existence of the vast conspiracy Plaintiffs allege is offered without any specific facts.

---

[8] While Plaintiffs follow this by saying "even after they knew that the exits had been barricaded," they allege no basis to think Plaintiffs would not have been let out of the building.  And indeed, Plaintiffs appear to have left the building without issue once they decided they *did* want to travel.

The federal rules demand more. The complaint is frivolous, and because it targets speech, anti-SLAPP sanctions are mandatory under New York law.[9]

## I.    Plaintiffs' State Law Claims Require the Court to Accept the Vague, Undefined Conspiracy Plaintiffs Allege.

To begin, to get their foot in the federal courthouse door, Plaintiffs must fit this case into 42 U.S.C. § 1985's[10] conspiracy to commit racial violence.[11] But they simply cannot get there. It is longstanding law that when a federal claim is "wholly insubstantial and frivolous," a federal court lacks even discretion to exercise supplemental jurisdiction. *Bell v Hood*, 327 US 678, 682-683 (1946). And the federal claims here are just that. Except as set out below — for the IIED claims that are facially frivolous, given *Snyder v. Phelps*, 562 US 443 (2011), which also bears on the anti-SLAPP issue — that means the Court should not touch the state law claims absent a viable § 1985 claim.

As set out below, however, no such claim exists here.

## II.    Plaintiffs' § 1985 Conspiracy Claim is Frivolous.

As set out in TPF's MTD, the bar to pleading a § 1985 conspiracy is high. And it is high on two fronts. First, "to present a claim of conspiracy, Plaintiff[s] must allege an agreement among two or more persons with ***substantial facts*** giving rise to an inference of a ***meeting of the minds*** of the alleged conspirators." *Farbstein v Hicksville Pub. Lib.*, 323 F Supp 2d 414, 418 (EDNY 2004) (alterations adopted; emphasis added).[12] And second, Section 1985(3) "was not intended to provide a federal

---

[9] Individual Defendants have also served a Rule 11 notice of motion and letter on Plaintiffs. Because such sanctions would likely cover the same fees as mandatory anti-SLAPP fees, Individual Defendants address only the grant of those fees now, while reserving the right to move for sanctions should the Court grant this motion.

[10] While Plaintiffs separately allege a claim under § 1986, as set out in TPF's MTD, "a § 1986 claim must be predicated upon a valid § 1985 claim." TPF MTD at 24 (collecting cases). Accordingly, Individual Defendants only address the predicate § 1985 claim, since it fails.

[11] Plaintiffs clarified, in response to the Individual Defendants' Rule 11 notice that the "rights incorporated against the States by the Fourteenth Amendment" are "not the rights at issue here," and instead, Plaintiffs were only pursuing the theories specified in Paragraph 149, the "right to travel and the right to be free from racial violence." FAC ¶ 149.

[12] *Farbstein* was pre-*Twombly* and *Iqbal*. So the burden has only increased since then.

remedy for 'all tortious, conspiratorial interferences with the rights of others.'" *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015)

Plaintiffs attempt to allege a conspiracy with two objectives:  to violate "the right to travel" and "the right to be free from racial violence."  FAC ¶ 149.

### A.  Plaintiffs affirmatively allege there was no violation of the right to travel.

As discussed in TPF's MTD, "[t]here is no highway travel or public roadway implicated" in Plaintiffs' claims.  TPF MTD at 2; *see also, id.* at 19-20.  But also — as TPF points out in passing — the allegations here undermine even the intra-Columbia Campus travel theory Plaintiffs allege.  That is, Plaintiffs repeatedly allege that they were asked by the "Occupiers" to leave Hamilton Hall.  And the narrative suddenly becomes very vague on timing once Plaintiffs started trying to leave, rather than fighting (sometimes physically) to stay.  FAC ¶¶ 122-125.

In short, Plaintiffs allege that they were not engaged in any travel implicated by the constitution — but that even if the constitutional right to travel were implicated, theirs was not impeded.

### B.  Plaintiffs fail to allege any facts supporting a meeting of the minds.

Plaintiffs' entire theory of the case relies on the Court not noticing the elision between Defendants' core, protecting political speech, and the claim that by engaging in that speech, Defendants joined a shadowy conspiracy aiming to impose some sort of racial violence and/or bar on travel.

