**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MARIANO TORRES and LESTER WILSON, <br><br> Plaintiffs, <br><br> v. <br><br> JAMES CARLSON, AIDAN PARISI, GRANT MINER, CATHERINE CURRAN-GROOME, PEOPLE'S FORUM, INC., LISA FITHIAN, GABRIEL YANCY, ETHAN CHOI, and JOHN DOES 1–40, <br><br> Defendants. | Civil Action No. 1:25-cv-03474 (CM) <br><br> **PLAINTIFFS' JOINT OPPOSITION TO THE MOTIONS TO DISMISS BY THE PEOPLE'S FORUM (ECF NO. 36) AND DEFENDANTS CARLSON, PARISI, FITHIAN, AND CHOI (ECF NO. 40)** <br><br> **ORAL ARGUMENT REQUESTED** |

TORRIDON LAW PLLC
Brett D. Katz
800 Westchester Avenue
Rye Brook, New York 10573
(646) 787-9290

Tara Helfman (*pro hac vice*)
Chase T. Harrington (*pro hac vice*)
801 Seventeenth Street, NW, Suite 1100
Washington, DC 20006
(202) 249-6900

Jeffrey B. Jensen (*pro hac vice*)
Julie Tang (*pro hac vice*)
13354 Manchester Rd., Suite 210
St. Louis, Missouri 63131
(314) 920-0138

THE LOUIS D. BRANDEIS CENTER FOR
HUMAN RIGHTS UNDER LAW
Kenneth L. Marcus (*pro hac vice forthcoming*)
1717 Pennsylvania Avenue, NW, Suite 1025
Washington, DC 20006
(202) 559-9296

Richard A. Rosen
David M. Dince
Paul M. Eckles
1675 Broadway, 13th Floor
New York, NY 10019
(212) 653-0630

*Attorneys for Plaintiffs Mariano Torres and Lester Wilson*

# TABLE CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 4

I.    The October 7 Massacre Triggers Organized Anti-Semitic Activity At Columbia............ 4

II.   Defendants, Along With Several Related Student Groups, Organize An Unauthorized "Resistance 101" Event. .................................................................. 6

III.  Defendants Organize The "Gaza Solidarity Encampment."................................. 6

IV.   Defendants And Their Co-Conspirators Agree To Violently Storm Hamilton Hall. ......... 7

V.    Defendants And Their Co-Conspirators Harm Plaintiffs..................................... 9

LEGAL STANDARD ........................................................................................ 12

ARGUMENT ........................................................................................ 12

I.    The FAC Sufficiently States A Claim Under 42 U.S.C. § 1985(3) That Defendants Conspired To Violate The Constitutional Rights Of Jews And Of People Who, Like Mr. Torres And Mr. Wilson, Were Perceived To Support Jews..................................... 12

      A.    The FAC's Particularized Allegations Of Planning By, Coordination Between, And Communication Among TPF And Individual Defendants Give Rise To A Plausible Inference Of A Meeting Of The Minds. .................... 13

            1.    The FAC Alleges That TPF Was Not Sitting "On The Sidelines" But Was A Key Player In The Planning And Execution Of The Conspiracy. ........................................................................... 14

            2.    The FAC Alleges In Detail Coordinated Actions Showing That The Individual Defendants Agreed To The Conspiracy. ................................. 16

            3.    The FAC's Limited Use Of "Information And Belief" Pleading Is Properly Grounded In The Facts Available To Plaintiffs. ........................ 18

      B.    The FAC Sufficiently Alleges That Defendants Conspired To Take Over Hamilton Hall In Order To Deprive Jews And Their Supporters Of The Equal Protection Of The Laws. .......................................................... 19

            1.    The FAC's Specific Allegations Of Anti-Semitism Are Not An Attack On Free Speech, But Evidence Of Defendants' Discriminatory Animus........................................................... 20

2.      Plaintiffs Have Plausibly Alleged That Defendants' Conspiracy Was Motivated By Anti-Semitic Animus. ................................................ 22

3.      Plaintiffs Adequately Allege That Defendants' Anti-Semitic Conspiracy Took Aim At The Constitutional Rights To Travel And To Be Free From Racial Violence. .......................................................... 25

4.      There Is A Constitutional Right To Be Free From Racial Violence, And Plaintiffs Sufficiently Allege A Conspiracy To Violate It. .............. 26

C.      The FAC Sufficiently Alleges That Defendants' Conspiracy Targeted The Plaintiffs' Constitutional Right To Travel. .......................................................... 28

D.      Plaintiffs Are Members Of A Protected Class Under 18 U.S.C. § 1985(3). ........ 30

II.     Plaintiffs Have Also Stated Valid Claims Under § 1986 Against TPF And Individual Defendants For Failing To Prevent Or Aid In The Prevention Of The Conspiracy. .......................................................... 31

III.    Defendants' Allegedly Violent Acts Imprisoning Plaintiffs Inside Hamilton Hall Plausibly Constitute IIED. .......................................................... 31

IV.     The FAC Plausibly Alleges Carlson And Choi Were Two Of The Rioters Who Assaulted Plaintiffs. .......................................................... 35

V.      Individual Defendants' Anti-SLAPP Claim Is Meritless. ................................................ 36

CONCLUSION .......................................................... 39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Angola v. Civiletti*,
    666 F.2d 1 (S.D.N.Y. 1981)...................................................................................19

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010)...............................................................................18

*Aristocrat Plastic Surgery, P.C. v. Silva*,
    169 N.Y.S.3d 272 (N.Y. App. Div. 2022) ...........................................................38

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................12, 18

*Bd. of Managers of Promenade Condo. v. Jackman*,
    217 N.Y.S.3d 471 (N.Y. Sup. Ct. 2024) .............................................................32

*Bernardi v N.Y. State Dep't of Corr. & Cmty. Supervision*,
    No. 19-cv-11867, 2021 WL 1999159 (S.D.N.Y. May 18, 2021) ..........................34

*Bingham v. Struve*,
    591 N.Y.S.2d 156 (N.Y. App. 1992) ..................................................................33

*Biswas v. City of New York*,
    973 F. Supp. 2d 504 (S.D.N.Y. 2013)..................................................................13

*Boykin v. KeyCorp*,
    521 F.3d 202 (2d Cir. 2008)...............................................................................18

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993)...........................................................................................26

*Campbell v. Westchester County*,
    No. 96-cv-0467, 1997 WL 773702 (S.D.N.Y. Dec. 11, 1997)..............................29

*Carlin v. Davidson Fink LLP*,
    852 F.3d 207 (2d Cir. 2017)...............................................................................12

*Cavallaro v. Pozzi*,
    814 N.Y.S.2d 462 (N.Y. App. 2006) ..................................................................32

*Coggins v. Cnty. of Nassau*,
    988 F. Supp.2d 231 (E.D.N.Y. 2013) .................................................................19

*Collins v. Giving Back Fund,*
   No. 18-cv-8812, 2019 WL 3564578 (S.D.N.Y. Aug. 6, 2019)...............................................35

*Colon v. Wal-Mart Stores,*
   182 Misc 2d 921 (N.Y. Sup. Ct. 1999) ...............................................................................34

*D.C. v. R.R.,*
   106 Cal. Rptr. 3d 399 (Cal. App. 2010)..............................................................................38

*Dawson v. Delaware,*
   503 U.S. 159 (1992)............................................................................................................20

*Dennis v. Napoli,*
   49 N.Y.S.3d 652 (N.Y. App. 2017) ....................................................................................33

*Doe 1 v. Gov't of United States Virgin Islands,*
   771 F. Supp. 3d 379 (S.D.N.Y. 2025)................................................................................37

*Doe v. AR,*
   No. 21-cv-06353, 2021 WL 5416235 (W.D.N.Y. Nov. 19, 2021).......................................28

*EEOC v. Port Auth. of New York & New Jersey,*
   768 F.3d 247 (2d Cir. 2014)...............................................................................................12

*Emanuel v. Barry,*
   724 F. Supp. 1096 (E.D.N.Y. 1989) ...................................................................................27

*Eves v. Ray,*
   840 N.Y.S.2d 105 (N.Y. App. 2007) ..................................................................................32

*Flatley v. Mauro,*
   139 P.3d 2 (Cal. 2006) ......................................................................................................38

*Fritz v. Jimenez,*
   No. C084291, 2020 WL 4782821 (Cal. App. Aug. 18, 2020)..............................................38

*Galella v. Onassis,*
   487 F.2d 986 (2d Cir. 1973)...............................................................................................33

*Gartenberg v. Cooper Union for the Advancement of Sci. and Art,*
   765 F. Supp. 3d 245 (S.D.N.Y. 2025)...................................................................20, 23, 24

*Graham by Graham v. Guilderland Cent. Sch. Dist.,*
   681 N.Y.S.2d 831 (N.Y. App. 1998) ..................................................................................34

*Green v. McLaughlin,*
   480 F. App'x. 44 (2d Cir. 2012) .........................................................................................13

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971) ..................................................................................19, 30

*Hogan v. County of Lewis, N.Y.*,
    No. 11-cv-0754, 2015 WL 1400496 (N.D.N.Y. Mar. 26, 2015) ............................27

*Hudson Planned Parenthood, Inc. v. Doe*,
    1991 WL 183863 (N.D.N.Y. 1991) .....................................................15, 16, 19, 21

*Jews for Jesus, Inc., v. Jewish Cmty. Rels. Council of New York, Inc.*,
    968 F.2d 286 (2d Cir. 1992) ......................................................................31

*Johnson v. Smith*,
    810 F. Supp. 235 (N.D. Ill. 1992) ...............................................................27

*Kamar v. AKW Holdings, LLC*,
    859 N.Y.S.2d 903 (N.Y. Sup. Ct. 2008) .......................................................32

*King v. New Rochelle Mun. Hous. Auth.*,
    442 F.2d 646 (2d Cir. 1971) ..................................................................28, 29

*LeBlanc-Sternberg v. Fletcher*,
    67 F.3d 412 (2d Cir. 1995) .......................................................................13

*Lefebvre v. Lefebvre*,
    131 Cal. Rptr. 3d 171 (Cal. App. 2011) .......................................................38

*Levine v. Babiarz*,
    No. 22-cv-891, 2024 WL 1463767 (N.D.N.Y. Apr. 4, 2024)...............................35

*Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    7 F.3d 1085 (2d Cir. 1993) .......................................................................31

*Mizrahi v. Borstein*,
    No. 152360/13, 2014 WL 2571644 (N.Y. Sup. Ct. June 5, 2014).........................34

*Moraes v. White*,
    571 F. Supp. 3d 77 (S.D.N.Y. 2021).............................................................32

*Murchinson Ltd. v. Nano Dimension Ltd.*,
    No. 23-cv-03658, 2025 WL 1397615 (S.D.N.Y. May 14, 2025) .....................36, 37

*Murphy v. Murphy*,
    486 N.Y.S.2d 457 (N.Y. App. 1985) ...........................................................32

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)...................................................................20, 33, 39

*Nat'l Jewish Democratic Council v. Adelson*,
    417 F. Supp. 3d 416 (S.D.N.Y. 2019) ...................................................................36

*Nelson v. Ardrey*,
    216 N.Y.S.3d 646 (N.Y. App. Div. 2024) ............................................................38

*Novartis Vaccines & Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*,
    50 Cal. Rptr. 3d 27 (Cal. App. 2006) .................................................................38

*Okudinani v. Rose*,
    779 F. App'x 768 (2d Cir. 2019) .......................................................................27

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ...............................................................................24

*Pangburn v. Culbertson*,
    200 F.3d 65 (2d Cir. 1999) .................................................................................13

*Paul for Council v. Hanyecz*,
    102 Cal. Rptr. 2d 864 (Cal. App. 2001) .............................................................38

*Penske Media Corp. v. Shutterstock, Inc.*,
    548 F. Supp. 3d 370 (S.D.N.Y. 2021) ...........................................................36, 37

*Rich v. Fox News Network, LLC*,
    939 F.3d 112 (2d Cir. 2019) ...............................................................................33

*Rivera v. Baccarat, Inc.*,
    No. 95-cv-9478, 1996 WL 251850 (S.D.N.Y. May 10, 1996) ............................34

