UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

MARIANO TORRES and LESTER WILSON,

           Plaintiffs,

    -against-                                 25-cv-3474 (CM)

JAMES CARLSON, AIDAN PARISI, GRANT
MINER, CATHERINE CURRAN-GROOME,
PEOPLE'S FORUM, INC., LISA FITHIAN,
GABRIEL YANCY, ETHAN CHOI, and
JOHN DOES 1-40

           Defendants.

—————————————————————————— x

### DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FEDERAL CLAIMS WITH PREJUDICE AND STATE LAW CLAIMS WITHOUT PREJUDICE

McMahon, J.:

Plaintiffs Mariano Torres and Lester Wilson (together, "Plaintiffs"), janitors employed by Columbia University, bring this action against The People's Forum, Inc. ("TPF"), James Carlson, Aidan Parisi, Grant Miner, Catherine Curran-Groome, Gabriel Yancy, Lisa Fithian, Ethan Choi, and John Does 1 through 40 (collectively, "Defendants") to redress injuries they allegedly suffered during the 2024 takeover and occupation of Columbia University's Hamilton Hall. Plaintiffs allege that they were injured in furtherance of an alleged conspiracy to deny the civil rights of people who are, or are perceived to be, Jews or supporters of Jews, in violation of 42 U.S.C. §§ 1985(3) and 1986. Plaintiffs also assert state law claims for assault, battery, and intentional or reckless infliction of emotional distress.

Before the Court are Defendants' motions to dismiss each claim pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Defendants James Carlson, Aidan Parisi, Lisa Fithian, Ethan Choi, and John Does 1 through 40 (the "Individual Defendants") have also moved for attorney's fees under New York's anti-SLAPP statute.

For the reasons set forth below, Defendants' motions to dismiss Plaintiffs' federal claims are GRANTED, while the motion to dismiss the state law claims is GRANTED WITHOUT PREJUDICE to the commencement of an action in the New York State Supreme Court. The Individual Defendants' motion for fees under New York's anti-SLAPP law is DENIED.

## BACKGROUND

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court liberally construes all claims, accepts all factual allegations in Plaintiffs' First Amended Complaint ("FAC") as true, and draws all reasonable inferences in favor of Plaintiffs. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

When considering whether Plaintiffs have failed to state a claim pursuant to Rule 12(b)(6), the Court will not consider the factual assertions set out in the declaration of Defendant Carlson filed in support of the Individual Defendants' motion to dismiss. *See Kopec v. Coughlin*, 922 F.2d 152, 154-55 (2d Cir. 1991). Plaintiffs' motion to strike Carlson's declaration is, therefore, granted. *See* Dkt. Nos 41, 50, 51, 57.

### I.    Factual Background

Plaintiffs Mariano Torres ("Torres") and Lester Wilson ("Wilson") are employed as janitors at Columbia University. Plaintiffs are not Jewish. *See* FAC ¶¶ 4, 5.

Defendant People's Forum, Inc. ("TPF") is a New-York based not-for-profit corporation organized under Section 501(c)(3) of the Internal Revenue Code.

Defendants James Carlson, Aidan Parisi, Lisa Fithian, Ethan Choi, and John Does 1 through 40 (the "Individual Defendants")[1] are "part of a broad, pro-Hamas, anti-Semitic network of organizations, groups, and cells that are connected through a largely untraceable underground communications system." FAC ¶ 147. Members of this network allegedly "promote and resort to violent and illegal tactics, and are motivated by invidious discrimination against Jews and supporters of Jews." *Id.*

On October 7, 2023, Hamas, a designated terrorist organization, launched offensive attacks from Gaza on Israel, killing 1,139 and kidnapping another 250. FAC ¶ 36. It "was the deadliest day for world Jewry since the Holocaust." FAC ¶ 38.

Over the following days, unauthorized protests took place on Columbia's campus which involved harassment and violence against Jews. FAC ¶ 45. Various student-led organizations, including Columbia-Barnard Jewish Voice for Peace ("JVP") and Columbia Students for Justice in Palestine ("SJP"), were suspended for violating University policies relating to the demonstrations. In response to Columbia's decision to suspend JVP and SJP, Columbia University Apartheid Divest ("CUAD") published a manifesto (the "Manifesto") in the Columbia Spectator, a student-run newspaper. The Manifesto identified CUAD as "a coalition of student organizations that see Palestine as the vanguard for our collective liberation" and "a continuation of the Vietnam anti-war movement and the movement to divest from apartheid South Africa." FAC ¶ 51. CUAD called on Columbia to "(1) reinstate SJP and JVP, (2) divest from companies profiting from Israeli apartheid, and (3) cancel the opening of the University's Tel Aviv Global Center." *Id.* (internal

---

[1] The FAC also names Grant Miner, Gabriel Yancy, and Catherine Curran-Groome as defendants. In September 2025, Plaintiffs filed a notice of voluntarily dismissal as to these three defendants pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) due to a settlement between Plaintiffs and Columbia University that released present and former Columbia employees from all claims related to the events set forth in the FAC. *See* Dkt. Nos. 30, 33. The complaint will, therefore, be dismissed as against those defendants.

quotations omitted). Plaintiffs allege that, as evidenced through the Manifesto, CUAD sought "to advance pro-Hamas, anti-Semitic objectives." *Id.*

In furtherance of its objectives, CUAD allegedly "began targeting Jewish students and anyone viewed as supporting the Jewish community," subjecting targets "to many forms of harassment ranging from mockery to vitriolic threats and physical assaults." FAC ¶ 52. CUAD and its affiliates also allegedly "sought to silence any opposition or criticism, drive those in the Jewish community apart and off campus, restrict their access to places on campus, and deny them safety or a feeling of safety as they attempted to engage in daily activities." *Id.*

On March 24, 2024, CUAD sponsored an event called "Resistance 101," which led to the suspension and eviction of several students, including Defendant Parisi. By April 17, 2024, Parisi had not yet complied with the order to vacate student housing. Early in the morning, Parisi and others set up tents on the East Butler Lawn of Columbia's campus, which came to be known as the "Gaza Solidarity Encampment." The Encampment's leaders, members, and supporters "sought to destabilize the campus for Jewish members of the Columbia community by subjecting them to intimidation, harassment, and terror." FAC ¶ 68.

On April 18, 2024, the University "determined that the encampment and related disruptions posed a clear and present danger to the substantial functioning of the University" and authorized the New York Police Department to begin clearing the Encampment. FAC ¶ 73. That afternoon, police began dismantling tents and arresting protestors who refused to disperse. Despite the arrests, CUAD, its affiliates, and individual protestors immediately reestablished the Encampment on West Butler Lawn. The Encampment continued despite warnings from the University that it would suspend and evict any students who remained. Defendant Parisi posted on X (f/k/a Twitter) that "We aren't going anywhere until our demands are met, @Columbia!!! #cu4palestine." FAC ¶ 78.

The Encampment's leaders and members allegedly "continued to encourage harassment of Jewish students, Jewish student groups, and anyone perceived to support them." *Id.*

On April 22, student workers at Columbia, led in part by Defendant Miner, engaged in another walkout to pressure the school to yield to CUAD's demands. The April 22 walkout was "largely staged and supported by TPF." FAC ¶ 82. One day before the walkout, TPF published a message on X that said, "Tomorrow, student workers will walk out on the Columbia campus to demand amnesty for student & faculty protestors & divestment from Israeli apartheid. The people of NYC will join them, and rally at the gates of Columbia University to show the world that the people stand with Palestine, and the student movement fighting for liberation!" *Id.*

On April 23, 2024, Columbia's President emailed the Columbia community to report that student organizers, faculty members, administrators, and the University Senate had been "in dialogue" to "discuss the basis for dismantling the encampment, dispersing, and following university policies going forward." FAC ¶ 83.

Columbia's negotiations with the leaders of the Encampment ended in failure. On April 29, 2024, Columbia's President issued a statement to the Columbia community stating that, "The encampment has created an unwelcoming environment for many of our Jewish students and faculty" and calling on members of the Encampment to disperse. FAC ¶ 87. An additional letter to the Columbia community stated that the "University will not divest from Israel." FAC ¶ 92.