But pleading conspiracy is no easy task.  Even pre-*Twombly*, it required "substantial facts." *Farbstein*, 323 F Supp 2d at 418; *James v Artuz*, 1998 US Dist LEXIS 1277, at *14 (SDNY Feb. 6, 1998). And as *Twombly* itself cautioned and expanded, merely alleging "parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary" to make a conspiracy.  *Bell Atl. Corp. v Twombly*, 550 US 544, 557 (2007).  So, just alleging that some subset of the "Occupiers" harassed Plaintiffs does not suggest they conspired to do so, let alone conspired to do so

because Plaintiffs were "perceived to be … supporters of Jews" (where "Jews" are defined, essentially, as those Jews who support Israel).  FAC ¶ 7.  And since "Plaintiffs have not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants," "[t]heir conspiracy allegation must therefore fail."  *Webb v Goord*, 340 F3d 105, 111 (2d Cir 2003).

Plaintiffs simply do not allege *facts* supporting a meeting of the minds as to essentially anything, other than a protest in the broadest sense.  And it is solely in conclusory paragraphs — where Plaintiffs do not directly use the phrase "meeting of the minds" — that they seem to be alleging that meeting of the minds when they say "Defendants … agreed with others ***to occupy Hamilton Hall***."  FAC ¶ 8 (emphasis added), *accord, id.* ¶¶ 15 (similar); 150 (similar); 154 (similar); 156 ("agreed-upon plan of seizing and holding the building").[13]  These are not specific enough.  But they fail for another reason, addressed in Point C, just below.

### C.  Plaintiffs affirmatively allege that any supposed conspiracy had a different objective than violating rights.

A § 1985 conspiracy does not rise from any agreement:  It must be an agreement "***for the purpose of depriving***" a target of constitutional rights.  42 U.S.C. § 1985(3).  That is, the constitutional right's "impairment must be a conscious objective of the enterprise" — a "defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part ***for the very purpose of producing it***."  *Bray v Alexandria Women's Health Clinic*, 506 US 263, 275 (1993) (emphasis added).

---

[13] Paragraph 102 reads:  "Upon information and belief, the co-conspirators addressed the possibility that Columbia employees might be inside Hamilton Hall and agreed that they would, as necessary, intimidate, harass, bribe, detain, threaten, and/or assault and batter such employees if they posed any obstacles to the execution of the plan."  But as TPF points out, the Second Circuit has directly held that "A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory."  TPF MTD at 23, *quoting Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018).  Since this single bare conclusion is not only not supported by any facts, but seems to be contradicted by the rest of the FAC, Individual Defendants do not believe it requires more addressing.

Perhaps most importantly, the objective Plaintiffs allege — "to occupy Hamilton Hall" (FAC ¶ 8) — does not have as its "very purpose" to assault people because they are "perceived to be … supporters of Jews" (FAC ¶ 7).  Rather, as Plaintiffs themselves note, the occupation was "in the spirit of the '68 occupation of Hamilton Hall," and had very explicit purposes alleged directly:  "Protestors have voiced their intention to remain at Hind's [Hamilton] Hall until Columbia concedes to … three demands: divestment, financial transparency, and amnesty."  FAC ¶¶ 135, 150; *accord id.* ¶ 154 ("those present at the meeting conspired and agreed to seize and hold Hamilton Hall until such time as Columbia acquiesced to" the divestment "demands").

The goal of "divestment" is simply not the same thing as a goal of racial violence.  Indeed, it is not even likely to produce racial violence — but even if it were, the Supreme Court has directly rejected § 1985 theories that turn on such anticipation in a case where people supporting abortion were directly prevented from engaging in interstate travel:

> "A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right. The right must be ***aimed at***, its impairment must be a conscious objective of the enterprise. Just as the invidiously discriminatory animus requirement, discussed above, requires that the defendant have taken his action at least in part because of, not merely in spite of, its adverse effects  upon an identifiable group, so also the intent to deprive of a right requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it. That was not shown to be the case here, and is on its face implausible. Petitioners oppose abortion, and it is irrelevant to their opposition whether the abortion is performed after interstate travel"

*Bray*, 506 US at 275-276 (internal quotation marks omitted, emphasis added in *Bray*).