*Rounseville v. Zahl*,
    13 F.3d 625 (2d Cir. 1994) .................................................................................13

*Ruiz v. Bertolotti*,
    236 N.Y.S.2d 854 (Sup. Ct. 1962) .................................................................32, 33

*Sahebdin v. Khelawan*,
    No. 21-cv-2956, 2022 WL 4451005 (E.D.N.Y. Sept. 24, 2022) ..........................32

*Samuels v. Mackell*,
    401 U.S. 66 (1971) ..............................................................................................20

*Shukla v. Deloitte Consulting LLP*,
    No. 19-cv-10578, 2020 WL 3181785 (S.D.N.Y. June 15, 2020) ..........................34

*Shulman v. Chaitman, LLP*,
    392 F. Supp. 3d 340 (S.D.N.Y. 2019) .................................................................18

*Sill v. Pennsylvania State Univ.*,
    318 F. Supp. 608 (M.D. Pa. 1970) ........................................................................38

*Sines v. Kessler*,
    558 F. Supp. 3d 250 (W.D. Va. 2021) ..................................................................14

*Sines v. Kessler*,
    324 F. Supp. 3d 765 (W.D. Va. 2018) .............................................................24, 28

*Sines v. Yiannopoulos*,
    No. 20 Misc. 241, 2020 WL 6058279 (S.D.N.Y. 2020) .......................................28

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ..............................................................................................33

*Spencer v. Casavilla*,
    903 F.2d 171 (2d Cir. 1990) .....................................................................19, 26, 28

*StandWithUS v. Massachusetts Institute of Technology*,
    No. 24-1800, 2025 WL 2962665 (1st Cir. Oct. 21, 2025) ................................24, 28

*Stirgus v. Benoit*,
    720 F. Supp. 119 (N.D. Ill. 1989) .........................................................................27

*Tchatat v. City of New York*,
    No. 14-cv-2385, 2015 WL 5091197 (S.D.N.Y. Aug. 28, 2015) .................22, 27, 29

*Thomas v. Roach*,
    165 F.3d 137 (2d Cir. 1999) .............................................................................13, 16

*Trump v. Trump*,
    192 N.Y.S.3d 891 (N.Y. Sup. Ct. 2023) ...............................................................38

*Turkmen v. Hasty*,
    789 F.3d 218 (2d Cir. 2015) ..................................................................................16

*United Bhd. of Carpenters & Joinders of Am., Loc. 610, AFL-CIO v. Scott*,
    463 U.S. 825 (1983) .....................................................................................13, 19, 30

*United States v. Bingert*,
    605 F. Supp. 3d 111 (D.D.C. 2022) .......................................................................39

*United States v. Grider*,
    617 F. Supp. 3d 42 (D.D.C. 2022) .........................................................................39

*United States v. Rowlee*,
    899 F.2d 1275 (2d Cir. 1990) .................................................................................20

*White v. Frank*,
   680 F. Supp. 629 (S.D.N.Y. 1988) ......................................................16, 18, 19, 22

*Williams v. City of Mount Vernon*,
   428 F. Supp. 2d 146 (S.D.N.Y. 2006)................................................................35

*Williams v. Port Authority of N.Y. and N.J.*,
   880 F. Supp. 980 (E.D.N.Y. 1995) ....................................................................34

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993)....................................................................................20, 22, 33

*Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead*,
   98 F. Supp. 2d 347 (S.D.N.Y. 2000)..................................................................38

*Zhang Jingrong v. Chinese Anti-Cult World All.*,
   287 F. Supp. 3d 290 (E.D.N.Y. 2018) ....................................................13, 21, 26

## Statutes

42 U.S.C. § 1985........................................................................................... *passim*

42 U.S.C. § 1986........................................................................................... *passim*

N.Y. Civ. Rights L. § 76-a................................................................................38

## Other Authorities

5B Arthur R. Miller & A. Benjamin Spencer, FED. PRAC. & PROC. CIV. § 1356
   (4th ed. 2025).....................................................................................................3

Fed. R. Civ. P. 12(b)(6)..............................................................................3, 12

REPUBLICAN STAFF, COMM. ON EDUC. & THE WORKFORCE, 118TH CONG.,
   ANTISEMITISM ON COLLEGE CAMPUSES EXPOSED (Oct. 31, 2024),
   perma.cc/66RW-R8A2........................................................................................5

Gabriella Gregor Splaver, et al., *In Focus: When Hamilton Hall Became 'Hind's
   Hall'*, COLUM. SPECTATOR (May 12, 2024), tinyurl.com/Hamilton-HindsHall. ...................15

Joseph Simonson, *Anti-Israel Group Encouraged Columbia Protesters To Re-
   Create 'The Summer of 2020' Hours Before Students Stormed a Building*,
   WASH. FREE BEACON (May 1, 2024), perma.cc/JD35-G78U.................................19

Restatement (Second) of Torts § 46...............................................................33

Plaintiffs Mariano Torres and Lester Wilson ("Plaintiffs") submit this consolidated memorandum of law in opposition to (1) the motion to dismiss the First Amended Complaint ("FAC") filed by defendant The People's Forum ("TPF"), ECF No. 36, and (2) the motion to dismiss filed by defendants James Carlson ("Carlson"), Aidan Parisi ("Parisi"), Lisa Fithian ("Fithian"), and Ethan Choi ("Choi") (collectively, the "Individual Defendants"), ECF No. 40.[1]

## PRELIMINARY STATEMENT

In the late hours of April 29, 2024, Defendants set into motion a violent conspiracy to "escalat[e]" a months-long campaign to "take[ ] back" Columbia University's campus from Jews and "Zionists." FAC ¶¶ 2, 96. With the knowledge and support of TPF, Individual Defendants and Defendant John Does 1–40 (the "Occupiers") smashed their way into the University's historic Hamilton Hall, seizing it in the name of Intifada. There, they terrorized two janitors—Mr. Torres and Mr. Wilson—who were working the overnight shift, held the men against their will, physically assaulted them, and derided them as "Jew-lovers" and "Zionists" when they refused to be bought off with rolls of cash. *Id.* ¶¶ 4–5, 20, 112, 122–25, 133. While this was happening, TPF, which only an hour earlier had called on supporters to "MOBILIZE TO COLUMBIA NOW," took to social media, celebrating as "heroic and resilient" the very individuals who were in the process of brutalizing Mr. Torres and Mr. Wilson and mocking them with anti-Semitic epithets. *Id.* ¶¶ 16, 107.

Now Defendants argue that the First Amendment shields them from legal liability, attempting to reframe the violent conspiracy detailed in the FAC as lawful political advocacy.

---

[1]     While styled as a "motion to dismiss," the Individual Defendants' motion only seeks dismissal of the claims pursuant to 42 U.S.C. § 1985 (Count One), 42 U.S.C. § 1986 (Count Two), and Intentional Infliction of Emotional Distress (Count Seven), and partial dismissal of the claims for assault (Count Three) and battery (Count Four). It also seeks affirmative relief in the form of attorneys' fees pursuant to New York State's anti-SLAPP statute.

They attack the motives behind this case, arguing that this lawsuit seeks to "harass[ ]" them for their political views, ECF No. 36-1 ("TPF Mem."), at 1, limit their free "exercise of First Amendment rights," ECF No. 40 ("Ind. Defs. Mem."), at 17, and "impugn an entire group's motivation," ECF No. 42 ("TPF Supp."), at 2. But the First Amendment does not protect unlawful conspiracies to deprive individuals of the equal protection of the laws, nor does it permit violent mobs to go marauding in the guise of "advocacy."

This lawsuit has one purpose: to hold Defendants accountable for their roles in planning and executing the siege that left Mr. Torres and Mr. Wilson physically battered, psychologically disabled, and without livelihoods. Defendants' efforts to portray this lawsuit as an attempt to "censor" or "punish speech critical of Israel" and "conflat[e] anti-Zionism with anti-Judaism," distort the allegations in the FAC and ignore settled precedent. Ind. Defs. Mem. 2; TPF Mem. 1; TPF Supp. 2. Beating, threatening, and holding Plaintiffs against their will—all while calling them "Zionists" and "Jew-lovers," FAC ¶ 1—is not "speech critical of Israel." It is anti-Semitic violence. Trapping Mr. Wilson behind barricaded doors so that he was not free to leave while telling him, "You work for the Jews," FAC ¶ 132–33, is not "speech critical of Israel." It is anti-Semitic violence.

Defendants mischaracterize the public statements and social media posts detailed at length in the FAC as the stand-alone basis for Plaintiffs' claims under the Ku Klux Klan Act. 18 U.S.C. §§ 1985(3), 1986. They are not. The FAC presents Defendants' own words as *evidence* of coordination among the Defendants and as *evidence* of the hateful animus that motivated their conspiracy to take physical actions to deprive Jews—and people who, like Mr. Torres and Mr. Wilson, were believed to support Jews—of their constitutional rights to travel and to be free from racial violence.

Defendants argue that there is no constitutional right to be free from racial violence and that the facts alleged do not implicate the right to travel.  That misstates the law and ignores the plain allegations in the FAC, which must be construed with every inference in Plaintiffs' favor.  Finally, Defendants argue that Mr. Torres and Mr. Wilson cannot have been the targets of an anti-Semitic conspiracy because they are not Jewish nor were they perceived to be Jewish by Defendants.  As a matter of law, this is wrong.

For their part, Individual Defendants add a smattering of factual arguments, none of which is appropriate on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  A Rule 12(b)(6) motion "is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case."  5B Arthur R. Miller & A. Benjamin Spencer, FED. PRAC. & PROC. CIV. § 1356 (4th ed. 2025).  For example, the precise location and number of tattoos on Defendant James Carlson's stomach have no bearing on the legal sufficiency of the FAC.  The self-serving declaration filed by Carlson should be stricken, and that portion of the motion that seeks dismissal of the assault and battery claims against Carlson and Choi should be denied.  Likewise irrelevant is Individual Defendants' bizarre defense that "until now" there was "a fundamental understanding" and "acceptance" at Columbia that violently occupying a campus building was a legitimate form of protest.  The suggestion that particular practices at Columbia University somehow expanded the scope of First Amendment protections on that campus and made violent occupation of buildings and assault and battery forms of protected speech is frivolous.  In any event, if Defendants wish to prove the existence of such past practices that place Columbia University beyond the jurisdiction of federal and state law, they can argue and attempt to prove those practices at trial.

Finally, that portion of Individual Defendants' motion to dismiss Plaintiffs' Intentional Infliction of Emotional Distress ("IIED") claim should be denied, as Defendants' misapprehend the gravamen of the claim. Plaintiffs do not allege that Defendants' "bigotry" caused them emotional distress. Plaintiffs allege that Defendants' violent *conduct* caused compensable emotional distress. Similarly, Individual Defendants' anti-SLAPP motion and fee request should also be denied. Forcibly invading a building, assaulting and battering two janitors working inside, and holding those janitors against their will is in no way lawful public participation protected by New York's anti-SLAPP statute.

## STATEMENT OF FACTS

### I.    The October 7 Massacre Triggers Organized Anti-Semitic Activity At Columbia.

On October 7, 2023, some 3,000 Hamas militants launched a surprise attack on Israel. FAC ¶ 36. Hamas is designated by the United States as a terrorist organization. Its charter calls for the murder of all Jews. *Id.* ¶ 37. Using trucks, bulldozers, motorcycles, and motorized paragliders, militants crossed from Gaza into Israel and proceeded to slaughter, mutilate, plunder, and rape over 1,300 Israelis and take 250 hostages to underground tunnels back in Gaza. *See id.* ¶ 36. Their victims included men and women, babies and octogenarians, inhabitants of kibbutzim, and youths enjoying an outdoor music festival. October 7 was the deadliest day for Jews since the Holocaust. *See id.* ¶ 38.