A letter to the Encampment's leaders on the same day urged protestors to voluntarily leave the encampment by 2 PM and informed them that the University would initiate disciplinary procedures if the Encampment was not removed. Copies of President Shafik's letter were posted online and on social media. Defendant Parisi posted a photo of the letter on X with a handwritten

5

message stating "COLUMBIA WILL BURN" and "I AINT READING ALL THAT FREE PALESTINE" scrawled across it in bright red letters. FAC ¶ 91.

Despite the President's direction to disband, the Encampment continued and the occupying protestors refused to vacate the lawn. At 11:50 AM on April 29, TPF posted a message to X stating, "URGENT! EMERGENCY RALLY FOR COLUMBIA TODAY AT 1 PM! Stand with students, stand with Palestine!" FAC ¶ 93. The post further stated, "Columbia University administration is threatening students and attempting to suppress the powerful student movement for Palestine. They're telling students to leave the encampment by 2 PM and turn themselves in or else face disciplinary probation and suspension." *Id*. It also stated, "JOIN US TODAY AT 1 PM FOR AN EMERGENCY RALLY TO STAND WITH STUDENTS BOLDLY STANDING FOR PALESTINE, DESPITE STATE AND UNIVERSITY ADMINISTRATION'S REPRESSION!" FAC ¶ 93.

Several hours later, at 2:55 PM – after the 2 PM deadline for protestors to disband the Encampment had passed – TPF posted another message to X stating, "ALL OUT FOR COLUMBIA NOW! The historic movement on university campuses for Palestine, sparked at Columbia isn't going anywhere! The students, faculty, staff, and community supporters stand with Palestine and with the movement against genocide and apartheid!" FAC ¶ 94.

Despite Columbia's ultimatum, rather than voluntarily dispersing by 2 PM, hundreds of pro-Hamas demonstrators picketed through Columbia's campus. FAC ¶ 96. The Encampment was not disbanded, and the protestors did not vacate the lawn; "Instead, they made a strategic decision. As several CUAD members and supporters wrote, 'Rather than indefinitely continue our encampment and the media circus that surrounded it, we chose to escalate.'" *Id*.

6

During the evening of April 29, 2024, TPF hosted an event at its office "to plan the next steps for the protestors at Columbia University in the wake of Columbia's ultimatum to the Encampment." FAC ¶ 97. The meeting was publicly advertised as a "Volunteer Meeting" to prepare for "May Day." FAC ¶ 98. More than 100 individuals attended the meeting in person and countless others attended via Zoom, including many of the named defendants.

During the meeting, TPF's Executive Director praised students for prioritizing resistance over negotiations and urged attendees to "support our students so that the encampments can go for as long as they can." FAC ¶ 100. The meeting included "break-out sessions that focused on organizing new methods of 'resistance.'" *Id.*

During the meeting and in the hours that followed, a group of alleged co-conspirators, including Defendants Carlson, Parisi, Miner, Curran-Groome and certain of John Does 1-40, "solidified and set into motion their coordinated plan to seize Hamilton Hall." FAC ¶ 101. The co-conspirators produced and distributed hand-drawn maps and diagrams of Hamilton Hall "plus other indicia of a sophisticated and coordinated assault on Hamilton Hall including but not limited to food and supplies for barricading the building and sustaining the dozens of Occupiers who would storm and occupy the building." *Id.*

The alleged conspirators also "addressed the possibility that Columbia employees might be inside Hamilton Hall and agreed that they would, as necessary, intimidate, harass, bribe, detain, threaten, and/or assault and batter such employees if they posed any obstacles to the execution of the plan." FAC ¶ 102. The "plan," of course, was a seizure of Hamilton Hall – the traditional method of escalating a protest movement at Columbia.[2]

---

[2] Hamilton Hall has long been a focal point of student activism at Columbia. It has been occupied by student protest movements on several occasions, including the April 1968 protests in opposition to the United States' involvement in the Vietnam War. *See* John Yoon, *Hamilton Hall Has a Long History of Student Takeovers*, THE NEW YORK TIMES,

Later that evening, TPF published a message on social media calling for people to "MOBILIZE TO COLUMBIA NOW! The students have asked for community support tonight as they continue to resist the university's criminalization and repression. We will stand with the students until all of their demands are met! THE PEOPLE ARE WITH PALESTINE!" FAC ¶ 106. The post indicated that there would be a "Rally at midnight: 116th & Broadway" and instructed individuals to "Bring flashlights, water, snacks, and high energy—together our movement is strong and cannot be stopped!" *Id.*

One hour later, rioters stormed Hamilton Hall. TPF posted another message on social media stating "RIGHT NOW: The heroic and resilient student organizers at Columbia University have successfully taken and 'de-occupied' a building on campus and now they need our support to defend against a possible sweep! We will stand with the students until all of their demands are met!" FAC ¶ 107. One hours after that, TPF posted another social media message stating, "DISCLOSE, DIVEST, WE WILL NOT STOP WE WILL NOT REST! We will stay in the streets for Palestine and to support the student movement!" FAC ¶ 108.

That night, Plaintiffs had reported to work for their overnight shifts in Hamilton Hall. Shortly after midnight, Plaintiff Torres was cleaning third-floor classrooms when he was suddenly surrounded by dozens of masked rioters. Two masked individuals demanded that Torres leave. Torres refused and told them to get out. The rioters pressed a roll of cash into Mr. Torres' hand and said, "This is bigger than you," and "You don't make enough money for this." FAC ¶ 112. Torres threw the money on the ground and told the rioters, "I don't want your fucking money." *Id.* Torres became concerned about Wilson's safety, but as the rioters grew increasingly violent and threatening, Torres realized he needed to escape. When he demanded the rioters let him out of the

Apr. 30, 2024, available at https://www.nytimes.com/2024/04/30/nyregion/hamilton-hall-columbia-student-protests.html. Seizing Hamilton Hall is what protesters do at Columbia.

building, they told Torres that, "It's over" and "it's too late." FAC ¶ 113. Torres considered jumping out of a third-floor window, but realized it was too dangerous and decided to push his way down the stairs through the mob of rioters.

As Torres pushed his way toward an exit, rioters struck him and shoved furniture into him. He was followed by two masked men: Defendants Yancy and Choi. Defendant Carlson then confronted Torres and began shoving him violently. The rioters again tried to give Torres money, "You're a janitor. You don't make enough money for this." FAC ¶ 122. Torres again refused and said, "I don't want your fucking money." *Id*. Rioters shouted, "Why are you defending them?" and "What are you, a Jew-lover?" *Id*. They repeatedly called him "Jew-lover." *Id*. Defendant Carlson became increasingly aggressive, repeatedly shoving Torres and standing in his way. He told Torres, "I'm going to get twenty guys up here to fuck you up." FAC ¶ 124. Torres pulled a fire extinguisher, which was within arm's reach, off the wall to defend himself and replied, "I'll be right here." *Id*. Carlson then backed away.

Throughout this confrontation, Defendant Yancy kept striking Torres from behind, and Defendants Carlson, Yancy, and Choi repeatedly punched Torres and pushed him against the wall, causing Torres to sustain upper body injuries. When Torres finally reached the ground floor of Hamilton Hall, he saw that the doors had been sealed with zip ties and bike chains and were blocked by heavy furniture from both the inside and outside. He tried to leave through a second door, which was likewise obstructed. Despite the rioters' efforts to obstruct his path, Torres eventually found an exit door that had been sealed with zip ties but not blocked by furniture. After Torres demanded that he be released from the building, one of the rioters cut the zip ties to let him out. Once outside, Torres saw that the rioters had taken control of Hamilton Hall, having hung a banner emblazoned with the word "INTIFADA" from a third-floor balcony.

Meanwhile, Plaintiff Wilson was cleaning a third-floor bathroom when he heard a commotion in the hallway. Upon stepping into the hall, Wilson saw many rioters moving chairs from the classrooms down to the lobby, most of whom were wearing masks or other face coverings. An unmasked individual wearing a Columbia University shirt approached Wilson and told him, "You need to leave." FAC ¶ 115. Wilson responded, "No, you need to leave. I work here." *Id.* Wilson then radioed his supervisor and asked him to call the police because the building was full of rioters.