There is simply no allegation here that racial violence or a restriction on a right to travel was "aimed at."  For the latter, Plaintiffs literally allege that the Defendants here told them ***to*** travel.  For the former, Plaintiffs' is "claim on its face implausible" because Defendants "oppose [Israel], and it is irrelevant to their opposition whether the [protest against investment in Israel] is [preventing] interstate travel" or (allegedly) results in some violence.  *Id.*

### D. Plaintiffs do not plausibly allege any racial motivation or agreement to racially motivated conduct by Individual Defendants.[14]

Last, Plaintiffs do not allege a plausible racial motivation on the part of Individual Defendants. Again, recall that "[a] conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right. The right must be **_aimed at_**." *Bray*, 506 US at 275-276 (emphasis in original)

Even if there were enough in the FAC to conclude *someone* aimed at racial discrimination, there is no factual allegation any Individual Defendant did. At *most*, Plaintiffs allege the Individual Defendants held "political points of view critical of the Israeli government," which "cannot … represent discriminatory harassment of plaintiff on the ground of her Jewish or Israeli identities." *Canel v. Art Inst. of Chicago*, No. 23 CV 17064, 2025 WL 564504, at *8 (N.D. Ill. Feb. 20, 2025). Nothing in any allegation in the FAC suggests any Individual Defendant acted or agreed to anything on the basis of Jewish identity (or Plaintiffs' perceived association with Jewish identity). And since that is what changes simple alleged assault into a federal case, that is the part of "right [that] must be **_aimed at_**." *Bray*, 506 US at 275-276 (emphasis in original).

Again, as set out above, the allegations about Individual Defendants are sparse, particularly given the prolix complaint. Others lobbed accusations, but no Individual Defendant did. And without such facts, there is no basis to infer animus. *See, e.g., Sanders v Grenadier Realty, Inc.*, 367 F App'x 173, 175 (2d Cir 2010) (while plaintiffs "allege facts consistent with a discrimination claim, i.e., that non-black residents were granted subsidies, it nevertheless 'stops short of the line between possibility and plausibility of entitlement to relief, because plaintiffs do not allege any facts supporting an inference of racial animus.") (citation omitted).

---

[14] This point requires the Court to reject the multiple hurdles to this claim that TPF raises (it should not). *See* TPF MTD at 13-19. That is, it assumes arguendo there is a claim at all, that being "perceived to be … supporters of Jews" (FAC ¶ 7) is a cognizable category, and so on. But if the Court makes it past those issues, Plaintiffs' claim fails for yet another reason.

### III. Plaintiffs Do Not Plausibly Allege Intentional Infliction of Emotional Distress.

Plaintiffs purport to bring an intentional infliction of emotional distress ("IIED") claim. IIED has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v NY Post Co.*, 81 NY2d 115, 121 (1993). And just as important, IIED "is a highly disfavored cause of action under New York law, one that is almost never successful." *Collins v Giving Back Fund*, 2019 US Dist LEXIS 132088, at *35-36 (SDNY Aug. 6, 2019). *See also, Williams v City of Mount Vernon*, 428 F Supp 2d 146, 160 (SDNY 2006) (same).

IIED for conduct at a protest — or for speech alone — is probably "all but obsolete." Elizabeth M. Jaffe, *Sticks and Stones May Break My Bones but Extreme and Outrageous Conduct Will Never Hurt Me: The Demise of Intentional Infliction of Emotional Distress Claims in the Aftermath of* Snyder v. Phelps, 57 Wayne L. Rev. 473, 475 (2011). Post-*Snyder,* there is no IIED liability for any speech that gets "special protection" under the First Amendment — which includes speech "at a public place on a matter of public concern." *Snyder v. Phelps*, 562 US 443, 474 (2011).

As the US Supreme Court explained, because IIED's required "[o]utrageousness ... is a highly malleable standard with an inherent subjectiveness about it which would allow a jury to impose liability on the basis of jurors' tastes or views," the First Amendment cannot tolerate the risk that "a jury [would] impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression." 562 US at 458. Rather, "[i]n a case such as this, a jury is unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the suppression of vehement, caustic, and sometimes unpleasant expression." *Id.* (cleaned up).