On October 7, while the massacre was still underway, Manolo De Los Santos ("De Los Santos"), a founder and the executive director of TPF, shared a propaganda video of Hamas paratroopers training for the attack, and praised Hamas as "heroic." *Id.* The following day, before Israel even began burying its dead, TPF held a rally in Times Square, during which De Los Santos urged Hamas to "[c]ontinue to resist" and pledged to stand with them "by any means necessary." *Id.* Likewise, the National Students for Justice in Palestine ("NSJP") urged local chapters to

remember their "unshakable responsibility to join the call for mass mobilization." *Id.* ¶ 39. To help local chapters heed this call, NSJP issued a "Day of Resistance Toolkit" ("Resistance Toolkit") that exhorted members to "resist [Zionism] directly" on "our campuses and in our communities." *Id.* ¶ 40. The Resistance Toolkit urged local chapters to, among other things, organize "sit-in[s], disruption[s], or educational event[s]." *Id.*

Responding to that call to action, a web of individuals and non-defendant organizations including Columbia University Apartheid Divest ("CUAD"), Within Our Lifetime-United for Palestine ("WOL"), Westchester People's Action Coalition, Inc. ("WESPAC"), Columbia Students for Justice in Palestine ("SJP"), and Columbia-Barnard Jewish Voice for Peace ("JVP") planned, supported, and agreed to organize actions on Columbia's campus to express anti-Semitic hatred and to intimidate Jewish students and those perceived to be their supporters. *Id.* ¶ 8. On November 9, 2023—the 85th anniversary of Kristallnacht—demonstrators at a "Shut it Down for Palestine" event shouted, "Death to Jews!" and "Fuck the Jews." *Id.* ¶ 46. Columbia subsequently suspended SJP and JVP for "repeatedly violat[ing] University policies." *Id.* ¶ 47. In response, CUAD published a Manifesto calling on Columbia to, among other things, divest from companies that do business with Israel. *Id.* ¶ 51. CUAD claimed that it was merely following in time-honored traditions of political protest at Columbia; but the House Committee on Education and the Workforce documented numerous anti-Semitic incidents involving CUAD forming "a sustained pattern of antisemitic discrimination and threatening conduct directed at Jews."[2]

---

[2] REPUBLICAN STAFF, COMM. ON EDUC. & THE WORKFORCE, 118TH CONG., ANTISEMITISM ON COLLEGE CAMPUSES EXPOSED 61 (Oct. 31, 2024), perma.cc/66RW-R8A2.

II.    **Defendants, Along With Several Related Student Groups, Organize An Unauthorized "Resistance 101" Event.**

On March 24, 2024, CUAD sponsored an event called "Resistance 101" without Columbia University's approval. *Id.* ¶¶ 54–56.  The Resistance 101 event was organized, in part, by Parisi and now-dismissed defendant Catherine Curran-Groome.[3]  One of the featured speakers was Khaled Baraka, who is reportedly a senior member of the Popular Front for the Liberation of Palestine, a terrorist organization that participated in the October 7 attacks. *Id.* ¶ 59.  Baraka "claimed to have spoken with his 'friends and brothers in Hamas, Islamic Jihad, and the PFLP'" and told attendees, "Your work as students is important to Hamas." *Id.* ¶ 60.  Baraka's wife Charlotte Kates, herself the international coordinator for terrorist group Samidoun: Palestinian Prisoner Solidarity Network, declared, "There is nothing wrong with being a member of Hamas, being a leader of Hamas, being a fighter in Hamas." *Id.* ¶ 62.  She further encouraged the audience "to stand with the armed resistance.  It is the moral and right thing to do." *Id.*

Columbia suspended Parisi and Curran-Groome for their involvement in the Resistance 101 event, and both were evicted from their on-campus graduate student housing. *Id.* ¶ 65.  However, Parisi refused to comply with Columbia's eviction notices, vowing (on social media) to "resist institutional repression" and stating, "Que viva la intifada." *Id.* ¶ 66.

III.    **Defendants Organize The "Gaza Solidarity Encampment."**

Parisi still had not vacated student housing when, on April 17, 2024, Parisi and others, with support from CUAD, SJP, and JVP, set up tents on the East Butler Lawn of Columbia's campus, soon known as the "Gaza Solidarity Encampment." *Id.* ¶ 67.  This encampment became a hotbed

---

[3]    Curran-Groome, a Columbia University employee, was voluntarily dismissed from this case pursuant to Plaintiffs' agreement settling certain employment-discrimination claims against Columbia University which included a release of all claims against Columbia employees.  ECF No. 33.

of anti-Semitic harassment. Columbia's Task Force on Anti-Semitism found that Jewish students holding Israeli flags were physically assaulted by demonstrators. *Id.* ¶ 69. Jewish students were taunted with chants calling for the death of Jews and Israelis such as "Yes Hamas, we love you, we support your rockets too," and "We say justice you say how, burn Tel Aviv to the ground." *Id.* A video reel linked by the Task Force's second report contains footage of these and other anti-Semitic incidents, including Jewish students being told, "Go back to Poland," "Go back to Europe—You have no culture," "Kill yourself," "go to a synagogue," and "Yahoodim, yahoodi, [Jews, Jew] fuck you." *Id.* ¶ 70.

The encampment was sustained by outside support. *Id.* ¶ 71. Among the entities providing support for the encampment was TPF, which posted messages encouraging individuals to help the encampment by dropping off food, artwork, signs, and by sending money via Venmo to the account @bcabolitioncollective to "Help support legal fees, supplies, and more." *Id.*

Determining that the encampment "pose[d] a clear and present danger to the substantial functioning of the University," Columbia suspended three students involved with the formation of the encampment and authorized the NYPD to "begin clearing the encampment." *Id.* ¶ 73. At 1:30 p.m. on April 18, the NYPD announced that individuals participating in the encampment would be arrested. *Id.* ¶ 75. Ultimately, more than 100 participants were arrested. *Id.* Yet organizers immediately re-established the encampment, this time on the West Butler Lawn. *Id.* ¶ 76. Harassment of Jewish students intensified, prompting a campus rabbi to warn that authorities "cannot guarantee Jewish students' safety in the face of extreme anti-Semitism and anarchy." *Id.* ¶ 79.

## IV.    Defendants And Their Co-Conspirators Agree To Violently Storm Hamilton Hall.

On April 29, 2024, Columbia announced it would remove the Encampment, citing "a hostile environment [for Jews] in violation of Title VI." *Id.* ¶ 87. President Shafik's letter directed

protestors to leave by 2:00 p.m.  *Id.* ¶ 89.  Parisi responded by posting a photo of the letter on social media with "the following handwritten message scrawled over it in bright red letters: 'COLUMBIA WILL BURN' and 'I AINT [sic] READING ALL THAT FREE PALESTINE.'" *Id.* ¶ 91.

As the deadline approached, TPF issued successive online calls to action: "URGENT! EMERGENCY RALLY FOR COLUMBIA TODAY AT 1PM!" and shortly after the 2:00 p.m. deadline passed, "ALL OUT TO COLUMBIA NOW!" *Id.* ¶¶ 93–94.  WOL likewise posted, "TONIGHT / ALL OUT TO COLUMBIA / STUDENTS ARE CALLING ON US TO PROTECT THE ENCAMPMENT!" *Id.* ¶ 95.  Rather than disband, the occupying protestors made a strategic choice.  In the words of several CUAD members, "Rather than indefinitely continue our encampment and the media circus that surrounded it, we chose to escalate."  *Id.* ¶ 96.

That evening, over 100 participants—including certain of the Individual Defendants—met at TPF's Manhattan office to plan their next move.  *Id.* ¶¶ 97–101.  At this meeting, certain of the Individual Defendants along with other representatives from CUAD, NSJP, SJP, JVP, and WOL, coordinated a plan to seize Hamilton Hall, including by producing and distributing hand-drawn maps and diagrams of Hamilton Hall, obtaining supplies for barricading the building, and stocking food and water to sustain the dozens of Occupiers who would later storm the building.  *Id.* ¶¶ 101, 104.

Their plan followed steps detailed in a guidebook that has been used and disseminated by anti-Israel militants called *Palestine Action – The Underground Manual*.  *Id.* ¶ 103.  Consistent with the Underground Manual, the co-conspirators had compiled information and had drawn maps of Hamilton Hall that identified, among other things, the location of heavy furniture that could be used to fortify the building, including podium toppers, tables, and benches, the location of each

door and window on the third floor, including certain windows that needed to be blocked to secure the building, and the locations of fire extinguishers, water fountains, and electrical panels. *Id.* ¶ 104. This kind of planning and reconnaissance is advised by the Underground Manual, which, as part of Step 3, instructs cells to "PREPARE FOR ACTION" by "KNOWING YOUR TARGET AND DOING AN EFFECTIVE RECONNAISSANCE (RECCE)." *Id.*

At 11:27 p.m., TPF posted a message on social media ordering people to "MOBILIZE TO COLUMBIA NOW!" *Id.* ¶ 106. About one hour later, rioters smashed their way through the doors and windows of Hamilton Hall. *Id.* ¶ 107. By 12:40 a.m. on April 30, 2024, TPF was celebrating online that "[t]he heroic and resilient student organizers at Columbia University have successfully taken and 'de-occupied' a building on campus." *Id.* One hour after that, at 2:02 a.m., TPF posted another message on the social media site X stating, "DISCLOSE, DIVEST, WE WILL NOT STOP WE WILL NOT REST! We will stay in the streets for Palestine and to support the student movement!" *Id.* ¶ 108.

## V.    Defendants And Their Co-Conspirators Harm Plaintiffs.

At the time of this siege, Plaintiffs Mariano Torres and Lester Wilson—both third-shift janitors assigned to Columbia University's Hamilton Hall—were inside cleaning classrooms, bathrooms, and hallways. *Id.* ¶¶ 4–5, 109. Shortly after midnight, Mr. Torres saw a group of masked people in the room with him. Suddenly, dozens more masked Occupiers appeared and surrounded him. *Id.* ¶ 110. A John Doe pressed a roll of cash into his hand and said, "This is bigger than you" and "You don't make enough money for this." *Id.* ¶ 112. When he refused the bribe, John Does shouted, "What are you, a Jew-lover?" and "Why are you protecting them?" *Id.* ¶ 4. As the Occupiers became more violent and threatening, Mr. Torres realized he needed to escape and demanded that they let him out of the building. He was then told, "It's over" and "It's too late." *Id.* ¶ 113. He feared for his own life and that of Mr. Wilson. *Id.* ¶ 117.

Mr. Wilson, working nearby, was confronted by masked individuals moving chairs and ramming furniture into him. *Id.* ¶ 115. When he radioed for help, they surrounded him, shoved him and rammed furniture into him, taunting him as a "Jew-lover," "Jew-worker," and "Zionist." *Id.* ¶ 5. Both men were trapped as Occupiers barricaded the exits with vending machines and furniture and zip-tied doors shut. *Id.* ¶ 17. They were held against their will inside the building while protestors unfurled banners reading "INTIFADA" and "Student Intifada," *id.* ¶¶ 1, 18, and moved supplies around Hamilton Hall as the rioters expected to hold the building for an extended period of time.

As Mr. Torres observed the Occupiers, he realized that what initially seemed like chaos was disciplined and coordinated. An unmasked woman and masked man shouted orders, directing Occupiers to different areas of Hamilton Hall. The Occupiers were organized and performed separate tasks, whether carrying in cases of water and food, carrying rolled-up mattresses, or carrying tables and chairs to barricade the building's entrances and exits from the inside. *Id.* ¶ 119. All of this indicated significant planning and preparation, since Occupiers knew where to go and where they could find certain items and equipment inside the building. *Id.*

Mr. Torres began to push his way through the crowd. *Id.* ¶ 120. Another John Doe offered him money, which Torres refused, *id.* ¶ 112, after which other Occupiers shouted "Why are you defending them?" and "What are you, a Jew-lover?" *Id.* ¶ 122. He was repeatedly called a "Jew-lover." *Id.*

Carlson was more aggressive. He repeatedly shoved Mr. Torres and blocked his way. *Id.* ¶ 123. The two struggled together, Mr. Torres managing to remove Carlson's mask and hooded sweatshirt. *Id.* Carlson shouted to the Occupiers "How can you let him do that to me?" indicating Carlson had some authority over the mob. *Id.* Carlson then threatened Mr. Torres: "I'm going to

10

get 20 guys up here to fuck you up." *Id.* ¶ 124.  Meanwhile, Gabriel Yancy ("Yancy") and Ethan Choi ("Choi") struck Mr. Torres repeatedly from behind.  Throughout the confrontation, Carlson, Yancy, and Choi punched Mr. Torres and pushed him against the wall.  *Id.*

When Mr. Torres reached the ground floor of Hamilton Hall, he found the doors had been shut with zip ties and bike chains and blocked by heavy furniture.  *Id.* ¶ 126.  Eventually, one of the Occupiers cut the zip ties and let him out.  *Id.* ¶ 129.  Once outside, Mr. Torres saw the Occupiers had hung a banner emblazoned with the word "INTIFADA" from the third-floor balcony.  *Id.* ¶ 130.