At this point, masked rioters began shoving Wilson and ramming furniture into him. Fearing for his safety, Wilson realized he needed to escape. He began pushing his way downstairs toward the lobby, followed by masked rioters who blocked, pushed, and shoved him. Once in the lobby, Wilson realized that the doors had been sealed shut and barricaded. He tried to find another door through which to exit but found that the other doors were similarly blocked. He begged the rioters to let him out of the building, pleading, "I work here. Let me out." FAC ¶ 132. The rioters responded by laughing at and mocking Wilson, telling him, "You work for the Jews" and "You're a Zionist." FAC ¶ 133. Eventually, one of the rioters opened a door and Wilson was physically pushed out of the building.

More than seventeen hours after the protestors stormed Hamilton Hall, the NYPD arrived on Columbia's campus and began arresting rioters. Columbia allowed Plaintiffs to each take three days off of work to recover from their physical injuries. However, neither Plaintiff has been able to return to work since the night of April 29, 2024, due to injuries and PTSD sustained during and as a result of the attacks. As a result, Plaintiffs exhausted all their available sick leave and vacation time. Because they were unable to return to work, Plaintiffs were put on unpaid leave in May 2024 before ultimately being fired in the summer of 2025. Plaintiffs now subsist on Workers

Compensation Payments, which they allege is inadequate to cover their living expenses and medical care.

## II.      Procedural History

On April 25, 2025, Plaintiffs filed their initial complaint. *See* Dkt. No. 1. On September 5, 2025, Plaintiffs filed their First Amended Complaint ("FAC"), asserting federal causes of action against TPF and the Individual Defendants under 42 U.S.C. § 1985(3) (Count 1) and 42 U.S.C. § 1986 (Count 2). *See* Dkt. Nos. 27, 56-1. Plaintiffs allege that the Defendants "conspired for the purpose and intent of depriving, directly and indirectly, the equal protection of the laws, and equal privileges and immunities under the laws, for a targeted class consisting of people who are or are perceived to be Jews or supporters of Jews." FAC ¶ 148. Specifically, Defendants are alleged to have conspired to violate "the right to travel and the right to be free from racial violence." FAC ¶ 149.

Plaintiffs also assert state law claims against Carlson, Yancy, Choi, and John Does 1-40 for assault (Counts 3 and 5) and battery (Counts 4 and 6), and against the Individual Defendants for intentional or reckless infliction of emotional distress (Count 7).

On September 19, 2025, TPF moved to dismiss all claims against it (Counts 1 and 2) for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 36. On October 20, 2025, Defendants Carlson, Choi, Fithian, and Parisi moved to dismiss Counts 1, 2, and 7 for failure to state a claim pursuant to Rule 12(b)(6) and to dismiss the remaining state law claims for lack of jurisdiction. *See* Dkt. No. 39. The Individual Defendants also moved for an award of mandatory anti-SLAPP fees under New York state law. *See id.*

## LEGAL STANDARD

### I.    Dismissal Pursuant to Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'" *Sphere Digital, LLC v. Armstrong*, 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 555). Where a plaintiff fails to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570. Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545.

## DISCUSSION

### I.    Plaintiffs' 42 U.S.C. § 1985(3) Claim (Count 1) is Dismissed

42 U.S.C. § 1985(3) provides that:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. . . if one or more persons . . . do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is . . . deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages . . .

To state a claim of conspiracy under § 1985(3), a plaintiff must show that there exists (1) a conspiracy; (2) for the purpose of depriving the plaintiff of the equal protection of the laws, or the equal privileges or immunities under the laws; (3) an overt act in furtherance of the conspiracy;

12

and (4) an injury to the plaintiff's person or property, or a deprivation of her right or privilege as a citizen of the United States. *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). Additionally, plaintiffs are required to allege that they are a member of a protected class and that the conspiracy was motivated by racial or class-based discriminatory animus. *Dorce v. City of New York*, 608 F. Supp. 3d 118, 147 (S.D.N.Y. 2022); *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996). "[A] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997).

Plaintiffs allege that Defendants violated 42 U.S.C. § 1985(3) by conspiring for the purpose and intent of depriving a class of "people who are or are perceived to be Jews or supporters of Jews" of the equal protection of the laws – specifically, the right to intrastate travel and the right to be free from racial violence. In support of this assertion, Plaintiffs allege that, during the April 29 meeting at the TPF office. a group of co-conspirators, including Defendants Carlson, Parisi, Miner, Curran-Groome, and certain unidentified others (John Does 1 through 40) "conspired and agreed to seize and hold Hamilton Hall until such time as Columbia acquiesced to CUAD's anti-Zionist, anti-Israeli, and anti-Semitic demands." *Id.* ¶ 154. The co-conspirators produced maps and diagrams of Hamilton Hall and distributed "food and supplies for barricading the building and sustaining the dozens of Occupiers who would storm and occupy the building." *Id.* ¶ 101. The co-conspirators "addressed the possibility that Columbia employees might be inside Hamilton Hall and agreed that they would, as necessary, intimidate, harass, bribe, detain, threaten, and/or assault and batter such employees if they posed any obstacles to the execution of the plan." *Id.* ¶ 102. Their strategy also involved using, "if necessary, physical violence to take and maintain control of

Hamilton Hall," against "those who were or were perceived to be Jews or supported of Jews, as well as anyone who might stand in their way." *Id.* ¶ 150, 154.

Defendants argue, *inter alia*, that Plaintiffs fail to plausibly allege the existence of a conspiracy for the purpose of depriving the Plaintiffs of the equal protection of the laws. The Court agrees. Because Plaintiffs otherwise fail to state a claim under Section 1985(3), I need not reach the issue of whether Plaintiffs have plausibly alleged either an overt act in furtherance of the conspiracy or injury.

### a.    Plaintiffs Plausibly Allege a Bare Conspiracy

A conspiracy is "an agreement between two or more individuals where one acts in further[ance] of the objective of the conspiracy and each member has knowledge of the nature and scope of the agreement." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F.Supp.2d 309, 339 (E.D.N.Y. 2010). To plausibly allege a conspiracy, a "plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003).

Here, Plaintiffs allege that during the April 29, 2024 meeting at the TPF office, the conspirators, including Defendants Carlson, Parisi, Miner, Curran-Groome and certain of John Does 1-40, "solidified and set into motion their coordinated plan to seize Hamilton Hall." FAC ¶ 101. Plaintiffs allege additional details about the co-conspirators' discussions and actions during the meetings, including that the conspirators "produced and distributed hand-drawn maps and diagrams of Hamilton Hall plus other indicia of a sophisticated and coordinated assault on Hamilton Hall, including but not limited to food and supplies for barricading the building and sustaining the dozens of Occupiers who would storm and occupy the building." FAC ¶ 101.

14

Plaintiffs have alleged "specific times, facts, and circumstances of the alleged conspiracy." *Fitzgerald v. Field*, 1999 WL 1021568, at *4 (S.D.N.Y. Nov. 9, 1999), *aff'd*, 216 F.3d 1072 (2d Cir. 2000). These allegations are sufficiently specific to support an inference that two or more persons entered into an agreement to occupy Hamilton Hall until such time as Columbia acquiesced to CUAD's demands. Occupying Hamilton Hall until the demands were met is alleged to have been the conspirators' stated object.

But because the conspiracy in this case is alleged to violate 42 U.S.C. § 1985, its object cannot be just any illegal end. Rather, the object of the conspiracy must be to deprive a specific alleged group of persons of the equal protection of the laws. In this case, that group is "people who are—or are perceived to be—Jews or supporters of Jews." FAC ¶ 7.

For the reasons set forth below, I conclude that the FAC fails to allege such a conspiracy.

b.    **Plaintiffs Fail to Plausibly Allege That the Object of Defendants' Conspiracy Was to Deprive Anyone – including "Jews and Perceived Supporters of Jews – of the Equal Protection of the Laws**

Plaintiffs fail to allege such a conspiracy for at least three reasons. First, Plaintiffs do not plausibly allege that the deprivation of anyone's rights was a conscious objective of the conspiracy. Second, they do not plausibly allege that Defendants conspired to deprive "people who are or are perceived to be Jews or supporters of Jews" of their constitutional rights. Finally, "people who are or are perceived to be Jews or supporters of Jews" is not a cognizable class under Section 1985(3).