For that matter, as far as the outrage piece, the speech and conduct in *Snyder* is far more outrageous than what took place here. Members of the Westboro Baptist Church picketing near a

soldier's memorial service after he was killed in Iraq in the line of duty.  They held signs filled with homophobic slurs and outrageous celebration of Snyder's death.  The signs proclaimed, "God Hates the USA/Thank God for 9/11," "America is Doomed," "Don't Pray for the USA," "Thank God for IEDs," "Fag Troops," "Semper Fi Fags," "God Hates Fags," "Maryland Taliban," "Fags Doom Nations," "Not Blessed Just Cursed," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "You're Going to Hell," "God Hates You," and the like.  562 US at 454.  But "[t]he arguably 'inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.'"  562 US at 453 (*quoting Rankin v. McPherson*, 483 US 378, 387, (1987)); *see also, generally, id.* at 463-475 (Alito, J., dissenting).

Whatever bigotry Plaintiffs allege, bigotry simply isn't IIED in New York.  Repeated use of slurs does not get there, even with significant horrible conduct alongside it.  *See, for examples, Graham by Graham v Guilderland Cent. Sch. Dist.*, 256 AD2d 863, 863 (3d Dept 1998) (a teacher, in class, asking about the only Black student, "Why not call Liz a 'nigger' because that's what she is? Liz, why not tell us what it feels like to be called a 'nigger'?"); *Mizrahi v Leon Baer Borstein, Gorstein & Sheinbaum*, 2014 NY Slip Op 31485[U], *5 (Sup Ct, NY County 2014) (no IIED for "epithets (albeit reprehensible) uttered on a single occasion"); *Bernardi v NY State Dept. of Corr. & Community Supervision*, 2021 US Dist LEXIS 95225, at *23-24; *42 (SDNY May 18, 2021) ("the type of derogatory comments and slurs allegedly uttered by Rushia" — including the "co-workers telling [P]laintiff to 'go back to his own country,' many references to [P]laintiff's immigrant status, claims that his 'guinea food stinks,' use of this and other Italian slurs, and many similar comments" — "do not reach th[e] high bar" for IIED); *and Collier v Ram Partners, Inc.*, 159 F Supp 2d 889, 902 (D Md 2001) (no IIED liability for repeated use of n-word, even the same conduct sustained a hostile work environment claim).[15]

---

[15] *For more examples, see Shukla v. Deloitte Consulting LLP*, 2020 US Dist. LEXIS 104555, 2020 WL 3181785, at *13 (SDNY June 15, 2020) ("comments about [the plaintiff's] heritage made by senior managers" and "jokes or other comments . . . related to [the] [p]laintiff's national origin" did not state a claim for IIED); *Cook v Emblem Health Servs. Co., LLC*, 59 Misc

There is simply no way that the allegation people — largely not even Defendants — "threatened, harassed, and mocked Plaintiffs including by calling them 'Jew-lovers,' 'Jew-workers,' and 'Zionists,' and by saying Plaintiffs were 'working for the Jews'" even compares to the outrageous conduct courts have rejected in the long citations above, let alone can be distinguished for being *more* outrageous. FAC ¶ 221-22. "[R]epeatedly ask[ing] Mr. Torres, 'Why are you defending them?'" plus the other conduct alleged (*id.*) seems like a slightly milder version of, say, a person's supervisor, among other things, "called plaintiff into his office, and then us[ing] a racial slur, back[ing] the plaintiff against the wall, and threaten[ing] 'to get [him]'" while and more broadly using frequent slurs. *Williams*, 880 F Supp at 995.

Nothing in this case steps outside the clear rule announced in *Snyder*. And so the IIED claims must fail.

## IV. Plaintiffs Do Not Plausibly Allege the People who Assaulted Them are Defendants Carlson and Choi.

Defendant Carlson does not have stomach tattoos on the right side of his stomach. Carlson Decl. ¶¶ 1-6. The person who assaulted Plaintiff Torres does. FAC ¶ 123. And Defendant Carlson has *different* tattoos on the left side of his stomach.