Like Mr. Torres, Mr. Wilson also realized he needed to push through the mob to the lobby downstairs.  Each exit was barricaded with zip ties, bike chains, or blocked with furniture and vending machines.  He begged the Occupiers to let him out, pleading, "I work here.  Let me out." *Id.* ¶ 132.  The Occupiers responded by laughing at Mr. Wilson and mocking him, saying "You work for the Jews" and "You're a Zionist."  *Id.* ¶ 133.  Eventually, an Occupier let Mr. Wilson out.  Once outside, Mr. Wilson saw Columbia safety officers and told them "You left us for dead" and "I could have been killed."  *Id.* ¶ 134.

The following day, Columbia authorized the NYPD to enter Hamilton Hall and remove the Occupiers.  *Id.* ¶¶ 136, 139, 141.  Among those arrested were Carlson, Parisi, Choi, Yancy, and John Does 1–40.  *Id.* ¶ 141.

As a direct result of these events, both Mr. Torres and Mr. Wilson suffered physical injuries and have been diagnosed by their physicians with Post-Traumatic Stress Disorder, *id.* ¶ 6, which has prevented each of them from returning to work, *id.* ¶ 20.  Each has incurred medical expenses and other economic damages and will be obligated to expend sums of money for, among other

things, future medical care for PTSD, *id.* ¶ 145, and other psychological ailments that have manifested because of the distress caused by the Occupiers' conduct, *id.* ¶ 144.

## LEGAL STANDARD

When a party moves to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a district court's analysis is confined to "the allegations contained within the four corners of the complaint." *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017) (bracket and quotation omitted). In considering a Rule 12(b)(6) motion, the court must "accept all the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *EEOC v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 253 (2d Cir. 2014). To survive, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ARGUMENT

**I.     The FAC Sufficiently States A Claim Under 42 U.S.C. § 1985(3) That Defendants Conspired To Violate The Constitutional Rights Of Jews And Of People Who, Like Mr. Torres And Mr. Wilson, Were Perceived To Support Jews.**

Section 1985(3) prohibits "two or more persons" from "conspir[ing] or go[ing] in disguise on the . . . premises of another, for the purpose of depriving . . . any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws." Consistent with the pleading standards for a claim under § 1985(3), the FAC sufficiently alleges that Defendants (1) engaged in a conspiracy for the purpose of depriving Jews and individuals believed to support Jews of the equal protection of the laws, and (2) acted in furtherance of the conspiracy, as a result of which Plaintiffs were injured in their persons or property or deprived of any right or privilege of a citizen of the United States. *See, e.g.*, *United Bhd. of Carpenters & Joiners of Am.*,

*Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 828–29 (1983) (laying out the elements of a claim under 18 U.S.C. § 1985(3)).

Civil rights conspiracies "'are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)); *see also Biswas v. City of New York*, 973 F. Supp. 2d 504, 533 (S.D.N.Y. 2013) (discussing *Pangburn*). Accordingly, a meeting of the minds among the co-conspirators need not be alleged by "direct evidence—a plaintiff may also meet this burden by alleging 'facts upon which it may be plausibly inferred that the defendants came to an agreement to violate his constitutional rights.'" *Zhang Jingrong v. Chinese Anti-Cult World All.*, 287 F. Supp. 3d 290, 298 (E.D.N.Y. 2018) (citing *Green v. McLaughlin*, 480 F. App'x. 44, 46 (2d Cir. 2012)); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995). Furthermore, Plaintiffs must allege overt acts by Defendants reasonably related to the promotion of the conspiracy. *See Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999).

As discussed below, the FAC details specific events, communications, and actions—down to the minute—from which it may be plausibly inferred that Defendants reached an agreement to take over Hamilton Hall for the purpose of depriving Jews and their supporters of the equal protection of the laws. It further alleges, with a high degree of specificity, the overt acts showing the role each Defendant played—both inside and outside Hamilton Hall—in executing the conspiracy that left Plaintiffs gravely injured and without livelihoods.

### A.    The FAC's Particularized Allegations Of Planning By, Coordination Between, And Communication Among TPF And Individual Defendants Give Rise To A Plausible Inference Of A Meeting Of The Minds.

Ignoring the particularized factual allegations of the FAC, Defendants argue that Plaintiffs' §§ 1985(3) and 1986 claims should be dismissed because the FAC fails to allege a meeting of the

minds among Defendants.  *See* Ind. Defs. Mem. 10 (arguing that the FAC does not establish "a meeting of the minds as to essentially anything, other than a protest in the broadest sense"); TPF Mem. 4 (arguing that the FAC fails to allege "a plan with TPF as a party to an agreement to engage in illegal conduct").  However, the FAC alleges numerous overt acts by Defendants that give rise to a reasonable inference that they agreed to engage in a conspiracy to deprive Jews and their supporters of the equal protection of the laws.

1.    **The FAC Alleges That TPF Was Not Sitting "On The Sidelines" But Was A Key Player In The Planning And Execution Of The Conspiracy.**

According to TPF, the FAC merely alleges "that TPF was on the sidelines" of the Encampment and the takeover of Hamilton Hall, "engag[ing] in time-honored political expression."  TPF Mem. 6.  In support of this argument, TPF offers a two-page bullet-point list quoting its own social media posts and concluding that the statements do nothing more than "call[] for protest rallies outside of the University."  *Id.* at 6–8.  But the FAC does not doomscroll through TPF's X account and then pronounce a conspiracy.  As it must, the FAC places these posts in the context of publicly reported events to allege that TPF played an active role in planning and executing the conspiracy.  *See, e.g.*, *Sines v. Kessler*, 558 F. Supp. 3d 250, 283 (W.D. Va. 2021) (reviewing social media posts and conduct of various defendants and concluding that the allegations were sufficient to state a civil rights conspiracy claim).

Likewise, De Los Santos's publicly reported statements at TPF's April 29 meeting must be read as a prelude to the overt acts of the conspiracy in the hours that followed: "**The moment the call goes out, we have to go back out . . . . We have to be the bodies willing to stand between the police and our students**."  FAC ¶¶ 16, 100 (emphasis added).  Notably, TPF does not quote this statement in its litany of public statements and social media posts—or anywhere else in its Memorandum of Law.  Instead, TPF suggests blandly that De Los Santos told his

audience "to go back out to engage in demonstration activity whenever the call goes out," TPF Mem. 7, as TPF had done in social media posts earlier that day. But the events that immediately followed the TPF meeting show that De Los Santos meant every word he said when he demanded that his followers heed "the call" and "be the bodies" between the police and the Occupiers.

"The call" went out at 11:27 p.m., when TPF posted a message on the social media platform X ordering people to "MOBILIZE TO COLUMBIA NOW!" FAC ¶ 106. One hour later, Individual Defendants and John Does 1–40 stormed Hamilton Hall. *Id.* ¶ 107. According to public reports, while crowds of demonstrators gathered at the gates of Columbia University, groups of individuals formed multiple layers of human cordons around Hamilton Hall,[4] becoming, as De Los Santos put it, "the bodies" between "the police and our students." At 12:40 a.m., TPF posted, "RIGHT NOW: The heroic and resilient student organizers at Columbia University have successfully taken and 'de-occupied' a building on campus and now they need our held to defend against a possible sweep!" *Id.* The takeover had barely begun, and TPF was already celebrating its consummation online, giving rise to a reasonable inference that the organization was in direct communication with co-conspirators in the building. Moreover, TPF's call for "help to defend a possible sweep!" is consistent with De Los Santos's earlier demand that his followers "be the bodies" between the police and the Occupiers. TPF's social media posts continued exhorting such action throughout the night. *Id.* ¶ 108.

When taken in the broader context of the allegations of the FAC, it is clear that TPF's social media posts and statements show a degree of coordination between TPF and the Occupiers sufficient to allege a meeting of the minds. *Upper Hudson Planned Parenthood, Inc. v. Doe* is

---

[4]    Gabriella Gregor Splaver, et al., *In Focus: When Hamilton Hall Became 'Hind's Hall'*, COLUM. SPECTATOR (May 12, 2024), tinyurl.com/Hamilton-HindsHall.

instructive. No. 90-cv-1084, 1991 WL 183863 (N.D.N.Y. Sept. 16, 1991). In that case, the court held that the plaintiffs sufficiently stated a § 1985(3) claim against non-profit organizations alleged to have "advocated and encouraged" illegal acts enumerated in the complaint. Key to the court's decision was the fact that the plaintiffs there alleged that certain of the individual defendants were "associated" with the non-profits "and that those individuals allegedly engaged in illegal overt acts, purportedly at the [non-profits'] behest." *Id.* at *12. Here, the FAC alleges that TPF did more than just "advocate and encourage" illegal acts: TPF *directed* those acts. FAC ¶¶ 97, 103. Furthermore, the FAC alleges that a number of Individual Defendants participated in the meeting convened by TPF that night for the express purpose of "organizing new forms of resistance" at Columbia University. *Id.* ¶ 97.

### 2. The FAC Alleges In Detail Coordinated Actions Showing That The Individual Defendants Agreed To The Conspiracy.

Individual Defendants ask this Court to ignore the well-pleaded factual allegations of the FAC, as well as settled precedent, in arguing that the FAC fails to allege "any act joining" them in "entry into" a conspiracy. Ind. Defs. Mem. 4–6. However, a conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *Thomas*, 165 F.3d at 146 (quotation omitted)); *see also Turkmen v. Hasty*, 789 F.3d 218, 262–63 (2d Cir. 2015) (denying former Justice Department officials' motion to dismiss § 1985(3) claim where allegations were "sufficient to support the reasonable inference that" Defendants shared "a tacit understanding about carrying out the unlawful conduct"). A meeting of the minds can be shown by alleging facts that render it implausible that the Individual Defendants were acting independently. *See White v. Frank*, 680 F. Supp. 629, 640 (S.D.N.Y. 1988) (denying law enforcement officers' motion to dismiss § 1985(3)

claim where, under the facts as alleged, it was implausible that individual defendants fabricated false testimony independently of each other).

On the facts alleged, it is all but impossible that Individual Defendants were acting independently of one another. As the FAC alleges, "[t]he hate-fueled mob that took over Hamilton Hall had commanders and foot soldiers, each with a specific role to play and task to execute." FAC ¶ 17. Carlson was a commander, as his "words and actions indicated to Mr. Torres that Carlson had some sort of authority over the mob." *Id.* ¶ 123. Upon being unmasked by Mr. Torres, Carlson shouted to the other Occupiers, "How can you let him do that to me?" *Id.* He then threatened Mr. Torres, saying "I'm going to get twenty guys up here to fuck you up." *Id.* ¶ 124. Choi was a foot soldier along with Yancy.[5] Choi and Yancy stayed close to Carlson and followed Mr. Torres, punching and striking him from behind. *Id.* ¶¶ 123–24. Fithian was a commander, "coaching, training, and directing the Occupiers on how to storm and seize Hamilton Hall and how to bar the doors so that no one could enter or leave, based on her years of experience agitating and protesting." *Id.* ¶ 128. It alleges that she stayed outside the building, "directing masked individuals to move the furniture in front of the door and instructing them, 'Tie it right to the lock' as they held zip ties." *Id.* ¶ 127. Parisi was a commander, a leader of one of the Columbia student organizations responsible for the siege of Hamilton Hall. *Id.* ¶ 24. Carlson, Parisi, and Choi were among those arrested inside Hamilton Hall after occupying the building for more than 17 hours. *Id.* ¶¶ 139–41. They did not meet in the building by coincidence. Their conduct, as alleged in the FAC, more than amply establishes a tacit agreement to take Hamilton Hall by force in furtherance of their conspiracy against civil rights.