### i.    *The FAC does not plausibly allege that the deprivation of rights was an object of the conspiracy*

Despite the fact that two or more people agreed to act in concert for a purpose, Plaintiffs' § 1985(3) claim fails because Plaintiffs have not plausibly alleged that Defendants conspired, in whole or in part, for the purpose of depriving any member of a protected class – whether Jewish or not – of any constitutional right. *See, e.g., Wang v. Miller*, 356 F. App'x 516, 517 (2d Cir. 2009).

To state a Section 1985(3) claim, the alleged conspiracy must be "*for the purpose of depriving*" citizens of the equal protection of the laws. 42 U.S.C. § 1985(3) (emphasis added). Significantly, "A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993) (quoting *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 833 (1983)). Rather, the conspiracy must be "aimed at" the deprivation of rights – that is, the impairment of constitutional rights must be a "conscious objective of the enterprise." *Id.* at 275–76; *Spencer v. Casavilla*, 44 F.3d 74, 79 (2d Cir. 1994). In other words, the conspirators "must act at least in part for the very purpose of producing [the deprivation of rights]." *Bray*, 506 U.S. at 275–76. Their mere awareness and acceptance of the deprivation of rights is not sufficient. *Id.*

Here, Plaintiffs allege, in conclusory fashion, that as part of the plan to seize Hamilton Hall, "Defendants conspired for the purpose and intent of depriving, directly and indirectly, the equal protection of the laws, and equal privileges and immunities under the laws, for a targeted class consisting of people who are or perceived to be Jews or supporters of Jews." FAC ¶ 148. This conclusory statement does not satisfy the pleading standards of Rule 8. *See Twombly*, 550 U.S. at 555 (courts need not accept as true conclusory allegations or "formulaic recitation[s] of the elements of a cause of action.").

So the first question I must address is whether the factual allegations in the FAC, taken together, can support an inference that depriving *anyone* of his or her civil rights was among the conspirators' conscious objectives. I conclude that the allegations cannot support such an inference. Plaintiffs have not plausibly alleged that impairing *anyone*'s rights was among the conspirators' "conscious objectives" in taking over Hamilton Hall. Drawing all reasonable inferences in favor of Plaintiffs, the purpose (and the only purpose) of the alleged conspiracy was,

16

in Plaintiffs' own words, "to seize and hold Hamilton Hall until such time as Columbia acquiesced to CUAD's anti-Zionist, anti-Israeli, and anti-Semitic demands." FAC ¶ 168. Specifically, CUAD demanded that Columbia reinstate [Students for Justice in Palestine ("SVP") and Jewish Voice for Peace ("JVP")], "divest from companies profiting from Israeli apartheid," and cancel the opening of Columbia's Tel Aviv Global Center. FAC ¶ 51. This was unquestionably the purpose – the objective – of the conspirators: to seize the building and hold it until their demands were met.

Plaintiffs also allege that, while planning the takeover of Hamilton Hall, the conspirators "addressed the *possibility* that Columbia employees might be inside Hamilton Hall and agreed that they would, *as necessary*, intimidate, harass, bribe, detain, threaten, and/or assault and batter such employees *if* they posed any obstacles to the execution of the plan." FAC ¶¶ 101, 102 (emphasis added).

What the students actually did to the Plaintiffs (assuming, as I must, that the allegations of the complaint are true) did indeed interfere with their right to do their jobs in Hamilton Hall and, for a time, their right to leave the building when they perceived that it would be dangerous to remain. But recognizing that persons *might* be inside Hamilton Hall and making plans to deal with that contingency does not turn taking action against people who were interfering with the conspirators' ultimate goal into a conscious objective of their conspiracy. It was simply a side effect, a possibility with which the alleged conspirators were prepared to deal. The conspirators must "do more than merely be aware of a deprivation of rights that he causes, and more than merely accept it; he must act *at least in part for the very purpose of producing it*." *Bray*, 506 U.S. at 276 (emphasis added). There is not a single allegation in the FAC that admits of an inference that the alleged conspirators acted for the purpose of depriving anyone of any civil rights – that they did what they planned to do (take over Hamilton Hall) for the purpose of depriving Columbia

17

employees who might be inside of their civil rights. The fact that the alleged conspirators planned for the possibility that they might encounter employees when they entered the building does not mean that dealing with those employees was a conscious objective of the conspiracy. It was a side effect – nothing more.

Plaintiffs argue that antisemitism both "played a starring role in the siege" and served as the "backdrop" against which the takeover of Hamilton Hall occurred. Dkt. No. 52 at 30. Specifically, Plaintiffs argue that, because some of the protesters hurled anti-Semitic insults at them – referring to Plaintiffs during the takeover as "Jew-lovers," "Zionists," "Jew-workers," and "working for the Jews" FAC ¶¶ 159, 173 – the pleading admits of an inference that depriving persons who were Jewish or were deemed to be sympathetic with Jews of their civil rights was *an* object of their conspiracy (a conspiracy can, of course, have more than one objective).

Two sister courts have recently wrestled with a similar question in connection with motions to dismiss cases arising out of similar protests at other universities. They have reached different results on the question of whether the facts pleaded in those complaints – two very different sets of facts – admitted of an inference that it was an object of the plotters to deprive Jews (not Jews or perceived Jews and their supporters or perceived supporters) of their civil rights.[3]

In *StandWithUs Center for Legal Justice v. Massachusetts Institute of Technology*, 742 F. Supp. 3d 133, 138 (D. Mass. 2024), *aff'd sub nom. Stand With US Ctr. for Legal Just. v. Massachusetts Inst. of Tech.*, 158 F.4th 1 (1st Cir. 2025), Jewish members of the MIT community sued the school for failing to prevent an alleged conspiracy by multiple student groups, including the Coalition Against Apartheid ("CAA"), to deprive a class consisting of "Jewish and Israeli

---

[3] Notably, neither case considered whether *supporters or perceived supporters of Jews* constituted a cognizable class for purposes of Section 1985(3). Whether a "class consisting of people who are or are perceived to be Jews or supporters of Jews" is entitled to protection under Section 1985(3) is discussed *supra*, Section I(b)(iii).

students" of their civil rights in the wake of the October 7, 2023 Hamas attack on Israel. Plaintiffs alleged that the protests "reached a boiling point on April 21, 2024, when students erected an encampment on Kresge lawn (across from Hillel, an organization promoting Jewish campus life), protesting Zionism and MIT's ties to Israeli academics and government contractors." *StandWithUs*, 742 F. Supp. 3d at 139. Protestors chanted Arabic slogans which translated to "Palestine is free, Israel out" and "From water to water, death to Zionism." *StandWithUs*, 158 F.4th at *10. CAA called for others to support the encampment and to "vote yes" on a referendum calling for a "permanent ceasefire" and the cutting of ties "between MIT and the Israeli military." *StandWithUs*, 158 F.4th at *9. The protests intensified on May 8 when protestors blocked the entrance and exit to a campus building near the encampment and "defaced and discarded Israeli and American flags." *Id*. Plaintiffs alleged that protestors also engaged in at least two acts of violence against Jewish students, including raising a bike tire at a passing Jewish student and shoving another Jewish student who was filming the protest. *Id*. at *25.

The district court dismissed the Section 1986 claim because plaintiffs failed to plead any conspiratorial agreement in support of an underlying Section 1985 conspiracy. While the "allegations establish[ed] that student groups acted in concert to plan protest events advocating their shared views," they did not raise a plausible inference that the groups agreed to plan the events "at least in part for the very purpose of" depriving plaintiffs of their civil rights. *StandWithUs*, 742 F. Supp. 3d at 143. In so holding, the district court rejected plaintiffs' contention that the "clear practical effect" of the protests "was to impede the rights of Jewish and Israeli students on campus" because "A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right." *Id*. at 144 (quoting *Bray*, 506 U.S. at 275).

19

The First Circuit affirmed the district court's dismissal, holding that plaintiffs failed to plead that the student groups conspired for the purpose of depriving plaintiffs of any constitutional rights, since they had not plausibly alleged that the student activists' "conscious objective" was the impairment of Jewish and Israeli students' rights to be free from racially motivated violence under the Thirteenth Amendment. *StandWithUs*, 158 F.4th at *25. The court found plaintiffs' theory particularly implausible in light of statements from student groups, which plaintiffs pointed to as evidence of the conspiracy's objective. *Id*. at *26. In those statements, the protesters outlined their goals: to pressure MIT to divest from Israel and to cease "sponsored research for the Israeli Occupation Forces," to express "solidarity with Columbia students" who were "calling for divestment," to "speak out" to "stop the genocide" and "defend Palestine," and to express their shared desire for a "permanent ceasefire in Gaza." *Id*. Ultimately, because plaintiffs "failed to adduce any facts suggesting a purpose beyond or behind these stated goals," they failed to state a claim that impairing the rights of Jewish students was among the student protestors' conscious objectives. *Id*. at *26. This was so even though two Jewish students were assaulted during the protests.