Yet, Plaintiffs do not allege how they came to the conclusion that the person in those photographs is Defendant Carlson, and there are no plausible factual allegations to that effect. So evaluating what basis there is, if any, for the factual claim in the FAC is difficult. Additionally, given

---

3d 1209[A] (Sup Ct, NY County 2018) (dismissing IIED based on "racially-coded" language); *Colon v Wal-Mart Stores*, 182 Misc 2d 921, 923 (Sup Ct, Montgomery County 1999); *Rivera v Baccarat, Inc.*, 1996 US Dist LEXIS 6355, at *9 (SDNY May 10, 1996) ("partial prohibition of her speaking Spanish in the workplace, of being ridiculed for her accent, and of being subjected to ethnic stereotyping"); *Williams v Port Auth.*, 880 F Supp 980, 995 (EDNY 1995) (supervisor, among other things, "called plaintiff into his office, and then used a racial slur, backed the plaintiff against the wall, and threatened 'to get [him]'" and used frequent slurs); *Mercado v PRRC, Inc.*, 2015 US Dist LEXIS 152511, at *11 (D Conn Nov. 10, 2015) ("repeated pattern of verbal abuse regarding the Plaintiffs race and national origin" by a manager in front of employees, along with public ridicule). [16] Indeed, nothing would have stopped Plaintiffs from simply suing *all* John Does, then seeking discovery to identify such Does, as happens routinely in this District.

the misidentification of Carlson, Plaintiffs' failure to allege a basis for identifying Defendant Choi —
particularly in light of their own description of the events as feeling like "chaos" and the like (FAC ¶
119), and the lack of photographs — means that Plaintiffs also fail to plausibly identify anyone
involved in their alleged assaults as Choi. *Cf., e.g., Comyack v Giannella*, 2020 N.J. Super. LEXIS 49, at
*118, n 16 (Super Ct Apr. 21, 2020) (on motion to dismiss, rejecting bare allegation an anonymous
account was one of several defendants, where plaintiff "speculates, without citation or evidence, that
the cited statements made by [] Defendants [] may have been concocted from 'throw away' accounts
that they themselves created" but those "allegations are not supported by any Certification of any
witness or party but are simply his (conspiracy) theory that has no apparent basis").

It is not clear that Plaintiffs have done anything other than pick random activists to sue, based
on their public, political advocacy. Plausibility requires something more.[16]

## V.    The Court Should Award Mandatory Anti-SLAPP Fees.

### A.    Brief background on the anti-SLAPP law.

In 2020, New York amended its anti-SLAPP law to provide significantly increased protection
for speech. The law is fairly unique among anti-SLAPP laws, being structured in two parts of
substantive law (N.Y. Civ. R. L. §§ 70-a and 76-a) and two parts of procedural law (CPLR 3211(g) and
3212(h)).

Prior to the 2020 amendments, New York's anti-SLAPP law was not — like other anti-SLAPP
laws — essentially a special motion to strike. Rather, Courts held specifically that it created a
substantive cause of action — and one that could not even be asserted by a motion, and instead
required a subsequent action or a counterclaim and summary judgment motion to accompany the
motion. *Cf., e.g., Southampton Day Camp Realty, LLC v Gormon*, 118 AD3d 976, 978 (2d Dept 2014).

---

[16] Indeed, nothing would have stopped Plaintiffs from simply suing *all* John Does, then seeking discovery to identify such
Does, as happens routinely in this District.

As it is currently drafted the substantive, mandatory entitlement to attorneys' fees in New York's anti-SLAPP law comes from N.Y. Civ. R. L. § 70-a(1)(a), which provides "costs and attorney's fees shall be recovered upon a demonstration, ***including*** an adjudication pursuant to [CPLR 3211(g) or CPLR 3212(h)]."[17]    N.Y. Civ. R. L. § 70-a(1)(a) (emphasis added).    That is, the law explicitly preserves the prior substantive cause of action, which can best be read "reflect[ing] the common will of New York that anti-SLAPP remedies be available in federal court." *Isaly v Garde*, 83 Misc 3d 379, 390 (Sup Ct, NY County 2024); *accord, Bobulinski v Tarlov*, 758 F Supp 3d 166, 188 (SDNY 2024) (Oetken, J.).

Meanwhile, the unit of the anti-SLAPP law is a "claim":  § 70-a(1)(a) applies to any "action involving public petition and  participation," but it cross references § 76-a for what such an "action," is, and that section defines "[a]n 'action involving public petition and participation' [a]s a claim based upon" (essentially) the exercise of First Amendment rights.  N.Y. Civ. R. L. § 76-a(1)(a)(1)-(2).  And it further broadens that a "'Claim' includes any lawsuit, cause of action, cross-claim, counterclaim, or other judicial pleading or filing requesting relief."  N.Y. Civ. R. L. § 76-a(1)(b).  So, specific "cause[s] of action" may be the subject of anti-SLAPP relief if they are dismissed.