---

[5]    Yancy, a Columbia University employee, was voluntarily dismissed from this case pursuant to Plaintiffs' agreement settling certain employment-discrimination claims against Columbia University. ECF No. 33.

3.      **The FAC's Limited Use Of "Information And Belief" Pleading Is Properly Grounded In The Facts Available To Plaintiffs.**

It is well settled that a plaintiff may plead facts on information and belief "where the facts are peculiarly within the possession and control of the defendant, *see, e.g.*, *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008), or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citing *Iqbal*, 556 U.S. at 678); *see also Shulman v. Chaitman, LLP*, 392 F. Supp. 3d 340, 353 (S.D.N.Y. 2019) (plaintiffs' pleading of facts on information and belief were sufficient "because such information would uniquely be in the defendants' possession").  This is especially true in the context of § 1985(3) claims, where courts have allowed for "information and belief" pleadings when "the specific facts surrounding the agreement between the defendants are likely unknown and inaccessible to the plaintiff" and where "the facts alleged raise a sufficient question to reject the argument that the claim is frivolous." *White v. Frank*, 680 F. Supp. 629, 640 (S.D.N.Y. 1988), *appeal dismissed*, 855 F.2d 956 (2d Cir. 1988).

The FAC properly alleges on "information and belief" that the conspiracy was solidified and set into motion during TPF's April 29 meeting and in the hours that followed.  The FAC also properly alleges on information and belief that a number of Individual Defendants and John Does 1–40 participated in the April 29 meeting.  These inferences are reasonable in light of the facts available to Plaintiff, including: (1) TPF's decision to delay the start time of the meeting to allow individuals traveling from Columbia University's Upper West Side campus to TPF's midtown offices, *see* Joseph Simonson, *Anti-Israel Group Encouraged Columbia Protesters To Re-Create 'The Summer of 2020' Hours Before Students Stormed a Building*, WASH. FREE BEACON (May 1, 2024), perma.cc/JD35-G78U ("The meeting, which was scheduled to start at 6:45 p.m., was delayed to give protesters from Columbia time to make it downtown.") (incorporated at FAC ¶ 100

n.50); (2) months of coordination between CUAD and TPF, FAC ¶¶ 97, 99; (3) the substance of the publicly reported portions of the meeting, together with the breakout sessions' focus on "new methods of 'resistance'" at Columbia University, *id.* ¶ 100; and (4) TPF's apparent advance knowledge of the conspiracy.

Claims alleging far less have survived motions to dismiss.  Indeed, courts have denied motions to dismiss claims against defendants even when, unlike here, "there are no allegations in the complaint detailing how, when and where the alleged conspiracy was consummated." *Upper Hudson Planned Parenthood*, 1991 WL 183863, at *12 ("[G]eneral allegations" against defendant non-profit, "when read in conjunction with the rest of the complaint, give rise to a reasonable inference that these group defendants formed a conspiracy."); *see also Coggins v. Cnty. of Nassau*, 988 F. Supp. 2d 231, 248 (E.D.N.Y. 2013) (denying motion to dismiss where complaint did not allege facts explicitly detailing agreement to a specific plan or a meeting of the minds); *White*, 680 F. Supp. at 640 ("[T]he absence of facts specifying when and where the defendants met to consummate their alleged bargain is not fatal to plaintiff's claim; at a minimum, the facts alleged raise a sufficient question to reject the argument that the claim is frivolous." (citing *Angola v. Civiletti*, 666 F.2d 1, 4 (S.D.N.Y. 1981))), *appeal dismissed*, 855 F.2d 956 (2d Cir. 1988).

**B.    The FAC Sufficiently Alleges That Defendants Conspired To Take Over Hamilton Hall In Order To Deprive Jews And Their Supporters Of The Equal Protection Of The Laws.**

"[I]n order to state a claim under Section 1985(3) a complaint must allege, *inter alia*, that the defendants who allegedly conspired sought, with discriminatory intent, to deprive the plaintiff of a right covered by the Constitution or other laws." *Spencer v. Casavilla*, 903 F.2d 171, 174 (2d Cir. 1990) (citing *Carpenters & Joiners*, 463 U.S. at 834, and *Griffin v. Breckenridge*, 403 U.S. 88, 101–03 (1971)).

19

### 1.    The FAC's Specific Allegations Of Anti-Semitism Are Not An Attack On Free Speech, But Evidence Of Defendants' Discriminatory Animus.

The FAC's specific allegations of anti-Semitism serve as evidence of the discriminatory animus that motivated Defendants' conspiracy against the constitutional rights of Jews and their supporters.  They are not, as Defendants argue, a "broadside attack on free speech and dissent in the United States."  TPF Mem. 1.  The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (rejecting First Amendment challenge to enhanced criminal sentence where defendant selected his victim because of the victim's race); *see also Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 267 (S.D.N.Y. 2025) ("[C]ourts have long recognized that there is no constitutional problem with using offensive speech as evidence of motive or intent." (quotations omitted)).  "[T]he Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment."  *Dawson v. Delaware*, 503 U.S. 159, 165 (1992).  Nor may "the use of weapons, gunpowder, and gasoline . . . constitutionally masquerade under the guise of 'advocacy.'"  *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) (quoting *Samuels v. Mackell*, 401 U.S. 66, 75 (1971) (Douglas, J., concurring)).  This is no less true in the context of a conspiracy, as "[s]peech is not protected by the First Amendment when it is the very vehicle of the crime itself."  *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990) (quotation omitted).

Courts have repeatedly held that speech that, in isolation, might be protected by the First Amendment, can support a conspiracy claim when viewed in the context of other allegations.  For example, in *Zhang Jingrong*, the court held that allegations of advocacy arguably protected by the First Amendment were sufficient to support a conspiracy claim under § 1985(3) because the

defendant non-profit organization's expressive activity served as the "backdrop" against which violent attacks allegedly committed by individual defendants occurred. 287 F. Supp. 3d at 299, 305.[6] The FAC details allegations showing that anti-Semitism served not only as the "backdrop" against which the takeover of Hamilton Hall occurred, but that anti-Semitism played a starring role in the siege, from the attacks on Mr. Torres and Mr. Wilson for being "Jew-lovers" to the Occupiers' calls for "Intifada." FAC ¶¶ 1, 120, 159, 173, 221.

Yet in an apparent effort to deflect attention from the actual facts alleged, Defendants mischaracterize the gravamen of Plaintiffs' claims under §§ 1985(3) and 1986. Defendants claim that the FAC "smears with such a broad brush" all anti-Zionist and anti-Israel opinions as anti-Semitic. TPF Mem. 11. The FAC does nothing of the sort. The FAC alleges, in scrupulous detail, expressive activity by Defendants as evidence of Defendants' own anti-Semitic animus. *See, e.g.*, FAC ¶¶ 38–39, 86, 66. But nowhere in page after hectoring page of digressions on the history of Zionism, Jewish identity, Israeli politics, and traditions of student revolt do Defendants address the FAC's specific allegations of anti-Semitic animus. TPF Mem. 10–13; Ind. Defs. Mem. 1–4.

For example, TPF makes no mention of De Los Santos's social media posts on the morning of October 7, 2023, celebrating as "heroic" the Hamas fighters who were still torturing, raping, and butchering Israeli civilians. FAC ¶ 38. Nor does TPF mention the public statements by De Los Santos that Congressman Ritchie Torres likened to "Nazi rhetoric about a 'final solution.'" *Id.* ¶ 86. For their part, Individual Defendants either ignore or trivialize the factual allegations in the

---

[6]     Similarly, in *Upper Hudson Planned Parenthood, Inc.*, the court held that plaintiffs adequately pleaded a § 1985(3) claim against a non-profit organization alleged to have regularly picketed outside a health care provider, noting, "Certainly defendants are entitled to exercise their First Amendment rights. The picketing allegations cannot be read in isolation though; and when read in conjunction with the other allegations, it could be that those picketing activities have encompassed conduct which is not constitutionally protected, and which may also infringe upon plaintiff's rights." No. 90-cv-1084, 1991 WL 183863, at *4 n.21 (N.D.N.Y. Sept. 16, 1991).

FAC.  For example, they refer to "some colorful social media posts" by Parisi "in reaction to attacks by the Columbia administration."  Ind. Defs. Mem. 6.  However, they neglect to mention that those posts called for Columbia to "BURN" in the wake of President Minouche Shafik's announcement directing the Encampment, organized in part by Parisi, to disband because it had created a hostile environment for Jews in violation of Title VI.  FAC ¶¶ 87–91.  And none of Defendants so much as utters the Occupiers' rallying cry of "Intifada," which they proudly displayed from the walls of Hamilton Hall, and which was immediately denounced by President Biden as a "repugnant, antisemitic smear."  FAC ¶ 18.  These are not allegations of Defendants' "abstract beliefs" but rather their "discriminatory motive" for "committing the offense." *Wisconsin*, 508 U.S. at 485–87.

Finally, Individual Defendants' argument that the FAC fails to state a claim against them because it does not specifically attribute any anti-Semitic slurs to them is unavailing.  Ind. Defs. Mem. 5.  A complaint need not show that every single defendant was motivated by class-based animus or that such animus was the sole motive for the conspiracy.  Indeed, this court has held that a complaint sufficiently alleged a civil rights conspiracy where "*some* of the[] defendants were motivated *at least in part* by racial animus."  *Tchatat v. City of New York*, No. 14-cv-2385, 2015 WL 5091197, at *5 (S.D.N.Y. Aug. 28, 2015) (emphasis added).  This is because, "allegations of racial animus involve defendants' state of mind, which is difficult to prove in any event and particularly so at the pleading stage."  *White*, 680 F. Supp. at 640.

### 2. Plaintiffs Have Plausibly Alleged That Defendants' Conspiracy Was Motivated By Anti-Semitic Animus.

At this point in the proceedings, the question before the Court is whether Plaintiffs have *plausibly alleged* that Defendants' actions (including their posts) show anti-Semitic animus sufficient to adequately allege an anti-Semitic motive for their conspiracy.  Judge Cronan's recent

decision in *Gartenberg v. Cooper Union* is instructive. 765 F. Supp. 3d at 270. There, as here, a key question before the Court was whether the plaintiffs sufficiently pleaded, albeit in the context of a Title VI claim, that campus demonstrators were motivated by discriminatory intent against Jews. Judge Cronan observed that the motion to dismiss "c[ould] be resolved without opining on whether conduct or speech hostile to Zionism . . . is necessarily antisemitic." *Id.* at 268.

Looking to the express words allegedly used by the demonstrators, Judge Cronan held that specific references to "Jews" was speech that "on its face [went] beyond mere criticism of Israeli government policy, or Zionist ideology," and instead evidenced anti-Semitic animus. *Id.* Furthermore, Judge Cronan observed that because "the federal anti-discrimination laws can hear [bigotry] sung in the whistle register, . . . even facially neutral words and phrases can be highly probative of discriminatory intent depending on the circumstances and social context in which they are communicated." *Id.* at 269 (internal citations and quotations omitted). Based on the particular circumstances and social context alleged in the complaint, Judge Cronan concluded that demonstrators' slogans of "[l]ong live the intifada," "[r]esistance is justified," and "[f]rom the river to the sea, Palestine will be free," plausibly alleged anti-Semitic animus. *Id.* Particularly notable is Judge Cronan's observation that last of these slogans—"from the river to the sea . . . ," *see* FAC ¶¶ 12, 70—was described as anti-Semitic in a House resolution "precisely because it suggests the eradication of the State of Israel and the Jewish people." *Gartenberg*, 765 F. Supp. 3d at 269 (quotations omitted).