A district court in California, confronted with a similar situation but a very different set of facts, reached a different result. In *Weinberg v. National Students for Justice in Palestine*, 2026 WL 184302 (C.D. Cal. Jan. 20, 2026), three Jewish members of the UCLA community brought a Section 1985(3) claim against the defendants, including National Students for Justice in Palestine ("NSJP"), alleging a conspiracy to deprive Jews of their rights "to be free from racial violence and to be free from racially motivated deprivation of the use of public amenities." 2026 WL 184302, at *7 (quotation modified). The *Weinberg* plaintiffs alleged that UCLA's chapter of NSJP, in collaboration with similar organizations, created a "fortified encampment" on UCLA's campus and

20

"established a complex check-in, wristband, and vouching system to keep out Zionists," which was enforced by teams of armed members of the encampment. 2026 WL 184302, at *1, *8 (quotation modified). Plaintiffs alleged that the encampment and surrounding areas included extensive antisemitic imagery, including a "van festooned with Swastikas" parked outside the encampment "blaring antisemetic propaganda." *Id.* at *2. Plaintiffs further alleged numerous instances of violence and threats of violence directed at visibly Jewish community members, and that protestors physically prevented Jews from entering the encampment. *Id.* The case was not brought on behalf of a class – just on behalf of the three named plaintiffs – but the protected class to which all three allegedly belonged was "Jews."

On these allegations, the district court denied defendants' motion to dismiss plaintiffs' Section 1985 claim. The district judge concluded that the allegations in this complaint admitted of an inference that the encampment organizers acted at least in part with an intent to deprive the Jewish plaintiffs of their Thirteenth Amendment rights to be free from race-based violence and exclusion. *Id.* The court reasoned that the *Weinberg* plaintiffs – unlike the plaintiffs in *StandWithUs* – "alleged much more than two isolated incidents of anti-Jewish violence and exclusion." *Id.* "The sheer volume of alleged incidents of exclusion and violence against Jews" barred dismissal at the pleading stage. [4] *Id.* at *9.

Significantly, neither the *Weinberg* court nor the First Circuit in *StandWithUs* concluded that the fact that the protesters were opposing Israel's occupation of and policies in Gaza following the October 7, 2023 Hamas attacks – or the fact that the protesters were trying to persuade their respective universities to disengage from interaction with Israel in light of those policies – could

---

[4] NSJP argued for the first time in its reply brief that plaintiffs alleged only discriminatory animus against Zionists, as opposed to animus against Jews. The court declined to consider plaintiffs' conflation of anti-Zionism and anti-Jewish animus because the argument was not raised in NSJP's opening brief. *See Weinberg*, 2026 WL 184302, at *9 n.6.

be relied on to infer antisemitism in support of a § 1985 conspiracy. The First Circuit expressly rejected the "contention that the choice to criticize Israel's actions in Gaza . . . necessarily manifests antisemitism." 158 F.4th at *18. Both courts walked a fine line between protecting the defendants' political speech – which is protected no matter how distasteful some may find it – and concluding that the words and actions of the protesters in planning and carrying out their respective "missions" fairly evidenced the "conscious aim or objective" of depriving a protected class of persons of Jews (or Jews and Israelis in *StandWithUs*) of their civil rights. That the two courts reached opposite conclusions was very much a function of the facts alleged in the respective pleadings that were placed before them.

The facts pleaded in the instant complaint are far closer to those in *StandWithUs* than they are to the facts in *Weinberg*. Plaintiffs allege that the Occupiers' publicly stated goal was to pressure Columbia to acquiesce to CUAD's demands, which included opposing the policies of the Israeli Government in Gaza and divesting from and cutting ties with Israel because of those policies. As was the case in *StandWithUs*, Plaintiffs have not pleaded "any facts suggesting a purpose beyond or behind these stated goals." 158 F.4th at *18, *26. As the First Circuit explained, "[P]laintiffs' allegations offer no facts to plausibly suggest that *the protestors agreed to target Jewish [persons]*, as opposed to agreeing to demand that the university adopt the activists' position regarding the conflict between Israelis and Palestinians." *Id.* at *25 (emphasis added). *See also Iqbal*, 556 U.S. at 681 (though allegations were "consistent with" a discriminatory purpose, they did not plausibly establish this purpose" given "more likely explanations.").

And unlike in *Weinberg*, where the complaint catalogued numerous discrete instances in which Jewish members of the UCLA community were subjected to anti-Jewish violence and exclusion, the instant complaint pleads that (1) the protesters decided that they would oppose,

22

forcefully if necessary, anyone, of any race, ethnicity or political persuasion, who tried to impede their effort to take over Hamilton Hall; (2) they encountered two university employees, who were not themselves Jewish and whose views on the Israeli-Palestinian conflict were utterly unknown to them (and are unknown to the Court); (3) those two employees tried to do their job by telling the protesters that they would not leave their jobs and that the students should leave Hamilton Hall; (4) those two employees were temporarily prevented from leaving Hamilton Hall, though they were ultimately allowed out; (5) those two employees were called names (including "Jew lover," "Jew-worker," and "Zionist") and were pushed, shoved, and in one case rammed with furniture before they were allowed to leave. The conduct of the Occupiers, if these pleaded facts be true, was despicable, but the allegations simply do not admit of an inference that interfering with the civil rights of "perceived Jews and their supporters" was a goal of the conspiracy. Those allegations might support an inference that it was a goal of the conspirators to interfere with the rights of anyone, of any race or ethnicity, who interfered with the Hamilton Hall takeover, but they do not support the inference Plaintiffs urge. And significantly, these factual allegations do not come close to the factual allegations of widespread violence and exclusion directed specifically and exclusively against Jews that were found in the complaint in *Weinberg*.

Plaintiffs allege that certain Occupiers also "called for 'Intifada, an Arabic term for 'uprising' that has become synonymous with a call to violent action against Israelis, Jews, and institutions supporting Jews and Israel," FAC ¶ 3, and hung a banner emblazoned with the word "INTIFADA" from a balcony, FAC ¶ 18. Plaintiffs further point to various social media posts made prior to and during the seizure of Hamilton Hall, such as a message posted by Defendant Parisi on April 8, 2023 stating "Que viva la intifada . . . Inshallah, we will rise victorious." FAC ¶ 66.

23

But as was the case in both *StandWithUs* and *Weinberg*, these are pure political speech allegations, and so do not admit of an inference that the Occupiers had the conscious aim and objective of depriving Jews and their perceived supporters of their rights. And while Plaintiffs allege that some John Doe protesters made offensive, even antisemitic remarks to the Plaintiffs,[5] the issue on this motion is whether the FAC pleads an agreement among two or more persons to deprive members of a protected class of persons of their civil rights. Intent to discriminate must motivate the *group* of conspirators; not just individual members of the conspiracy. *See Straker v. Metro. Transit Auth.*, 2005 WL 3287445, at *3 (E.D.N.Y. Dec. 5, 2005). The FAC is devoid of any factual allegation tending to show that antisemitic speech by any person conduct was "authorized, endorsed, or planned by [the conspirators], let alone that [it was] the purpose of the [conspiracy]." *StandWithUs*, 158 F.4[th] at *25. And even if the Court were to accept Plaintiffs' characterization of CUAD's demands as antisemitic – a fraught proposition, given the wildly differing opinions on the subject of Israel's policies in Gaza, even among Jews and Israelis – Plaintiffs' effort to infer from those demands that the conspirators' objective was to deny those they perceived as Jews or their supporters[6] of their civil rights is an inferential leap that the allegations of the complaint simply cannot support.

Similarly, Plaintiffs' argument that the Hamilton Hall takeover occurred against a "backdrop" of antisemitism does not get them past this motion because, while they identify instances of violence and harassment against Jews that occurred in and around Columbia's campus in the months between October 2023 and April 2024, they fail to plead any facts connecting the

---

[5] "Jew lover," which one unnamed protester called Mr. Torres, is unquestionably an antisemitic remark. However, the Jewish community itself is divided over whether anti-Zionism is inherently antisemitic.