### B.  The Court should grant mandatory fees here.

As set out above, Individual Defendants are entitled to judgment on at least three claims — and the assertion of jurisdiction for the others is frivolous.  Critically, any one of those "claims" can trigger an award of fees.[18]  Focusing, then, on the IIED claim, it is both facially based upon First

---

[17] The 2020 amendments added "shall," to overrule the line of cases finding that courts "providently exercised [their] discretion" in denying Civil Rights Law § 70-a fees.  *See, e.g.*, *Goldstein v Held*, 93 AD3d 689, 690 (2d Dept 2012).

[18] If the IIED claim was not pled, there might be some analysis necessary on whether frivolously dressing up state law claims as a federal conspiracy claim created Supremacy Clause issues.  *See, e.g.*, *Murchinson Ltd. v Nano Dimension Ltd.*, 2025 US Dist LEXIS 92192, at *16 [SDNY May 14, 2025].  But no such analysis is necessary because the IIED claim makes things easy.

Amendment conduct and without substantial basis in law. The real question is whether the Court should apply the anti-SLAPP law as an *Erie* matter.

For substantially the reasons Judge Oetken explains in *Bobulinski v Tarlov*, it should. *Bobulinski v Tarlov,* 758 F Supp 3d 166, 188 (SDNY 2024) (Oetken, J.). Essentially, because New York's anti-SLAPP law creates a substantive cause of action, while the procedural bells and whistles in CPLR 3211(g) and 3212(h) are unavailable, the substantive entitlement is.[19] The legislature's use of the phrase "***including*** an adjudication" under the CPLR contemplates other, non-CPLR adjudications — presumably, explicitly thinking of an adjudication under Fed. R. Civ. P. 12 or 56.

More, as Judge Oetken observes in *Bobulinski*, "[t]he only procedural rule that the Court is applying is a federal rule: Rule 12(b)(6). And the only element of New York's anti-SLAPP law that the Court is applying is *substantive*: the rule that a defendant is entitled to fees in a defamation action that is 'without substantial basis in fact and law.'" 758 F Supp 3d at 188. And "[t]he Second Circuit has consistently held that provisions for attorney's fees are a substantive, not procedural, right. *Id., citing Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir. 1992) and *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975).

Last, while other Judges in this district have reached other results, Judge Oetken's critique of those decisions is sound: Those "decisions fail to distinguish between the 'substantial basis' standard as a *procedural mechanism for dismissal*—which conflicts with Rule 12—and the 'substantial basis' standard as a *substantive standard for entitlement to attorney's fees*—which does not conflict with any federal Rule." *Id.* at 189 n. 24 (emphasis in original).[20]

---

[19] Alternatively, this motion might be conceptualized as both a pleading and a motion for summary judgment, *cf. Southampton Day Camp Realty, LLC v Gorman*, 118 AD3d 976, 978 (2d Dept 2014) (allowing something similar under the prior, claim-only version of the law).

[20] Since *Bobulinski*, at least as far as counsel can tell, it appears that the two other judges to reach the issue in written opinions have accepted its reasoning. *See, e.g., Heilbut v Cassava Scies., Inc.*, 778 F Supp 3d 551, 567-568 (SDNY 2025) (quoting *Bobulinski*, saying "New York's anti-SLAPP law 'is doing no procedural work' in the instant case; 'it is merely

## <u>CONCLUSION</u>

For the reasons discussed above and in the TPF MTD, the Court should dismiss the Section 1985, Section 1986 claims, and IIED claims, and decline jurisdiction over the remaining claims. In light of the dismissal, the Court should award mandatory anti-SLAPP fees, to be negotiated among counsel, or subject to a separate application should the parties be unable to agree.


Dated:    October 20, 2025
          Queens, New York


                                        Respectfully submitted,


                                        **COHEN&GREEN P.L.L.C.**


                                        By:    _____/s/_____
                                        J. Remy Green

                                        1639 Centre Street, Suite 216
                                        Ridgewood (Queens), NY 11385
                                            t: (929) 888-9480
                                            f: (929) 888-9457
                                            e: remy@femmelaw.com

---

defining the substantive standard for entitlement to' a state-law remedy'"); ; *Button v NY Times Co.*, 2025 US Dist LEXIS 180601, at *54 (SDNY Sep. 15, 2025) ("This Court agrees with *Bobulinski* and *Heilbut*").