Here, as in *Gartenberg*, the Occupiers made no effort to conceal their anti-Semitism, repeatedly calling Mr. Torres and Mr. Wilson "Jew lovers" and "Zionists" when the men resisted. FAC ¶¶ 4, 132–33. When Mr. Torres refused to accept bribes from the Occupiers, they demanded, "What are you, a Jew-lover?" and "Why are you protecting them?" *Id.* ¶ 4. And when Mr. Wilson

begged to be released from the building, pleading, "I work here," the Occupiers replied, "You work for the Jews," and "You're a Zionist." *Id.* ¶¶ 132–33. One does not have to move far up the whistle register to understand that the rallying cry of the siege—*Intifada*—was tantamount to a call for violence against Jews, *id.* ¶ 3, especially when taken in the context of the broader climate of anti-Semitic hatred and violence that had engulfed Columbia's campus, *see, e.g.*, *id.* ¶¶ 41–43, 45–46, 51–53, 56–63, 69–70. Indeed, when the Occupiers triumphantly hung banners reading "INTIFADA" from Hamilton Hall, President Biden issued a statement "condemn[ing] the use of the term 'intifada,' as . . . tragic and dangerous hate speech" and a "repugnant, antisemitic smear." *Id.* ¶ 18.

All these allegations plausibly allege anti-Semitic animus on the part of Defendants. Defendants' alternative explanations might be appropriate at trial. "But at this stage of the case, '[t]he test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation.'" *Gartenberg*, 765 F. Supp. 3d at 270 (quoting *Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019)); *see also Sines v. Kessler*, 324 F. Supp. 3d 765, 773 (W.D. Va. 2018) (denying motion to dismiss a § 1985(3) claim because at the 12(b)(6) stage the court does not "choose between parties' competing narratives of what 'actually happened'").

The First Circuit's decision in *StandWithUS Center for Legal Justice v. Massachusetts Institute of Technology* does not change this analysis. No. 24-1800, 2025 WL 2962665 (1st Cir. Oct. 21, 2025). There, the court cited *Gartenberg* in expressly acknowledging that anti-Zionism *can* be "wielded as a tool of the antisemite." *Id.* at *11.[7] However, the First Circuit dismissed the Title VI and § 1986 claims on the grounds that the plaintiffs had not alleged facts sufficient to

---

[7]    TPF's Notice of Supplemental Authority omits this, stating that the First Circuit "squarely rejects" the "conflation of anti-Zionism with anti-Jewish racism." TPF Supp. at 2.

show that campus demonstrators were indeed motivated by anti-Semitic animus. The underlying conspiracy allegations in *StandWithUs* were far weaker than the facts alleged here. In *StandWithUs*, the plaintiffs merely "alleged two acts of arguable 'violence' against Jewish or Israeli students," *id.* at *17, that took place almost a month apart, *id.* at *2, and neither was alleged to have been "authorized, endorsed, or planned" by any of the student groups allegedly involved in the conspiracy, *id.* at *17. The First Circuit concluded that it "strain[ed] credulity" that these two isolated altercations were the "conscious objective" of the campus protests and acknowledged that the plaintiffs had not even alleged that the altercations were the "purpose of the protests." *Id.* at *16–17. The plaintiffs in *StandWithUs* were not held against their will in a building fortified by MIT, physically assaulted by MIT, or called "Jew-lovers" by MIT. Rather, at issue in *StandWithUs* was MIT's culpability for anti-Semitic conduct by third parties under federal civil rights law. Accordingly, the allegations by the plaintiffs in S*tandWithUs* stand in stark contrast to the allegations of the FAC.

### 3. Plaintiffs Adequately Allege That Defendants' Anti-Semitic Conspiracy Took Aim At The Constitutional Rights To Travel And To Be Free From Racial Violence.

The FAC alleges that Defendants' conspiracy to take over Hamilton Hall took direct aim at Plaintiffs' constitutional rights to travel and to be free from racial violence. Specifically, the FAC alleges that Defendants "plotted and agreed to take control of Hamilton Hall . . . to wield power and leverage, and to create an atmosphere of terror and submission" for Jews and their supporters through a strategy that included "threats, intimidation, harassment, assaults, and if necessary, physical violence." FAC ¶ 150. It alleges that Defendants anticipated that employees would be inside Hamilton Hall during the siege and planned accordingly by taking direct aim at the Plaintiffs' right to travel: Defendants held the men captive in the barricaded and "fortified" building, refusing to allow them to leave their workplace so they could return home. *Id.* ¶¶ 113,

25

126, 132–33.  It further alleges that Defendants planned to use physical violence, threatened <u>actual</u> attacks against the captive Plaintiffs, and used physical restraint, as evidenced by Defendants' blockade and fortification of Hamilton Hall and Defendants' <u>actual</u> detention of Plaintiffs inside the building against their will.  *Id.*  And it alleges that throughout the siege, various Occupiers derided Mr. Torres and Mr. Wilson for being "Jew-lovers" and "Zionists," for "work[ing] for the Jews," and demanded to know, "why are you protecting them?"  *Id.* ¶¶ 1, 4–5, 122, 133.

Defendants argue that the real purpose of the conspiracy was to seize Hamilton Hall "to pressure Columbia to acquiesce to policy demands" and that "any alleged effect on Plaintiffs' rights was merely incidental."  TPF Mem. 21.  But this does not change the sufficiency of the allegations, as a civil rights conspiracy may be proven where the defendant "act[s] *at least in part for the very purpose of producing*" a deprivation of rights.  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276 (1993) (emphasis added).

The FAC alleges that Mr. Torres and Mr. Wilson were held against their will in a locked building, physically assaulted, threatened, and derided as "Jew lovers" by a highly coordinated mob orchestrated in part by TPF and comprised of Individual Defendants and John Does.  These allegations are sufficient to create a plausible inference that the anti-Semitic attacks on Mr. Torres and Mr. Wilson were not "incidental to" the conspiracy—they were an object of it.  *See, e.g.*, *Zhang Jingrong*, 287 F. Supp. 3d at 298–99; *Spencer*, 903 F.2d at 175 (holding that plaintiffs adequately alleged conspiracies targeting constitutional rights by alleging overt acts (in both cases violent attacks) reasonably related to the promotion of the conspiracy).

### 4.    There Is A Constitutional Right To Be Free From Racial Violence, And Plaintiffs Sufficiently Allege A Conspiracy To Violate It.

Defendants argue that the FAC fails to allege a conspiracy to violate Plaintiffs' constitutional right to be free from racial violence because no such right exists.  But this Court

implicitly recognized a constitutional right to be free from racial violence in *Tchatat v. City of New York*. 2015 WL 5091197, at *12. There, Judge Schofield denied a motion to dismiss a § 1985(3) claim with respect to five defendants who allegedly detained a Cameroonian man in the security office of a Best Buy store and beat him while two of the five defendants used racial slurs. *Id.* Judge Schofield held that these factual allegations were sufficient to make out a claim that all five defendants conspired to deprive Tchatat of equal protection of the laws, "thereby caus[ing] [p]laintiff a loss of liberty *and bodily injury* in violation of § 1985(3)." *Id.* at *12 (emphasis added).

Defendants' argument ignores *Tchatat* and instead rests on a slender reed: one case from the Eastern District of New York that states in conclusory fashion that the "right[ ] to be free from racial violence" is "not among the rights the Constitution guarantees against private deprivation." *Emanuel v. Barry*, 724 F. Supp. 1096, 1102–03 (E.D.N.Y. 1989) (emphasis omitted). *Emanuel* provides no authority or explanation in support of this conclusion, and has been called into question by other courts. *See, e.g.*, *Johnson v. Smith*, 810 F. Supp. 235, 238–39 (N.D. Ill. 1992) (acknowledging, but declining to follow, *Emanuel*); *see also Stirgus v. Benoit*, 720 F. Supp. 119, 122–23 (N.D. Ill. 1989) (in case involving facts similar to those in *Emanuel*, denying motion to dismiss claims including § 1985(3) claim; rejecting defendants' contention that their "single violent act, even if discriminatory in nature," was insufficient to invoke § 1985(3)). Defendants also cite *Hogan v. County of Lewis, N.Y.* in support of the proposition that there is no constitutional right to be free from racial violence; however, the *Hogan* court never actually ruled on that question because the plaintiffs abandoned their racial-violence conspiracy theory. Thus, the *Hogan* court's commentary was mere dicta. No. 11-cv-0754, 2015 WL 1400496, at *12 (N.D.N.Y. Mar. 26, 2015), *aff'd sub nom.*, *Okudinani v. Rose*, 779 F. App'x 768 (2d Cir. 2019). Defendants

additionally cite *Doe v. AR*, No. 21-cv-06353, 2021 WL 5416235, at *5 (W.D.N.Y. Nov. 19, 2021), but that case is simply not relevant because it involved a § 1985(3) claim based on a sexual assault, with no allegation of class-based animus.

Defendants similarly ignore case law from other circuits recognizing a constitutional right to be free from racial violence. *Sines v. Kessler*, for example, squarely held that "the Thirteenth Amendment does provide an underlying right to be free from racial violence that can sustain a Section 1985(3) claim." 324 F. Supp. 3d at 782. Indeed, this Court recently acknowledged the *Sines* plaintiffs' theory of liability under § 1985(3), including the assertion that "these defendants conspired with one another to engage in violence against others motivated by a class-based animus." *Sines v. Yiannopoulos*, No. 20 Misc. 241, 2020 WL 6058279, at *6 (S.D.N.Y. 2020).

Although TPF urges this Court to treat the decision in *StandWithUs* as controlling here, it neglects to mention that the First Circuit implicitly recognized that there is a right to be free from racial violence under the Thirteenth Amendment. 2025 WL 2962665, at *17–18. The First Circuit affirmed the dismissal of the plaintiffs' § 1986 claim on the ground that the complaint failed to sufficiently allege a conspiracy to deprive Jewish students of their right to be free from racial violence. In other words, the decision was grounded on the inadequacy of the facts alleged, not a failure to assert a cognizable right. *Id.* at *17.

### C.    The FAC Sufficiently Alleges That Defendants' Conspiracy Targeted The Plaintiffs' Constitutional Right To Travel.

The Second Circuit has held that the constitutional right to travel protects not only the right to interstate travel, but "also protects the right to travel freely within a single state" because it would be "meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." *Spencer*, 903 F.2d at 174 (citing *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646 (2d Cir.

1971)) (quotations omitted).  In examining the scope of the right to travel, this Court held that denying an individual entrance to a building may implicate the constitutional right to travel.   In *Campbell v. Westchester County*, the court denied a motion to dismiss a § 1985(3) claim brought by a plaintiff who had been barred from entering a public hospital, reasoning, "It is possible that the right to travel could protect plaintiff's right to travel to the hospital, and that denial of entrance to the hospital would impinge upon that right."  No. 96-cv-0467, 1997 WL 773702, at *2 (S.D.N.Y. Dec. 11, 1997).  It is equally possible that the right to travel could protect Plaintiffs' right to travel *from* Hamilton Hall, and that barring their exit from the building would impinge upon *that* right.

Defendants argue that this case is different from *Campbell* because the latter involved "a unique destination, such as a medical facility, at the end of public roadway travel."  TPF Mem. 20. But this is a distinction without a difference, as the FAC expressly alleges that Defendants barred Mr. Torres and Mr. Wilson from leaving Hamilton Hall, thereby preventing them from traveling the public roadways to a destination no less unique than a medical facility: their homes.  FAC ¶¶ 160, 161.  *Tchatat*, in which the plaintiff was held against his will inside a Best Buy office, likewise supports Plaintiffs' right to travel.[8]  For their part, Individual Defendants offer a wholly revisionist account of the FAC, arguing that the Occupiers sought to "*facilitate* Plaintiffs' travel from the inside to the outside of Hamilton Hall — and even offered to pay them to engage in such travel."  Ind. Defs. Mem. 7 (emphasis original).   This completely ignores sections of the FAC detailing how Plaintiffs were detained inside the barricaded building while Occupiers refused their repeated pleas to be released.  FAC ¶¶ 5, 132, 159, 173.

---

[8]      As discussed above, the court denied a motion to dismiss by defendants alleged to have conspired to deprive plaintiff of equal protection of the laws by locking him in a Best Buy security office and beating him, "thereby caus[ing] [p]laintiff *a loss of liberty* and bodily injury in violation of § 1985(3)."  *Tchatat*, 2015 WL 5091197, at *12 (emphasis added).