[6] This phrase appears to refer to anyone who might have gotten in the way of the Hamilton Hall takeover, without regard to the views those individuals held about what is going on in the Middle East, or whether they had any views on the subject at all. *See supra* Section I(b)(ii).

alleged conspirators to any of those incidents, which predate the formation of the alleged conspiracy. The fact that Defendants conspired to seize Hamilton Hall "in the context of the broader climate of anti-Semitic hatred and violence that had engulfed Columbia's campus," Dkt. No. 52 at 33, does not make the deprivation of Jewish (or perceived Jewish) rights a conscious objective of this particular conspiracy – which, per the allegations of the complaint, was not formed until April 29, 2024.

For these reasons, the Section 1985(3) claim cannot survive a Rule 12(b)(6) motion to dismiss.

### ii.   The FAC does not plausibly allege that Defendants conspired to deprive Plaintiffs of their constitutional rights

The Supreme Court has made clear that "the language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102. This "class-based animus" requirement was added by the Supreme Court in order to prevent Section 1985(3) "from being broadly—and erroneously—interpreted as providing a federal remedy for all tortious conspiratorial inferences with the rights of others." *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of New York, Inc.*, 968 F.2d 286, 291 (2d Cir. 1992) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971)).

The claim in this case rests on the assertion that Defendants conspired to deprive a class of persons consisting of "people who are or are perceived to be Jews or supporters of Jews" of their civil rights. FAC ¶ 148.

As discussed below, *see supra* Section I(b)(iii), Being Jewish is unquestionably a recognized racial classification. *See Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y.,*

25

*Inc.*, 968 F.2d 286, 291 (2d Cir. 1992). But Plaintiffs have not alleged that they are Jews – in fact, they expressly allege that they are not Jewish. *See* FAC ¶¶ 4, 5.

It is also well settled that a Section 1985(3) class predicated on a racial status can include persons who do not share that racial characteristic, albeit in limited circumstances. This is so because "The predominate purpose of § 1985(3) was to combat the prevalent animus against [members of a protected class] *and their supporters.*" *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983) (emphasis added). In light of this language, courts have allowed, for example. white plaintiffs to bring claims under Section 1985(3) where plaintiffs were injured while seeking to vindicate the rights of members of a racial minority. *See Pisello v. Town of Brookhaven,* 933 F. Supp. 202, 216 (E.D.N.Y. 1996)*; Griffin-Nolan v. Providence Wash. Ins. Co.*, 2005 WL 1460424, at \*10 (N.D.N.Y. June 20, 2005). I can see no reason why the same principle ought not apply to Gentiles who are alleged to support Jews.

But Plaintiffs have not alleged any facts tending to support the assertion that either of them is a "supporter of Jews" or that they were injured by the conspiracy while seeking to vindicate the rights of Jews. Indeed, the FAC does not allege a single fact about the beliefs of either of the Plaintiffs, let alone facts that would tend to support such an inference. No fact is alleged tending to show that either of the Plaintiffs supports Jews or Jewish causes as a matter of personal belief. Unlike white civil rights plaintiffs who marched in support of vindicating the rights of Black Americans, Plaintiffs were not parading in support of Jewish rights. The only facts alleged about the Plaintiffs are that they were janitors who were doing their jobs inside Hamilton Hall; who were rightfully in the building at the time of the invasion; and who refused to cooperate with the Occupiers by leaving the building – which was perceived by the invaders as interfering with their objective of taking over the building. These well-pleaded facts show at most that Plaintiffs were

opponents of Defendants' plan to illegally occupy the Columbia campus building in which they were working. No facts are alleged tending to show that either of the Plaintiffs was refusing to leave his post, or was demanding that the Occupiers vacate Hamilton Hall, because he was seeking to vindicate the constitutional rights of Jews – or that he supported anything else aside from doing his job and remaining at his post.

To try to bring these two non-Jewish janitors, whose political and religious beliefs and sympathies are utterly unknown, under the umbrella of Section 1985(3), Plaintiffs claim that the conspiracy alleged in the FAC was directed at Jews, supporters of Jews and *perceived* supporters of Jews. In other words, they contend that the Defendants perceived them as being supportive of Jews because they would not cooperate with the protesters' efforts to take over Hamilton Hall. This, they claim, is enough to sweep up these two men into a Section 1985(3) class related to Jews.

But Plaintiffs' assertion that the conspiracy was directed at Jews, supporters of Jews, and perceived supporters of Jews is undercut by their own factual allegations. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995) ("[C]onclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint."). Plaintiffs said that, if necessary, they would take action against "anyone" who stood in their way – whether that person was Jewish or a supporter of Jews or Jewish causes, or was just some janitor who happened to be doing his job and didn't care why the protestors were in the building illegally. Plainly, during the planning stages of the conspiracy, the organizers were prepared to do whatever it took to hold Hamilton Hall, no matter who got in their way or what those people thought about the Israeli-Palestinian conflict (or anything else). The conclusory assertion that Defendants "were motivated by perceptions that Mr. Torres and Mr. Wilson supported Jews," FAC ¶ 159, is belied by Plaintiffs' factual allegations that the plan to occupy Hamilton Hall "included intimidating, harassing,

27

bribing, detaining, assaulting, and/or battering those who were or were perceived to be Jews or supporters of Jews, *as well as anyone who might stand in their way*." FAC ¶ 168 (emphasis added); *see also* FAC ¶ 150 ("Defendants plotted and agreed to take control of Hamilton Hall not only as a symbolic measure 'in the spirit of the '68 occupation of Hamilton Hall,' but also to wield power and leverage, and to create an atmosphere of terror and submission for those who were in the targeted class *as well as anyone who might stand in their way*") (emphasis added); FAC ¶ 220 ("Indeed, the Occupiers prepared themselves to encounter maintenance staff . . . This was consistent with their plan to use a variety of tactics to neutralize *anyone who might stand in their way, including Columbia employees who might be working inside the building*") (emphasis added). By Plaintiffs' own admission, members of the alleged conspiracy targeted *anyone* who "presented potential obstacles to the execution of their plot to take over and occupy Hamilton Hall," FAC ¶ 159, regardless of whether they perceived them to be Jews or supporters of Jews. These allegations do not suggest that it was an object of the charged conspiracy to deprive the members of any particular constitutionally protected group of any constitutionally recognized right. If my conclusion in Section I(b)(iii). is incorrect, and the plan for dealing with outsiders who might get in the way can indeed be assigned as an object of the conspiracy, it cannot be a racially-motivated conspiracy, because it sweeps up anyone of any race or belief system who just might have happened to be in Hamilton Hall that night.

It is of course the case that certain protesters called Plaintiffs "Jew lovers," and accused them of "Working for the Jews" when they refused to leave Hamilton Hall. Those are ugly statements, but they do not admit of the inference that the Defendants conspired to deprive these two Plaintiffs of their civil rights in violation of Section 1985. Plainly, the Plaintiffs were targeted by the protesters; they were kept from leaving the building for a time, and were subjected to taunts

28

and even blows. But that was because they would not give in to the protesters' demands that they cooperate with the plan to take over Hamilton Hall, where Plaintiffs had a right to be and Defendants did not. Plaintiffs effectively allege that one can conflate "anyone who might get in the way" of their takeover of Hamilton Hall with "perceived supporters of Jews," but those two things are not congruent – even the allegations of the complaint treat them differently. *See* FAC ¶¶ 168. *See Twombly*, 550 U.S. at 555–56; *Schorr v. Dopico*, 205 F. Supp. 3d 359, 363 (S.D.N.Y. 2016), *aff'd*, 686 F. App'x 34 (2017). A class of people who might "get in the way" of the protesters is not the same thing as a class of persons who can logically or reasonably be perceived as "supporters of Jews." And indeed, the pleading is devoid of any allegation that the Defendants, while planning their takeover of Hamilton Hall, equated "anyone who got in their way" with "supporters of Jews." When the plans were made to deal with anyone who might get in the way of the Hamilton Hall takeover (including stray Columbia employees whose political and racial sympathies were unknown), the conspirators are not alleged to have mentioned anything about "supporters of Jews" in their planning.