### D.    Plaintiffs Are Members Of A Protected Class Under 18 U.S.C. § 1985(3).

The fact that Plaintiffs are not themselves Jewish is immaterial to their § 1985(3) claim because the statute protects not only members of the protected class, but their perceived supporters as well.  "The predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes *and their supporters*."  *Carpenters & Joiners*, 463 U.S. at 836 (emphasis added).  Consistent with Thirteenth Amendment jurisprudence, the Supreme Court has held that § 1985(3) applies whenever there is "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."  *Griffin*, 403 U.S. at 102.[9]

Defendants argue that Mr. Torres and Mr. Wilson could not possibly have been the targets of an anti-Semitic conspiracy because they are not Jewish.  This argument is unavailing for the same reasons the *Sines* court rejected a similar argument from defendants who averred "that they only possessed racial animus against non-white individuals, and so they [could] not be held liable by white Plaintiffs."  324 F. Supp. 3d at 780.  Relying on *Carpenters & Joiners*, the *Sines* court held that white plaintiffs "plausibly alleged that they were attacked because of their *support of* non-white racial minorities[.]"  *Id.* at 780–81 (emphasis added).  Here, the FAC specifically alleges that Mr. Torres and Mr. Wilson were subjected to physical violence and held against their will because of their perceived support of Jews.  Occupiers could not have made this more clear than when they called Mr. Torres a "Jew-lover" and told Mr. Wilson "You work for the Jews."  FAC ¶¶ 122, 133.  One of the Defendants put an even finer point on it, shouting at Mr. Torres, "Why are you defending them? . . . What are you, a Jew-lover?"  *Id.* ¶ 122.

---

[9]    Notably, the conspiracy alleged in *Griffin* was motivated by defendants' belief that a white man driving the car in which black plaintiffs were passengers at the time they were assaulted was a civil rights worker.  403 U.S. at 90.  It was of no consequence to the court that defendants were mistaken in their belief.  *See id.* at 103.

II.   **Plaintiffs Have Also Stated Valid Claims Under § 1986 Against TPF And Individual Defendants For Failing To Prevent Or Aid In The Prevention Of The Conspiracy.**

Section 1986 "provides a cause of action against anyone who having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (per curiam) (quotation omitted), *aff'd in part and rev'd in part on other grounds*, 892 F.2d 20 (2d Cir. 1989)). "Liability under § 1986 is derivative of § 1985 liability," *Jews for Jesus, Inc.*, *v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286, 292 (2d Cir. 1992). As detailed above, Plaintiffs have stated a valid § 1985(3) claim against TPF and Individual Defendants. Defendants' failure to take action to prevent or aid in the prevention of the execution of the conspiracy creates additional liability under § 1986. *See, e.g.*, *Sines*, 324 F. Supp. 3d at 798 (holding that plaintiffs stated valid § 1986 claims against all but one of 18 named defendants, where plaintiffs had also stated a valid claim of conspiracy to violate their right to freedom of movement and the right to be free from racial violence).

III.   **Defendants' Allegedly Violent Acts Imprisoning Plaintiffs Inside Hamilton Hall Plausibly Constitute IIED.**

Contrary to Defendants' assertions, the extreme-and-outrageous element of Plaintiffs' IIED claim does not rest on their alleged "bigotry" and speech. Ind. Defs. Mem. 14. The allegations in the FAC, which Defendants' argument ignores, are straightforward: Defendants physically seized and barricaded a university building, FAC ¶¶ 217–18; locked exits with bike chains and zip ties, effectively imprisoning everyone inside; knew janitorial staff were likely to be inside, *id.* ¶ 220; prepared to "neutralize" employees, including with bribes, *id.*; harassed and threatened Plaintiffs with slurs and intimidation, *id.* ¶ 221; and used physical force and restraint, *e.g.*, *id.* ¶¶ 114–28. Taken together, these actions—not Defendants' speech—plausibly allege extreme and outrageous conduct.

There can be no serious dispute that organizing a mob, trapping Plaintiffs inside a building, threatening them with violence, and causing severe, medically diagnosed PTSD, *id.* ¶ 225, constitutes extreme and outrageous conduct. Under New York law, it is well established that allegations of physical threats are sufficient to state an IIED claim. *See, e.g., Kamar v. AKW Holdings, LLC*, 859 N.Y.S.2d 903 (table), at *8 (N.Y. Sup. Ct. 2008) ("It is sufficient [to state an IIED claim] . . . that plaintiff has alleged that he was threatened with physical violence which caused him immediate apprehension of sustaining physical harm, and that as a result of these menacing threats, he has become fearful for his well-being . . . ."); *Murphy v. Murphy*, 486 N.Y.S.2d 457, 459 (N.Y. App. 1985) (outrageous conduct where defendant broke into house, threatened plaintiff, and engaged in "general abusive conduct toward plaintiff" ultimately "requiring police intervention"); *Ruiz v. Bertolotti*, 236 N.Y.S.2d 854, 855 (Sup. Ct. 1962) (outrageous conduct where defendant "threatened bodily harm" to builder and plaintiffs to prevent plaintiffs as "'colored persons' [from] moving into the neighborhood").[10]

Indeed, the Second Restatement illustrates viable IIED claims with scenarios involving threats like those here—for example, when a "mob" threatens plaintiff's bodily safety at his home

---

[10]    *See also, e.g., Bd. of Managers of Promenade Condo. v. Jackman*, 217 N.Y.S.3d 471, at *3 (N.Y. Sup. Ct. 2024) (unpublished) ("insult[ing]" plaintiff, "repeatedly mock[ing]" plaintiff, threatening to have a "brawl" with plaintiff' and giving plaintiff "a threatening look" held sufficient to state an IIED claim (citation omitted)); *Cavallaro v. Pozzi*, 814 N.Y.S.2d 462, 466 (N.Y. App. 2006) ("threatening to kill plaintiff and his children . . . rose to the requisite level of outrageousness" for IIED); *Eves v. Ray*, 840 N.Y.S.2d 105, 106 (N.Y. App. 2007) (physical and financial threats constituted outrageous conduct); *Sahebdin v. Khelawan*, No. 21-cv-2956, 2022 WL 4451005, at *14 (E.D.N.Y. Sept. 24, 2022) ("threaten[ing] [plaintiff] with bodily injury and harm" was grounds for IIED). Indeed, even allegations short of physical threats may constitute IIED under New York law. *See, e.g., Moraes v. White*, 571 F. Supp. 3d 77, 105–06 (S.D.N.Y. 2021) (outrageous conduct where defendants had "an agent . . . sneak into [plaintiff's] building, and loudly and persistently bang on her door," "threaten[] [her] immigration status" and employment, and "follow[] her to the subway and 'harangue[]' her on the way").

or when "an intimidating group" corners plaintiff at a meeting.[11]  *See* RESTATEMENT (SECOND) OF

TORTS § 46, illus. 2, 20. (citing *Ruiz*, 236 N.Y.S.2d 854); *compare* FAC ¶ 124 ("Carlson then

threatened Mr. Torres, saying, 'I'm going to get twenty guys up here to fuck you up.'").

Defendants insist their violent conduct was a form of constitutionally protected political

expression.  However, "[t]he First Amendment does not protect violence."  *Claiborne Hardware*

*Co.*, 458 U.S. at 916; *see Wisconsin*, 508 U.S. at 484 ("Thus, a physical assault is not by any stretch

of the imagination expressive conduct protected by the First Amendment.").  It does not create "a

wall of immunity protecting" political protesters "from any liability for their conduct while"

protesting.  *Cf. Galella v. Onassis*, 487 F.2d 986, 995 (2d Cir. 1973) (holding reporters liable for

torts during "news gathering").   Under settled IIED jurisprudence, courts have had no trouble

rejecting First Amendment "smokescreens" where an IIED claim was plainly based on a

defendant's deliberate and malicious conduct.  *See, e.g.*, *Rich*, 939 F.3d at 118; *Dennis v. Napoli*,

49 N.Y.S.3d 652, 653–54 (N.Y. App. 2017) (rejecting First Amendment defense to IIED claim);

*Bingham v. Struve*, 591 N.Y.S.2d 156, 157–58 (N.Y. App. 1992) (per curiam) (similar).

Defendants' heavy reliance on *Snyder* is particularly inapt.  Ind. Defs. Mem. 13–15 (citing

*Snyder v. Phelps*, 562 U.S. 443 (2011)).  *Snyder* rejected a Gold Star family's IIED claim arising

out of a peaceful, lawful protest on public property near their son's funeral.  *Snyder* would only be

relevant here had Individual Defendants "notified the authorities in advance" before conducting a

demonstration, "complied with police instructions in staging their demonstration," stayed

"approximately 1,000 feet from" Hamilton Hall, and merely held signs in a "public place" and

"conducted [their] picketing peacefully."  562 U.S. at 448–49, 456.  But that is not even remotely

---

[11]     "New York has adopted the Restatement (Second) formulation of IIED."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019).

close to the events alleged in the FAC.  Here, Individual Defendants conducted a violent takeover of a private building, locked Plaintiffs inside, threatened them, beat them, and mocked them while they were trapped.  Such conduct is extreme and outrageous—just as it would have been if the Westboro Baptists had stormed the church during Lance Corporal Snyder's funeral, used zip ties and bike locks to barricade the exits, trapped mourners inside, and pushed Snyder's parents against a wall while shouting threats and epithets.

Individual Defendants thus miss the point by citing failed IIED claims involving nothing more than offense at defendant's speech.  Ind. Defs. Mem. 14–15 n.15.[12]  Of this line of cases, perhaps the most inapposite is *Williams v. Port Authority of New York and New Jersey*, 880 F. Supp. 980 (E.D.N.Y. 1995), a case that Defendants repeatedly quote to suggest that use of racial slurs and "back[ing] the plaintiff against the wall" does not constitute IIED.  Ind. Defs. Mem. 15 & n.15.  *Williams* was a bench-trial opinion, not a pleadings decision, and the cited language comes from the court's summary of plaintiff's assault claim, which the court dismissed because "there was no evidence" that the defendant ever "did anything" to "suggest imminent bodily contact" with plaintiff.  88 F. Supp. at 994.  The court then dismissed the plaintiff's IIED claim because it

---

[12]    *See, e.g.*, *Graham by Graham v. Guilderland Cent. Sch. Dist.*, 681 N.Y.S.2d 831 (N.Y. App. 1998) (finding teacher calling an African-American student the n-word "in an attempt to illustrate the hurtful nature of such comments, is not enough to trigger" IIED); *Bernardi v N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 19-cv-11867, 2021 WL 1999159, at *13 (S.D.N.Y. May 18, 2021) (finding racial epithets in workplace did not constitute IIED); *Shukla v. Deloitte Consulting LLP*, No. 19-cv-10578, 2020 WL 3181785, at *13 (S.D.N.Y. June 15, 2020) (same); *Colon v. Wal-Mart Stores*, 182 Misc 2d 921, 923 (N.Y. Sup. Ct. 1999) (same); *Rivera v. Baccarat, Inc.*, No. 95-cv-9478, 1996 WL 251850, at *3 (S.D.N.Y. May 10, 1996) (same).  Defendants misread *Mizrahi v. Borstein,* No. 152360/13, 2014 WL 2571644, at *8 (N.Y. Sup. Ct. June 5, 2014), which merely dismissed an IIED claim because it was based on speech made during privileged settlement negotiations.

was based solely on "the use of racial slurs." *Id.* at 995. Defendants prove nothing by citing a line

of cases where IIED claims failed because they were based on pure speech.[13]

## IV.    The FAC Plausibly Alleges Carlson And Choi Were Two Of The Rioters Who Assaulted Plaintiffs.

Individual Defendants also argue that Plaintiffs fail to plausibly allege a basis for their

assault claims. Ind. Defs. Mem. 15–16. However, Individual Defendants' argument ignores

(1) the allegations in the FAC identifying specific statements that are attributed to Carlson, FAC

¶¶ 123–24, (2) the photographs at paragraphs 121 and 123 of the FAC of the individuals that

Plaintiffs believe to be Carlson and/or Choi, and (3) that the Counts for Assault and/or Battery are

asserted against the Individual Defendants that were inside Hamilton Hall *and* the John Doe

Defendants, *see* FAC ¶¶ 180–215. Moreover, Individual Defendants' reliance on a self-serving

Declaration from James Carlson, *see* Carlson Decl. (October 20, 2025), ECF No. 41, (asserting,

"it appears that I have been misidentified" as "a person depicted in a photograph in an altercation

with Plaintiff Torres" but not denying that he did in fact attack Mr. Torres), is improper, *see Levine*

*v. Babiarz*, No. 22-cv-891, 2024 WL 1463767, at *3 (N.D.N.Y. Apr. 4, 2024), and the declaration

should be stricken, *Collins v. Giving Back Fund*, No. 18-cv-8812, 2019 WL 3564578, at *2

(S.D.N.Y. Aug. 6, 2019).[14] Accordingly, the FAC plausibly alleges that Carlson and Choi were

---

[13]    *Williams v. City of Mount Vernon* is also far afield. 428 F. Supp. 2d 146 (S.D.N.Y. 2006). There, two plainclothes police officers misidentified plaintiff as a narcotics suspect and punched him in the face while he resisted arrest. *Id.* at 152–53. This is the only IIED case Defendants cite where a plaintiff was subjected to physical force and restraint, and it is obviously distinguishable because the officers' conduct occurred during a mistaken arrest and thus did not "go beyond all possible bounds of decency" as required under New York law. *Id.* at 160. Here, by contrast, Defendants' intentionally barricaded Plaintiffs inside a building, knowing they could not escape, and used threats, slurs, and intimidation to terrorize them.