### iii. *Plaintiffs fail to allege a cognizable class*

Plaintiffs' claim also fails because "people who are or are perceived to be Jews or supporters of Jews" is not the kind of class contemplated by the Supreme Court's interpretation of Section 1985(3) in *Griffin v. Breckenridge*, 403 U.S. 88 (1971). *See Alexander v. Unification Church of Am.*, 634 F.2d 673, 678 (2d Cir. 1980), *overruled on other grounds by PSI Metals, Inc. v. Firemen's Ins. Co. of Newark, N.J.*, 839 F.2d 42, 43 (2d Cir. 1988).

The Court in *Griffin* made clear that a Section 1985(3) plaintiff must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* at 102. Class-based animus "encompasses only those groups with discrete and

immutable characteristics such as race, national origin, and sex." *Martin v. New York State Dep't of Corr. Servs.*, 115 F. Supp. 2d 307, 316 (N.D.N.Y. 2000).

The Second Circuit dispelled any doubt on that score in *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286, 291 (2d Cir. 1992). *Jews for Jesus* concerned a breach of contract for public accommodations between Jews for Jesus, a not-for-profit religious corporation, and Stevensville Country Club, a resort facility in Swan Lake, New York. *Id.* at 288. Stevensville cancelled its contract with Jews for Jesus after the Jewish Community Relations Council of New York, Inc. ("JCRC"), together with a non-party Orthodox Jewish group, threatened Stevensville with an economic boycott by the Jewish community unless the contract was cancelled. *Id.* Jews for Jesus brought claims against JCRC under various federal and state anti-discrimination statutes, as well as a common law claim for tortious interference with contract. *Id.* The district court granted the defendants' motion for summary judgment on the grounds that JCRC's actions constituted speech protected by the First Amendment. *Id.* Jews for Jesus appealed, arguing that JCRC's "speech" – which took the form of an economic boycott – was not entitled to First Amendment protection, because it was used solely to compel Stevensville to cancel its contract with Jews for Jesus. *Id.* at 289.

Before turning to the First Amendment, the Second Circuit considered whether any of Jews for Jesus' claims could survive a motion for summary judgment, addressing first whether Jews for Jesus had pleaded a viable Section 1985 conspiracy claim. *Id.* at 290. Jews for Jesus argued that it suffered racial discrimination because "gentiles who share the religious belief of plaintiffs are not targeted by defendants." *Id.* at 291. Defendants, on the other hand, argued that Jews for Jesus cannot be considered a "race" for purposes of the federal civil rights laws. *Id.*

The Second Circuit held that Jews could sue for racial discrimination under Section 1985. *Id.* at 291–92. Nevertheless, the court found that Jews for Jesus could not allege that it was the victim of a race-based conspiracy in violation of Section 1985 because its members included both Jews and non-Jews. *Id.* at 292. The Second Circuit explained that, "Because JFJ is a racially diverse society, it cannot, by definition, constitute a racial class or, consequently, maintain a claim as 'Jews' of racial discrimination." *Id.*

Following the Second Circuit's decision in *Jews for Jesus*, it is undisputed that a class consisting of both Jews and non-Jews cannot constitute a race-based class. Such an amorphous class cannot be said to have discrete and immutable characteristics or to have been formed on the basis of any invidious criteria. *See Church of Scientology of California v. Siegelman*, 475 F. Supp. 950, 957 (S.D.N.Y. 1979) (class consisting of members and formers members, and persons disseminating information about, the Church of Scientology was too "vague and amorphous" to have been formed on the basis of any invidious criteria).

And while individuals who offer support to a class of persons with a discrete and immutable protected characteristic can be members of a Section 1985(3) class, *see United Bhd. of Carpenters*, 463 U.S. at 836, no case of which this Court is aware has ever held that someone who is simply "perceived" – perhaps even wrongly "perceived" – as supporting a protected class can bring suit under Section 1985's deprivation clause as a member of a race-based class. If all that were necessary to plead a Section 1985 conspiracy were for the plaintiff to allege that a defendant was a "perceived" supporter of a suspect class – without pleading a single fact tending to show that such a perception could be logically and fairly inferred – the "discrete and immutable characteristics" among the members of the class would be eviscerated. In this case, someone who was swept into Plaintiffs' proposed class simply because he "got in Defendants' way" might well

not support Jews or Jewish causes. Indeed, the proposed class could include any number of individuals who secretly harbor antisemitic beliefs, simply because they took umbrage at the Defendants' decision to trespass in a university building. Such an undefined group of people with unknown racial characteristics and political beliefs cannot be a specific, identifiable class against whom the Defendants conspired.

The only thing that the members of the proposed class have in common is that they got in the Occupiers' way. This commonality is insufficient to create a cognizable race-based class under Section 1985(3). As the Supreme Court has stated, the term "class" for purposes of § 1985 "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray*, 506 U.S. at 269. *See also Reid v. City of New York*, 2022 WL 2967359, at *21 (S.D.N.Y. July 27, 2022) ("Plaintiff cannot state a claim under Section 1985(3) merely by alleging that Defendants took an action that negatively affected him or a class of ostensibly similarly situated people.").

Accepting Plaintiffs' proposed class – one whose status as a "class" depends on Defendants' perceptions rather than a shared immutable characteristic – would convert Section 1985 into the "general federal tort law" that the class-based animus requirement specifically sought to avoid. *See id.*; *Town of W. Hartford v. Operation Rescue*, 991 F.2d 1039, 1046 (2d Cir. 1993). *See also Aulson v. Blanchard*, 83 F.3d 1, 5 (1st Cir. 1996) ("If a class could be defined from nothing more than a shared characteristic that happened to form the basis of the defendants' actions, the requirement of class-based animus would be drained of all meaningful content.").

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

For all of the reasons discussed above, Plaintiffs' 42 U.S.C. § 1985(3) claim is dismissed for failure to state a claim upon which relief can be granted.

Because it is clear from the above discussion that amendment would be futile, Plaintiffs are denied leave to amend their federal claims. *See Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 833 (2d Cir. 2019).

This is not to say that the alleged treatment of the Plaintiffs by the Occupiers, if borne out by the evidence, qualifies as anything other than entirely unjustified. Two men trying to do their job should not find themselves at the mercy of a band of out-of-control student trespassers; no political cause can justify what happened to these loyal Columbia employees if indeed the allegations of the FAC are true.

But not every instance of despicable political behavior can be remedied by a lawsuit brought pursuant to the federal civil conspiracy statute. In the absence of allegations that injuring members of a protected class was one of the conspirators' conscious objectives – as opposed to a possible side effect of their rampage – there are plenty of common law torts implicated by the facts pleaded; they can be relied on to remedy the injuries alleged in the complaint.

## II.    Plaintiffs' 42 U.S.C. § 1986 Claim (Count 2) is Dismissed

Plaintiffs also allege that Defendants "neglected or refused to prevent or aid in preventing the commission of the [alleged conduct] despite having the power to do so" in violation of 42 U.S.C. § 1986. FAC ¶ 167.

42 U.S.C. § 1986 "provides a cause of action against anyone who, "having knowledge that any of the wrongs conspired to be done and mentioned in Section 1985 are about to be committed and having power to prevent or aid, neglects to do so." *Abadi v. Greyhound Lines, Inc.*, 2024 WL 5155601, at *9 (S.D.N.Y. Dec. 18, 2024) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993)). A § 1986 claim is therefore contingent on a valid § 1985 claim. *Graham*, 89 F.3d at 82.

Because Plaintiffs fail to state a valid claim under § 1985, their § 1986 claim also must be dismissed with prejudice.

### III.    Plaintiffs' State Law Claims (Counts 3 through 7) are Dismissed Without Prejudice

This leaves Plaintiffs' claims for assault, battery, and intentional infliction of emotional distress under state law. Plaintiffs assert that the Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

"In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998); *Torres v. City of New York*, 248 F. Supp. 2d 333, 334 (S.D.N.Y. 2003). Because the Court has dismissed Plaintiffs' federal claims, Plaintiffs' state law claims should also be dismissed. While dismissal of pendent state law claims is not mandatory, *see Marcus*, 138 F.3d at 57, the Court sees no compelling reason to exercise supplemental jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c)(3). Plaintiffs' state law claims are therefore dismissed. However, this dismissal is without prejudice to the commencement of an action in the New York State Supreme Court or any other court of competent jurisdiction.