[14]    Plaintiffs have separately filed a Motion to Strike the Declaration of James Carlson, ECF No. 41. *See* ECF No. 50.

two of the rioters who assaulted Plaintiffs.  But, even if it did not, the counts are asserted against

all Defendants who entered Hamilton Hall, including John Does, and thus, even by Individual

Defendants' own argument, Ind. Defs. Mem. 16 n.16, the allegations suffice at the pleading stage.

## V.    Individual Defendants' Anti-SLAPP Claim Is Meritless.

The FAC's detailed factual allegations describe Defendants arming themselves with ropes,

crowbars, and zip ties; smashing their way into Hamilton Hall; barricading exits; and assaulting

and detaining the Plaintiffs against their will.  *See, e.g.*, FAC ¶¶ 1, 107, 113, 116, 120, 121, 124,

126, 127, 131, 217–220.  These violent acts form the gravamen of Plaintiffs' IIED claim.  The

suggestion that Plaintiffs—two janitors who were beaten, restrained, threatened, and held captive

inside Hamilton Hall—filed a "strategic lawsuit against public participation" (SLAPP) to harass

*Defendants* is absurd.  *See* Ind. Defs. Mem. 16–18; *cf.* TPF Supp. 2 ("*Torres* is a SLAPP suit").[15]

The Court should deny Individual Defendants' request for attorneys' fees because (1) state anti-

SLAPP measures cannot apply to federal claims; (2) Defendants waived any argument to support

their SLAPP motion; and (3) the well-pleaded allegations in supporting the IIED claim are based

on unlawful, violent conduct—not speech.

To start, Plaintiffs' federal claims are not subject to New York's anti-SLAPP law.  "[B]lack

letter law is crystal clear that an anti-SLAPP motion cannot be used against a federal cause of

action."  *Murchinson Ltd. v. Nano Dimension Ltd.*, No. 23-cv-03658, 2025 WL 1397615, at *6

(S.D.N.Y. May 14, 2025) (quotation omitted); *see also Nat'l Jewish Democratic Council v.

Adelson*, 417 F. Supp. 3d 416, 423, n.1 (S.D.N.Y. 2019) ("[A]nti-SLAPP statutes do not apply to

---

[15]     Although TPF asserts that "[t]his case is a SLAPP suit," it does not request attorneys' fees,
apparently on the theory that New York's anti-SLAPP law does not apply in federal court.  TPF
Mem. 1.  Accordingly, TPF has forfeited—if not affirmatively waived—any argument for anti-
SLAPP relief.  *See Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370, 381 (S.D.N.Y.
2021).

federal causes of action.").[16]  That is because, as Defendants acknowledge, the application of state anti-SLAPP laws to federal causes of action would raise serious "Supremacy Clause issues."  Ind. Defs. Mem. 17 & n.18 (citing *Murchinson*, 2025 WL 1397615, at *6–7); *see Murchinson*, 2025 WL 1397615, at *6 (explaining that "burdensome [state] anti-SLAPP standards would frustrate congressional intent by chilling the exercise or vindication of certain federal rights").  Defendants expressly waived any contrary argument.  *See* Ind. Defs. Mem. 17 n.18 ("no such analysis is necessary").

Because Plaintiffs' federal claims cannot be subject to New York's anti-SLAPP statute, Individual Defendants instead "focus[] . . . on the IIED claim."  *Id.* at 17 & n.18.  They call that claim "easy," asserting—without analysis—that Plaintiffs' IIED claim is "both facially based upon First Amendment conduct and without substantial basis in law."  *Id.* at 17–18 & n.18.  "Such a single, conclusory, one-sentence argument is insufficient to raise an issue."  *Doe 1 v. Gov't of U.S. Virgin Islands*, 771 F. Supp. 3d 379, 400 (S.D.N.Y. 2025) (quotation omitted).  Accordingly, Defendants' anti-SLAPP argument must be deemed waived, and they may not resuscitate it on reply.  *See Penske*, 548 F. Supp. 3d at 381.

In any event, the anti-SLAPP motion fails on the merits.  Plaintiffs' IIED claim arises from unlawful—indeed, *criminal*—acts, not lawful speech or petitioning activity.  Therefore, New York's anti-SLAPP statute does not apply.

By its terms, § 76-a expressly limits its protection to "communication[s]," and "*lawful* conduct" in support of First Amendment activities.  N.Y. Civ. Rights L. § 76-a (emphasis added).  Defendants can obtain attorneys' fees only if they both (1) prevail on their motion to dismiss and

---

[16]    *See also, e.g.*, *Murchinson Ltd.*, 2025 WL 1397615, at *6 ("[T]he Court joins every other federal court to have opined on the issue and holds that the Supremacy Clause precludes the application of state-law anti-SLAPP statutes to federal claims in federal court." (collecting cases)).

(2) demonstrate that the IIED claim is "based upon" their "lawful conduct in furtherance of the exercise of the constitutional right of free speech." *Id.* § 76-a(1)(a)(2). Thus, courts routinely reject attempts to use anti-SLAPP measures against tort claims arising from illegal conduct. *See, e.g., Flatley v. Mauro*, 139 P.3d 2, 11 (Cal. 2006) (civil extortion); *Novartis Vaccines & Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*, 50 Cal. Rptr. 3d 27, 35 (Cal. App. 2006) (trespass, vandalism, harassment).[17]

Here, Plaintiffs do not allege that Defendants simply defamed or offended them with mere speech. Rather, Plaintiffs allege that Defendants illegally invaded their workplace, beat them, terrorized them, and held them captive—conduct that caused Plaintiffs to "fear[] for their lives" and resulted in many Defendants' arrests. FAC ¶¶ 141, 217–25. Plainly, Plaintiffs' allegations do not target lawful conduct in furtherance of free speech.

Defendants' attempt to reframe their seizure of Hamilton Hall as protected "First Amendment conduct," Ind. Defs. Mem. 17–18, is fanciful. Violent trespass is not protected expression. *See, e.g., Sill v. Pa. State Univ.*, 318 F. Supp. 608, 624 (M.D. Pa. 1970) (student protest

---

[17]    *See also, e.g., Fritz v. Jimenez*, No. C084291, 2020 WL 4782821, at *2 (Cal. App. Aug. 18, 2020) ("physical violence and intimidation"); *Lefebvre v. Lefebvre*, 131 Cal. Rptr. 3d 171, 174–75 (Cal. App. 2011) ("making a false police report"); *D.C. v. R.R.*, 106 Cal. Rptr. 3d 399, 414–26 (Cal. App. 2010) (illegal threats of physical violence); *Paul for Council v. Hanyecz*, 102 Cal. Rptr. 2d 864, 870 (Cal. App. 2001) (political-campaign money laundering); *cf. Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead*, 98 F. Supp. 2d 347, 360 (S.D.N.Y. 2000) ("To use [an earlier version of New York's anti-SLAPP statute] to protect state officials accused of violating constitutional rights . . . [would] stand the purpose of the legislation on its head." (emphasis omitted)).

Because "California's anti-SLAPP law "is similar to New York's anti-SLAPP statute in language and intent," *Nelson v. Ardrey*, 216 N.Y.S.3d 646, 649 (N.Y. App. Div. 2024), New York courts regularly find California's robust body of anti-SLAPP jurisprudence "persuasive," *Trump v. Trump*, 192 N.Y.S.3d 891, 898 (N.Y. Sup. Ct. 2023); *see, e.g., Nelson*, 216 N.Y.S.3d at 649–50 (analyzing California anti-SLAPP cases to apply New York anti-SLAPP law); *Aristocrat Plastic Surgery, P.C. v. Silva*, 169 N.Y.S.3d 272, 276 (N.Y. App. Div. 2022) (same).

involving "disruption, violence and confiscation of property . . . in an unlawfully occupied University building is particularly odious and cannot be sheltered as a form of free expression"), *aff'd*, 462 F.2d 463 (3d Cir. 1972); *United States v. Bingert*, 605 F. Supp. 3d 111, 130–31 (D.D.C. 2022) (violently storming the Capitol on January 6th, 2021, "to convey disagreement with the results of the 2020 election" is "plainly not expressive conduct"); *United States v. Grider*, 617 F. Supp. 3d 42, 53 (D.D.C. 2022) (same). As the Supreme Court has long made clear, "the First Amendment does not protect violence." *Claiborne Hardware Co.*, 458 U.S. at 916.

Because this is not a "strategic lawsuit against public participation" within the meaning of § 76-a, Defendants' anti-SLAPP motion—and fee request—should be denied in full.[18]

## CONCLUSION

For the forgoing reasons, the Court should deny the motions to dismiss in full.

---

[18]    Defendants do not argue that Plaintiffs' New York state-law assault and battery claims, Counts 3 through 6, are the basis for Defendants' anti-SLAPP arguments.

Dated: November 12, 2025

TORRIDON LAW PLLC

Brett D. Katz
800 Westchester Avenue
Rye Brook, New York 10573
(646) 787-9290

Tara Helfman (*pro hac vice*)
Chase T. Harrington (*pro hac vice*)
801 Seventeenth Street, NW, Suite 1100
Washington, DC 20006
(202) 249-6900

Jeffrey B. Jensen (*pro hac vice*)
Julia Tang (*pro hac vice*)
13354 Manchester Rd., Suite 210
St. Louis, Missouri 63131
(314) 920-0138

Respectfully submitted.

THE LOUIS D. BRANDEIS CENTER FOR
HUMAN RIGHTS UNDER LAW

s/ *Paul M. Eckles*
Kenneth L. Marcus (*pro hac vice forthcoming*)
1717 Pennsylvania Avenue, NW, Suite 1025
Washington, DC 20006
(202) 559-9296

Richard A. Rosen
David M. Dince
Paul M. Eckles
1675 Broadway, 13th Floor
New York, NY 10019
(212) 653-0630

*Attorneys for Plaintiffs Mariano Torres and Lester Wilson*

40

## CERTIFICATION OF COMPLIANCE

I certify that the foregoing memorandum of law complies with all formatting requirements of this Court and contains no more than 40 pages, including footnotes and headings but excluding the cover page, this certificate, the tables, and the signature blocks.

Dated: November 12, 2025                    s/ *Paul M. Eckles*
                                            Paul M. Eckles

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 12, 2025, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system and thereby served upon all counsel of record.

Dated: November 12, 2025          s/ *Paul M. Eckles*
                                  Paul M. Eckles