### IV.    The Individual Defendants' Motion for Anti-SLAPP Fees is Denied

The Individual Defendants argue that the Court should award mandatory fees pursuant to New York's anti-SLAPP statute because they are, for the reasons set out in their Rule 12(b)(6) motion to dismiss, "entitled to judgment on at least three claims – and the assertion of jurisdiction for the others is frivolous." Dkt. No. 40 at 24.

In 1992, New York enacted anti-SLAPP (strategic lawsuit against public participation) legislation "aimed at broadening the protection of citizens facing litigation arising from their public petition and participation." *Mable Assets, LLC v. Rachmanov*, 146 N.Y.S.3d 147, 149 (2021) (citing

L. 1992, ch. 767, § 1). SLAPP lawsuits "are characterized as having little legal merit but are filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future." *Id.*

N.Y. Civ. Rights Law § 70-a(1) provides:

A defendant in an action involving public petition and participation, as defined in paragraph (a) of subdivision one of section seventy-six-a of this article, may maintain an action, claim, cross claim or counterclaim to recover damages, including costs and attorney's fees, from any person who commenced or continued such action; provided that:

(a) costs and attorney's fees shall be recovered upon a demonstration, including an adjudication pursuant to subdivision (g) of rule thirty-two hundred eleven or subdivision (h) of rule thirty-two hundred twelve of the civil practice law and rules, that the action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law[.]

CPLR 3211(g), referenced in Section 70-a, states:

(g) Stay of proceedings and standards for motions to dismiss in certain cases involving public petition and participation.

1. A motion to dismiss based on paragraph seven of subdivision (a) of this section, in which the moving party has demonstrated that the action, claim, cross claim or counterclaim subject to the motion is an action involving public petition and participation as defined in paragraph (a) of subdivision one of section seventy-six-a of the civil rights law, shall be granted unless the party responding to the motion demonstrates that the cause of action has a substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law. The court shall grant preference in the hearing of such motion.[7]

Pursuant to CPLR 3211(g), fees should be granted to a party responding to a motion unless the party responding to the motion demonstrates that the cause of action has a "substantial basis in law or is supported by a substantial argument for an extension, modification or reversal of existing law."

---

[7] CPLR 3211(a)(7), referenced in CPLR 3211(g)(1), is New York's corollary to Rule 12(b)(6). It provides for dismissal of a complaint where "the pleading fails to state a cause of action."

The Individual Defendants focus much of their briefing on what they consider to be the "real question" at issue: whether the Court should apply the anti-SLAPP law as an *Erie* matter. They argue that New York's anti-SLAPP law provides a substantive standard for entitlement to attorney's fees which does not conflict with any Federal Rule. Further, they argue, the legislature's use of the phrase "including an adjudication" under the CPLR contemplates other, non-CPLR adjudications, such as adjudications under Federal Rules of Civil Procedure 12 and 56.

Courts within this Circuit have reached different conclusions about the applicability of New York's anti-SLAPP law in federal court. *See Yehudah v. Optoid Print3D Eyewear*, 2025 WL 2452383, at *8 (E.D.N.Y. Aug. 25, 2025). The vast majority of courts to consider this issue have concluded that New York's anti-SLAPP law does not apply in federal court under the *Erie* doctrine because the law's "substantial basis" standard is procedural and conflicts with the pleading standards under the Federal Rules of Civil Procedure, *see, e.g., CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 223-24 (S.D.N.Y. 2023); *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 432 (S.D.N.Y. 2021); *GM Photo, LLC v. Focus Camera, Inc.*, 2025 WL 1226629, at *12 (S.D.N.Y. Apr. 24, 2025); *Ginx, Inc. v. Soho All.*, 720 F. Supp. 2d 342, 366 (S.D.N.Y. 2010), *as corrected* (Aug. 19, 2010), although a few courts have drawn a distinction between the anti-SLAPP law's procedural and substantive components and determined that the substantive provisions apply in federal court. *See, e.g., Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 189 n.24 (S.D.N.Y. 2024), *appeal withdrawn*, 2025 WL 1009663 (2d Cir. Mar. 31, 2025); *Heilbut v. Cassava Scis., Inc.*, 778 F. Supp. 3d 551, 567 (S.D.N.Y. 2025).

However, the Court need not address whether New York's fee-shifting remedy has any application in federal court because state-law grounds alone dispose of the Individual Defendants' motion.

36

As the court explained in *Wang v. Sussman*, 2025 WL 2607155, at \*4 (S.D.N.Y. Sept. 9, 2025), "New York's statutory scheme does not contemplate an award of attorney's fees on a Rule 12(b)(6) dismissal." The *Wang* defendants argued that attorney's fees are mandatory where a claim lacks a "substantial basis," which is *a fortiori* established by a dismissal under Rule 12(b)(6). The court disagreed, explaining that Section 70-a specifically references only CPLR 3211(g), "without purporting to make attorney's fees available to parties who obtain dismissal by other means." *Id.* (internal quotations omitted). Considering the legislative history of Section 70-a, Judge Subramanian found that, when the law was amended in 2020, the New York legislature was aware that SLAPP actions could proceed in both state and federal court, and that motions to dismiss would come up in both. *Id.* at \*5. "If the legislature wanted to further broaden the statute's reach to federal dismissals under Rule 12 (or Rule 56), it could and would have said so." *Id.* The court also noted that the automatic shifting of fees on a Rule 12(b)(6) dismissal would create anomalies between the treatment of Section 70-a in state and federal court; while CPLR 3211(g) contemplates an "accelerated summary judgment" procedure under which a defamation plaintiff may seek discovery, this procedure is not available under the Federal Rules of Civil Procedure. *Id.* at \*6. For example, "it would be strange if in state court, a plaintiff facing a motion to dismiss can try to shore up their case through discovery, but in federal court, no discovery can be taken and any dismissal triggers mandatory fee-shifting." *Id.* at \*6. The *Wang* court therefore denied the defendants' motion for attorney's fees and costs pursuant to Section 70-a.

I agree with the *Wang* court's reasoning, which I apply here as well. *See also William Merrill et al. v. Onondaga County et al.*, 2026 WL 747093, \*5–6 (N.D.N.Y. Mar. 17, 2026). The Individual Defendants moved for dismissal solely under Rule 12(b)(6), without invoking CPLR 3211(g). As the defendants did in *Wang*, they now argue that the Court's dismissal of Plaintiffs'

37

claims pursuant to Rule 12(b)(6) demonstrates that their claims are "without substantial basis in law" under CPLR 3211(g). For the reasons articulated by Judge Subramanian in *Wang*, I disagree. *See also La Liberte v. Reid*, 966 F.3d 79, 88–89 (2d Cir. 2020) (no fee-shifting for Rule 12(b)(6) dismissal of SLAPP case where "[t]he [state law] does not purport to make attorney's fees available to parties who obtain dismissal by other means, such as under Federal Rule 12(b)(6)") (citation omitted).

I also am constrained to observe that the Plaintiffs' common law tort claims appear (with the possible exception of the intentional infliction of emotional distress claim) to be perfectly valid claims that, if repleaded in state court, will likely be adjudicated on their merits. I thus can hardly conclude that every claim pleaded in this lawsuit is "without substantial basis in law." At the very least, the Individual Defendants' motion is premature and must abide a decision on the fate of the common law claims. Since those claims will be adjudicated in a state court, the problems identified by so many of my colleagues in the cases cited above will not exist.

The Individual Defendants' motion for anti-SLAPP fees is therefore denied.

## CONCLUSION

Defendants' motions to dismiss Plaintiffs' federal claims are GRANTED, while the Individual Defendants' motion to dismiss Plaintiffs' state law claims is GRANTED WITHOUT PREJUDICE to the commencement of an action in the New York State Supreme Court. The Individual Defendants' motion for mandatory fees under New York's anti-SLAPP law is DENIED.

The Clerk of Court is respectfully requested to remove the motions at Dkt. Nos. 36, 39, 50, and 60 from the Court's list of open motions.

This is a written opinion.

This constitutes the decision and order of the Court. It is a written decision.

38

Dated: June 1, 2026

U.S.D.J.

BY ECF TO ALL COUNSEL